Case No: 1:23-cv-00811-EGB

# IN THE UNITED STATES COURT OF FEDERAL CLAIMS

Larry Golden, Pro Se Plaintiff

740 Woodruff Rd., #1102

Greenville, South Carolina 29607

(P) 864-992-7104 (E) atpg-tech@charter.net

| | |
|---|---|
| LARRY GOLDEN,<br><br>   *Plaintiff*,<br><br>   V.<br><br>UNITED STATES DEPARTMENT OF HOMELAND SECURITY,<br><br>   *Defendant*. | **Patent Infringement**<br><br>July 19, 2023 |

## PLAINTIFF'S MOTION FOR DISQUALIFICATION

  The Code of Conduct for United States Judges applies to United States circuit judges, district judges, Court of International Trade judges, Court of Federal Claims judges, bankruptcy judges, and magistrate judges.

  See Rules for Judicial-Conduct and Judicial-Disability Proceedings, Rule 4(a)(2) (providing that "cognizable misconduct includes: (B) treating litigants [], or others in a demonstrably egregious and hostile manner… and Rule 4(a)(3) (providing that "cognizable misconduct includes intentional discrimination on the basis of race…").

  The duties of judicial office take precedence over all other activities. The judge should perform those duties with respect for others, and should not engage in behavior that is harassing, abusive, prejudiced, or biased. The judge should adhere to the following standards:

   (C) Disqualification. (1) A judge shall disqualify himself or herself in a proceeding in which the judge's impartiality might reasonably be questioned, including but not limited

to instances in which: (a) the judge has a personal bias or prejudice concerning a party, or personal knowledge of disputed evidentiary facts concerning the proceeding;

Plaintiff is asking the Judge to disqualify himself for the following reasons: 1- The DOJ is forcing the Judge to comply by intimidation or threats. 2- This current case is to complicated for the Judge. Exhibit A is a chart illustration of the case and should be adjudicated by someone with prior patent litigation experience. Plaintiff recommends Judge Patricia Elaine Campbell-Smith. 3- If after the Judge has read this document and see no wrong, Plaintiff is requesting the Judge disqualify himself because of a personal bias or prejudice the Judge has against Plaintiff.

| Patent #: 9,096,189; Independent Claim 1 | CMDC Devices: Specifications, Descriptions, Meanings, and Functions | Defense Presented by the DOJ & DHS in the Related Case *Golden v. US* No. 13-307C |
|---|---|---|
| A communication device of at least one of a cell phone, a smart phone, a desktop, a handheld, a PDA, a laptop, or a computer terminal for monitoring products, interconnected to a product for communication therebetween, comprising: | Following is an example of CMDC Devices that are not limited to any particular brand, model, or type of equipment:<br><br>HP ZBook Fury 15.6 Inch G8 Mobile Workstation PC; Samsung Galaxy Book2 Pro 360 [PC Mode or Tablet Mode]; Asus/Qualcomm Smartphone for Snapdragon Insiders; LG V60 ThinQ 5G; Samsung Galaxy S21 Smartphone; Google Pixel 5 Smartphone; Apple iPhone 12 Smartphone | The DOJ/DHS made the *Golden v. US* Case No. 13-307C a case between private parties which places the case outside the COFC jurisdiction<br><br>When the DOJ/DHS stated the sensors must be "native to the manufacturing of the Apple and Samsung products, the DOJ/DHS knew they were demanding proof of direct infringement under 35 U.S.C. Sec. 271(a) as a predicated to direct infringement under 28 U.S.C. Sec. 1498(a) *Zoltek III*, that was overturned at the CAFC<br><br>The DOJ/DHS narrowed the case to that of Apple, LG, & Samsung, thereby omitting the sensors developed by Qualcomm, Synkera, NASA, SeaCoast, and the camera sensors for detecting CBR made by Rhevision. |

| | | |
|---|---|---|
| at least one of a central processing unit (CPU) for executing and carrying out the instructions of a computer program, a network processor which is specifically targeted at the networking application domain, or a front-end processor for communication between a host computer and other devices; | Your smartphone processor, also known as chipset, is a component that controls everything going on in your smartphone and ensures it functions correctly. You can compare it to the brain of the human body. Every action you perform on your smartphone goes straight to the processor. A processor, also known as CPU, consists of multiple cores: Dual, Quad, Hexa, and Octa core. What do these cores do exactly? Processor cores distribute the work that comes in when you use your phone. One core has a maximum number of instructions it can process within a certain amount of time.<br><br>A process is an operating system concept and it is the smallest unit of isolation provided by, for example, Windows operating system (OS). Application Domain or AppDomain is one of the most powerful features of the framework. AppDomain can be considered as a light-weight process. AppDomain is of great advantage for ISP (Internet Service Provider) who hosts hundreds of applications. Because each application can be contained in an application domain and a process can contain many such AppDomains.<br><br>Sensor Front-End Processors and Sensor Devices: These are processors that are designed to handle data from sensors and convert them into usable data for further processing. They are optimized for handling low-level sensor data and can perform tasks such as signal conditioning, filtering, and data acquisition. Sensor front-end processors are commonly used in sensor devices such as smartphones, wearables, and IoT (Internet of Things) devices. | The DOJ & DHS stated "Golden's patented Central Processing Units (CPUs) was an enlargement of the case.<br><br>The DOJ & DHS motioned to have the case dismissed because they believe the CPU was an enlargement of the case; which means Golden violated a Court order not to amend the case. The DOJ & DHS lied to the Court.<br><br>The DOJ & DHS also stated Golden claimed his CPU is a sensor located inside the product used for detecting.<br><br>As stated left of this column, the CPU is used for carrying out the operational and functional instructions of the devices, and that the CPU is considered by many as the brains of the devices.<br><br>No where, did Golden claim the CPU is used as a sensor for CBR detection.<br><br>Golden did not enlarge the case with the CPU. Rule 4 required Golden to identify where each element is found in the alleged infringing products. Golden located where the CPU was found, which is not an enlargement.<br><br>Further, if the products do not have CPUs, the products cannot function correctly.<br><br>The case was dismissed because the DOJ & DHS lied to the Court. |

3

| | | |
|---|---|---|
| a transmitter for transmitting signals and messages to at least one of plurality product groups based on the categories of a multi-sensor detection device, a maritime cargo container, a cell phone detection device, or a locking device; | Golden's Communicating, Monitoring, Detecting, and Controlling (CMDC) devices are referred to as communication devices, monitoring devices, monitoring equipment, *multi-sensor detection devices, cell phone detection devices*, smartphones, and new and improved upon cell phones, laptops, tablets, desktop PCs, etc. | The Federal Circuit in *FastShip, LLC v. U.S.*, "[W]e interpret "manufactured" in § 1498 [] such that a product is "manufactured" when it is made to include each limitation of the thing invented and is therefore suitable for use. Without the sensors the products will never be suitable for use. |
| a receiver for receiving signals, data or messages from at least one of plurality product groups based on the categories of a multi-sensor detection device, a maritime cargo container, a cell phone detection device, or a locking device; | Golden's Communicating, Monitoring, Detecting, and Controlling (CMDC) devices are referred to as communication devices, monitoring devices, monitoring equipment, *multi-sensor detection devices, cell phone detection devices*, smartphones, and new and improved upon cell phones, laptops, tablets, desktop PCs, etc. | The DOJ & DHS made sure the sensors and detectors required to have product "suitable for use" never happen. The DOJ & DHS blocked the sensors and detectors of Qualcomm, NASA, Synkera, SeaCoast, Rhevision, Apple, Samsung, and LG. |
| at least one satellite connection, Bluetooth connection, WiFi connection, internet connection, radio frequency (RF) connection, cellular connection, broadband connection, long and short-range radio frequency (RF) connection, or GPS connection; | Internet of Things (IoT) and Internet of Everything (IoE) are emerging communication concepts that will interconnect a variety of devices (including smartphones, home appliances, sensors, and other network devices), people, data, and processes and allow them to communicate with each other seamlessly. These new concepts can be applied in many application domains such as healthcare, transportation, and supply chain management (SCM), to name a few, and allow users to get real-time information such as location-based services, disease management, and tracking. The smartphone-enabling technologies such as built-in sensors, Bluetooth, radio-frequency identification (RFID) tracking, and near-field communications (NFC) | The DOJ & DHS chose not to challenge this limitation, because a challenge would verify the internet, Bluetooth, and RF connections makes the smartphones "capable of" integrating detectors and sensors remote the smartphone.<br><br>The DOJ & DHS decided to challenge the term "capable of" without a claim construction hearing because 21 of the 25 patent claims that the USPTO issued with the presumption of validity" in the related *Golden v. US* case no. 13-307C, has "capable of" in it. |

4

| | | |
|---|---|---|
| the communication device is at least a fixed, portable or mobile communication device interconnected to a fixed, portable or mobile product, capable of wired or wireless communication therebetween; and, | The DHS Cell-All initiative: "biological and chemical sensors could be [] integrated into common cell phone devices" … "miniaturized biological and chemical sensing with integration into common." "[] second-generation prototypes, chemical sensors were separated from the phones, allowing deployment of the sensors through third-party products, [] that could be added to existing phones (U.S. Department of Homeland Security, 2011a) | Golden made multiple repeated attempts to inform the DOJ & DHS that the sensors, according to the DHS Cell-All initiative, can be located both inside and outside the phones.<br><br>When Golden identified sensors both inside (camera sensor) the phone, and outside (NODE+) the phone, the DOJ & DHS did not accept the devices. |
| whereupon the communication device, is interconnected to a product equipped to receive signals from or send signals to lock or unlock doors, activate or deactivate security systems, activate or deactivate multi-sensor detection systems, or to activate or deactivate cell phone detection systems | 28 U.S. Code § 1498(a): "For the purposes of this section, the use or manufacture of an invention described in and covered by a patent of the United States by a contractor, a subcontractor, or any person, firm, or corporation for the Government and with the authorization or consent of the Government, shall be [] use or manufacture for the United States."<br><br>The NODE+ was invented and produced in 2011 by George Yu, Ph.D. Yu worked as a subcontractor to NASA on the DHS Cell-All initiative. The NODE+ sensor is an interactive scanner that uses … data from NASA to give information [] using sensors on your phone NODE+ wireless sensor platform is a handheld sensor that communicates wirelessly through Bluetooth with Apple iOS devices.<br><br>The Tucker Act, is merely a jurisdictional statute and "does not create any substantive right enforceable against the United States for money damages." *United States v. Testan*. Instead, the substantive right must appear in another source of law; a "money-mandating constitutional provision, statute or regulation that has been violated…" *Loveladies Harbor, Inc. v United States* | Apple and NASA are two of the third-party contractors in the related *Golden v. US* case no. 13-307C for the DHS Cell-All initiative.<br><br>NASA's contribution to the development of the "cell phone sensing device" was not accepted or considered by the DOJ & DHS.<br><br>The DOJ & DHS pled that "to include the NODE+ is an enlargement of the case; which is a violation of the Court's order not to amend."<br><br>The DOJ & DHS created the substantive right for Golden to receive "just Compensation for the taking of Golden's property under the Fifth Amendment Clause of the U.S. Constitution when they violated 28 U.S. Code § 1498(a): "a money-mandating constitutional provision" and the "statute or regulation" of the provision. |

| | | |
|---|---|---|
| wherein the communication device receives a signal via any of one or more products listed in any of the plurality of product grouping categories; | **Patent Specifications:**<br>It is another objective of the present invention to provide a multi sensor detection [] system for preventing terrorist activity by using products grouped together by common features in several product groupings such as design similarity, similarity in the presentation of security problems and similarity with regard to the presentation of solutions to preventing terrorist…<br><br>Still yet a further objective of the present invention is to provide a multi sensor detection [] system that can be implemented by business or government at a minimum cost by organizing the products to be protected into product grouping categories.<br><br>Product grouping 2 (sensors) include, but are not limited to, chemical, biological, radiological, explosive and nuclear detectors, motion sensors, door sensors, [] biometric sensors, [] detection of humans…<br><br>Product grouping 4 (monitoring & communication devices) include, but are not limited to, mobile communication devices, mobile communication units, portable communication devices, [] monitoring sites, monitoring terminals, web servers, desktop PCs, notebook PCs, laptops, satellite cell phones, cell phones, [] PDAs, [] and [] handhelds<br><br>Product grouping 7 (authorized person) include, but are not limited to, owner, pilot, conductor, captain, [] airport security, police, highway patrol, security guard, military personnel, HAZMAT, CIA, FBI, Secret Service, port security personnel, border security personnel, first responders, [] terminal personnel. | After the Department of Homeland Security (DHS) received information from the then President, Vice-President, three U.S. Senators from South Carolina, a DHS SBIR Program Manager, and a DHS Contracting Officer for the SafeCon initiative, the DHS in 2007 released the DHS S&T Cell-All Ubiquitous Biological and Chemical Sensing solicitation for a cell phone "capable of" detecting for CBR agents and compounds.<br><br>Using Golden's Product Grouping strategies, the DHS contracted Apple, Samsung, LG, Qualcomm, Synkera, NASA, Rhevision, and SeaCoast to assemble Golden's CMDC device in a way that will group products together by common features and design similarities.<br><br>The DOJ & DHS has continually retaliated against Golden for 10 years (2013-2023) for filing a claim in the United States Court of Federal Claims for just compensation.<br><br>It is the belief of Golden that the Trial Court Judge was acting under Duress (threats, intimidation, or some other type of coercion) to comply with the lies the DOJ & DHS has put before this Court.<br><br>The reason Golden is asking the Judge to transfer the current case, is because it is a little more complicated. |

| | | |
|---|---|---|
| wherein at least one satellite connection, Bluetooth connection, WiFi connection, internet connection, radio frequency (RF) connection, cellular connection, broadband connection… short range radio frequency (RF) connection is capable of signal communication with the transmitter and the receiver of the communication device and transceivers of the products; | Internet of Things (IoT) and Internet of Everything (IoE) are emerging communication concepts that will interconnect a variety of devices (including smartphones, home appliances, sensors, and other network devices), people, data, and processes and allow them to communicate with each other seamlessly. These new concepts can be applied in many application domains such as healthcare, transportation, and supply chain management (SCM), to name a few, and allow users to get real-time information such as location-based services, disease management, and tracking. The smartphone-enabling technologies such as built-in sensors, Bluetooth, radio-frequency identification (RFID) tracking, and near-field communications (NFC) | The DOJ & DHS chose not to challenge this limitation, because a challenge would verify the internet, Bluetooth, and RF connections makes the smartphones "capable of" integrating detectors and sensors remote the smartphone.<br><br>The DOJ & DHS decided to challenge the term "capable of" without a claim construction hearing because 21 of the 25 patent claims that the USPTO issued with the presumption of validity" Golden asserted in the case has "capable of" in it. |
| wherein the communication device is equipped with a biometric lock disabler that incorporates at least one of a fingerprint recognition, voice recognition, face recognition, hand geometry, retina scan, iris scan and signature such that the communication device that is at least one of the cell phone, the smart phone, the desktop, the handheld, the PDA, the laptop or the computer terminal is locked by the biometric lock disabler to prevent unauthorized use; | **Patent specifications**:<br>"FIG. 1 is a perspective view of the… an automatic/mechanical lock disabler and a fingerprint biometric lock with disabler… FIG. 14 is a representative schematic view of the… lock disabling system of the present invention illustrating interconnection of the… fingerprint biometric lock with disabler for engaging and disengaging the fingerprint biometric lock …<br><br>The fingerprint biometric lock with disabler 62 is interconnected to the cpu 40… Moreover, resetting of the fingerprint biometric lock with disabler 62 occurs when the fingerprint of the individual is placed on the fingerprint-matching pad 64, and if a match occurs with a known fingerprint stored by the cpu 40, then the individual can reset the fingerprint biometric lock with disabler 56… a fingerprint that matches stored and authorized fingerprints 102 would indicate an authorized individual … The fingerprint biometric lock with disabler 62 would then be reset 106 after the appropriate safety… and protection measures are completed… | Golden has two disabling locking mechanism that follows the same patterns: detection; lock; reset. The first is when a hazardous substance is detected it sends a signal to lock the device. The second is when and unauthorized attempt (fingerprint, facial, code) to unlock the device, a signal is sent to lock the device.<br><br>The first pattern was identified in claim 1 of the '497 patent and claim 10 of the '752 patent. The second pattern was identified in 11 of the remaining 23 patent claims. 12 of the patent did not call for a locking mechanism.<br><br>The DOJ & DHS repeatedly stated in signed pleadings that Golden did not identify the locking mechanism. That lie caused the case to be dismissed. |

7

| | | |
|---|---|---|
| wherein the only type or types of communication with the transmitter and the receiver of the communication device and transceivers of the products is a type or types selected from the group consisting of satellite, Bluetooth, WiFi, internet, radio frequency (RF), cellular, broadband, and long and short-range radio frequency (RF). | Internet of Things (IoT) and Internet of Everything (IoE) are emerging communication concepts that will interconnect a variety of devices (including smartphones, home appliances, sensors, and other network devices), people, data, and processes and allow them to communicate with each other seamlessly. These new concepts can be applied in many application domains such as healthcare, transportation, and supply chain management (SCM), to name a few, and allow users to get real-time information such as location-based services, disease management, and tracking. The smartphone-enabling technologies such as built-in sensors, Bluetooth, radio-frequency identification (RFID) tracking, and near-field communications (NFC) | The DOJ & DHS chose not to challenge this limitation, because a challenge would verify the internet, Bluetooth, and RF connections makes the smartphones "capable of" integrating detectors and sensors remote the smartphone.<br><br>The DOJ & DHS decided to challenge the term "capable of" without a claim construction hearing because 21 of the 25 patent claims that the USPTO issued with the presumption of validity" in the related *Golden v. US* case no. 13-307C, has "capable of" in it. |

## Pursuant to 37 CFR § 11.303 Candor Toward the Tribunal: The DOJ & DHS Has Failed to Meet or Comply with the Following:

(a) A practitioner shall not knowingly:

(1) Make a false statement of fact or law to a tribunal or fail to correct a false statement of material fact or law previously made to the tribunal by the practitioner;

(3) Offer evidence that the practitioner knows to be false. If a practitioner,

the practitioner's client, or a witness called by the practitioner, has offered material

evidence and the practitioner comes to know of its falsity, the practitioner shall take

reasonable remedial measures, including, if necessary, disclosure to the tribunal.

A practitioner may refuse to offer evidence that the practitioner reasonably believes is

false.

(b) A practitioner who represents a client in a proceeding before a tribunal and who knows that a person intends to engage, is engaging or has engaged in [] fraudulent conduct related to the

proceeding shall take reasonable remedial measures, including, if necessary, disclosure to the tribunal.

(c) The duties stated in paragraphs (a) and (b) of this section continue to the conclusion of the proceeding, and apply even if compliance requires disclosure of information otherwise protected by § 11.106.

(d) In an *ex parte* proceeding, a practitioner shall inform the tribunal of all material facts known to the practitioner that will enable the tribunal to make an informed decision, whether or not the facts are adverse.

### THREE CLAIMS OF A GOVERNMENT "TAKINGS" OF GOLDEN'S PROPERTY UNDER THE FIFTH AMENDMENT CLAUSE OF THE UNITED STATES CONSTITUTION WITHOUT PAYING JUST COMPENSATION "RIPEN" WHEN A FINAL DECISION WAS MADE IN THE LEAD CASE 13-307C GOLDEN V. US, ON NOVEMBER 10, 2021 WITHOUT ADJUDICATING THE CLAIMS.

The claim of a "Government Takings of Property Under the Fifth Amendment Clause of the U.S. Constitution without paying 'Just Compensation'" proposes a framework for assessing the constitutionality of the Government's deliberate falsehoods. To this end, it builds on due process theory and doctrine, to identify when and how the Government's lies inflict the harms of deception and breach of trust in ways that endanger specific constitutional rights.

More specifically, it proposes that the Government's lies violate the Due Process Clause when they directly deprive individuals of life, liberty, or property; and in those extreme circumstances when they lack any reasonable justification and thus constitute an abuse of governmental power.

The Fifth Amendment says to the federal government that no one shall be "deprived of life, liberty or property without due process of law." These words have as their central promise an assurance that all levels of American government must operate within the law ("legality") and provide fair procedures.

As an illustration, the Model Code of Judicial Conduct and the Model Rules of Professional Conduct impose an explicit duty of truthfulness [] on government actors, and others, who are also members of the bar.

- MODEL CODE OF JUDICIAL CONDUCT R. 4.1(A)(11) (2007) (prohibiting judges and judicial candidates from "knowingly, or with reckless disregard for the truth, mak[ing] any false or misleading statement");
- MODEL RULES OF PROF'L CONDUCT R. 3.3(a)(1) (2014) ("A lawyer shall not knowingly [] make a false statement of fact or law to a tribunal…");
- MODEL RULES OF PROF'L CONDUCT R. 4.1(a) (2014) ("In the course of representing a client a lawyer shall not knowingly [] make a false statement of material fact or law to a third person[.]");
- MODEL RULES OF PROF'L CONDUCT R. 8.4(c) (2014) ("It is professional misconduct for a lawyer to [] engage in conduct involving dishonesty, fraud, deceit or misrepresentation[.]").

Although many disciplinary actions under these rules punish lies like fraud or perjury that violate other legal constraints, some hold lawyers and judges to higher standards of truthfulness by punishing lies that would likely not be punishable if uttered by nonattorneys. *See* In re *Pautler*, 47 P.3d 1175 (Colo. 2002); In re *Carpenter*, 95 P.3d 203 (Or. 2004).

**Standards of Review**

"The Fifth Amendment prohibits the federal government from taking private property for public use without paying just compensation. U.S. Const. amend. V. "It is undisputed that the Takings Clause of the Fifth Amendment is a money-mandating source [of law] for purposes of Tucker Act jurisdiction" in the Court of Federal Claims. *Jan's Helicopter Serv., Inc. v. FAA*, 525 F.3d 1299, 1309 (Fed. Cir. 2008).

"[O]nce a claim has been stated adequately, it may be supported by showing any set of facts consistent with the allegations in the complaint." *Bell Atl. Corp.*, 550 U.S. at 546. Indeed, "[t]he issue is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims." *Scheuer v. Rhodes*, 416 U.S. 232, 236 (1974), overruled on other grounds by *Harlow v. Fitzgerald,* 457 U.S. 800, 814-19 (1982)."

"The ability of the Court of Federal Claims to entertain suits against the United States is limited. "The United States, as sovereign, is immune from suit save as it consents to be sued. "*United States v. Sherwood*, 312 U.S. 584, 586 (1941). A waiver of immunity "cannot be implied

but must be unequivocally expressed." *United States v. King*, 395 U.S. 1, 4 (1969). The Tucker Act, the principal statute governing the jurisdiction of this court, waives sovereign immunity for claims against the United States not sounding in tort that are founded upon the Constitution, a federal statute or regulation, or an express or implied contract with the United States. 28 U.S.C. § 1491 (2012). However, the Tucker Act is merely a jurisdictional statute and "does not create any substantive right enforceable against the United States for money damages." *United States v. Testan*, 424 U.S. 392, 398 (1976)."

"Instead, the substantive right must appear in another source of law, such as a "money-mandating constitutional provision, statute or regulation that has been violated, or an express or implied contract with the United States." *Loveladies Harbor, Inc. v. United States*, 27 F.3d 1545, 1554 (Fed. Cir. 1994) (en banc). Retrieved from: Chief Judge Margaret Sweeney; *Christy, Inc. v. The United States*; Opinion and Order; Case No. 18-657C; filed January 29, 2019: C. Tucker Act

## *"Takings" I*

As a result of the 9/11 attacks, between the years 2003-2005, Golden submitted three (3) Economic Stimulus and Terrorism Prevention Packages, that included strategies for stimulating our economy as a whole and the African-American community, to at least that of President Bush, VP Cheney, and S.C. Senators Holland, DeMint, and Graham.

President Bush, VP Cheney, and S.C. Senators Holland, DeMint, and Graham sent the *nonfrivolous* "Economic Stimulus and Terrorism Prevention Packages", that included schematics for CBRNE detection devices (the "SafeRack" package); the schematics for a new, improved upon, and useful cell phone, PC, tablet, laptop, etc. (the "ATPG" package); and the schematics for a remote stop, stall, and vehicle slow-down system, and pre-programmed stopping, stalling, and slowing down of a vehicle (the "V-Tection" package), over to the Department of Homeland Security (DHS) for development and implementation.

Golden's evidence is the response letters Golden received from the offices of President Bush, VP Cheney, and S.C. Senators Holland, DeMint, and Graham.

Golden traveled to Colorado in 2006 for the Government Agencies (DoD, DOE, DHS, etc.) SBIR Tour. Golden meet with, and left behind copies of Golden's stimulus packages with Lisa Sabolewski, DHS SBIR Program Manager, who in turn asked Golden to send the information to her via email. (E-mail correspondence available).

Golden responded to an RFI in 2007 to the DHS/S&T Safe Container (SafeCon) Initiative, and discussed the intellectual property subject matter of Golden's inventions with DHS Margo Graves; margaret.graves@hq.dhs.gov, 202-379-8727. (E-mail correspondence available).

Golden submitted a proposal in 2007, in response to the DHS S&T *Cell-All Ubiquitous Biological and Chemical Sensing* request for proposals, and upon request, resubmitted Golden's intellectual property directly to the Stephen Dennis, DHS Program Manager for the *Cell-All Ubiquitous Biological and Chemical Sensing* initiative in 2008. (E-mail correspondence available).

Golden traveled to Washington, DC in 2008 with his lead engineer [Harold Kimball] to discuss a "read-ahead" of Golden's intellectual property and the possibility of Golden incubating his company at the Department of Homeland Security (DHS). Golden and Mr. Kimball meet with Ed Turner, DHS/S&T Program Manager.

Golden was invited by DHS to Sacramento, CA in 2008 to attend a T.R.U.ST Industry Day Symposium. Golden discussed and left copies of his intellectual property subject matter with a selected panel. Golden was walked out by the Program Manager Dave Masters, where he promised Golden, he will release a Request for Proposal in the near future that aligns with Golden's intellectual property technological rational.

Golden's initial "takings" begin in 2008 when the DHS made a "final decision" to take and give Golden's intellectual property subject matter to Apple, Samsung, LG, NASA, Synkera, SeaCoast, Rhevision, and Qualcomm for development and commercialization. This happened two years before the DHS cause the release of the first infringing product in 2010.

Some statistics about the award: 1) Golden was the only person (African American) to hold a patent(s) for the cell phone sensing device the Government was requesting; Golden owned the only African American company (ATPG Technology, LLC) not awarded a contract, in view of the eight other white-owned companies that was awarded to develop and assemble Golden's patented devices; and, sixty millions African Americans are the only ones who are not benefitting from the three economic stimulus packages, through the not-for-profit company (ATPG Corporation) Golden established to receive funding specifically targeted for African Americans.

According to Macrotrends, between the years 2010 – 2026, Apple's total estimated revenues are $4.5T dollars; Samsung's total estimated revenues are $3.5T dollars; LG's total

estimated revenues are $.9T dollars; and, Qualcomm's total estimated revenues are $.5T dollars. The companies indirectly benefiting from the stimulus packages over the same time period is AT&T's total estimated revenues are $2.6T dollars; Verizon's total estimated revenues are $2.2T dollars; T-Mobile's total estimated revenues are $.8T dollars; and Google's total estimated revenues are $2.5T dollars.

Within the six-year statute of limitations period, in 2013 Golden filed a takings claim in the COFC. The DOJ & DHS motioned to "stay" Golden's takings claims and in 2014 the COFC court stayed Golden's takings claim until 2019.

The DOJ & DHS spent six years lying to the Court that Golden's takings claim was no different than Golden's infringement claims.

The COFC dismissed Golden takings claim because DOJ & DHS said "taking Golden's property and giving it to Apple, Samsung, LG, and Qualcomm, sounds like infringement". The takings begin in 2003 and a final decision to take Golden's property [ripeness of the takings] was made in 2008. Two years before the first infringing product that included all the inventions' elements were released.

Therefore, Golden's Takings claim, for the Government taking Golden's property and giving it to Apple, Samsung, LG, and Qualcomm, was never adjudicated before the case closed on November 10, 2021.

## *"Takings" II*

Within the six-year period from *10/01/2015*, Golden filed in the United States Court of Federal Claims, on *01/17/2019* in *Larry Golden v. United States* Case No. 1:19-cv-00104-EGB, Golden initiated the filing of an Unconstitutional IPR-Based Takings claim against the Government, the United States.

In *Larry Golden v. United States* Case No. 1:19-cv-00104-EGB *OPINION*. Document: 12 Page: 4 Filed: *05/14/2019*. The United States Court of Federal Claims responded to the Government's Motion to Dismiss for lack of jurisdiction: "Finally, as we held in the related action, plaintiff fails to state a claim to the extent that his complaint alleges a taking by the actions of this court, the Federal Circuit, or the PTAB." … "Plaintiff appears to argue that the cancellation of his '990 independent claims in the IPR at the PTAB constitutes a taking by the PTAB." … "In sum, plaintiff's takings claim duplicates his related patent action in Docket No.

13-307C, asserts claims over which this court does not have jurisdiction, and fails to state a takings claim. Defendant's Motion is granted pursuant to Rule12(b)(1) and Rule12(b)(1)."

"On Appeal from the United States Court of Federal Claims in No. 1:19-cv-00104-EGB, Senior Judge Eric G. Bruggink, in the *OPINION* for *Larry Golden v. United States* CAFC Case No. 19-2134 Document: 37 Pages: 11-12 Filed: *04/10/2020*. The Federal Circuit clarified the COFC's jurisdiction:

"We next turn to Golden's IPR-based takings claims. We first address whether the Claims Court had jurisdiction to hear these claims. … The government argues that the American Invents Act ("AIA")'s creation of inter partes review by the Board, followed by judicial review before this court, creates a "'self-executing remedial scheme' that 'supersedes the gap-filling role of the Tucker Act.'" Id. at 41 (quoting *United States v. Bormes*, 568 U.S. 6, 13 (2012))."

"According to the government, the AIA statutory scheme displaces Tucker Act jurisdiction because there is no procedural impediment to presentation of a takings claim to the agency and because the remedial scheme provides for judicial review of constitutional challenges to the agency's action. Id. at 43–49. The government's argument is without merit."

"In *Bormes*, the Supreme Court explained that Tucker Act jurisdiction is displaced "when a law assertedly imposing monetary liability on the United States contains its own judicial remedies." 568 U.S. at 12 (emphasis added). More recently, the Court explained that, "[t]o determine whether a statutory scheme displaces Tucker Act jurisdiction, a court must 'examin[e] the purpose of the [statute], the entirety of its text, and the structure of review that it establishes." *Horne v. Dep't of Agric.*, 569 U.S. 513, 526–27 (2013) (quoting *United States v. Fausto*, 484 U.S. 439, 444 (1988)). Thus, when there is a precisely defined statutory framework for a claim that could be brought against the United States, the Tucker Act gives way to the more specific statutory scheme. Regardless of the structure of review it establishes, the AIA is not a statute that provides for claims against the United States."

"The government is correct that, under the AIA, parties may raise constitutional challenges in our court on appeal from Board decisions. But this remedial scheme does not convert the AIA into a statutory framework for claims against the United States. The AIA is by no means "a law assertedly imposing monetary liability on the United States." Borne,

568 U.S. at 12. Accordingly, we reject the government's argument that the AIA displaced Tucker Act jurisdiction over Golden's IPR-based takings claims."

In Golden's Motion for Leave to File a Motion for Summary Judgement *Larry Golden v. United States*, COFC Case 1:13-cv-00307-EGB Document 196 Filed **11/03/20**, Golden continued his efforts to get the DOJ and the COFC Court to address Golden's IPR-Based Takings claims. Golden could never be time barred when the Claim was still pending in an active case.

The DOJ, the Defendant, continued to defend against Golden's "Takings" claim. In the lead case *Larry Golden v. United States*, COFC Case 1:13-cv-00307-EGB the Government ("DOJ"), on behalf of the Department of Homeland Security ("DHS"), filed Document 238 on **07/08/2021**, "Defendant the United States' Notice Regarding Service of The Government's Preliminary Invalidity Contentions", with more unqualified patent and publications' references.

When the United States causes injury to property, a property owner can sue in the Court of Federal Claims. This is a result of the Tucker Act, which waives the United States' sovereign immunity in the COFC only, *United States v. Mitchell*, 463 U.S. 206, 215-19 (1983).

Significantly, a suit alleging a compensable taking in the Court of Federal Claims is viable as soon as government invades a property interest without proving a statutory compensation guarantee. *Kirby*, 467 U.S. at 5; Dow, 357 U.S. at 22. The claimant need not sue in another court to "ripen" the takings suit. As the Court stated long ago in *Great Falls Mfg. Co.*, 112 U.S. at 656.

Unless proven otherwise, Golden is the only African American Patent Owner that has ever been petitioned for *Inter Partes Review* at the PTAB by two Government agencies [the Department of Justice (DOJ) and the Department of Homeland Security (DHS)], who are not "persons" authorized to petition the PTAB to invalidate Golden's patents.

Unless proven otherwise, the DHS & DOJ has never petitioned the PTAB for *Inter Partes Review* of patent(s) owned by a White(s).

Unless proven otherwise, Golden is the only African American Patent Owner that has ever been petitioned for *Inter Partes Review* at the PTAB by two Government agencies [the Department of Justice (DOJ) and the Department of Homeland Security (DHS)], who are not "persons" authorized to petition the PTAB to invalidate patents; with three unqualified patent references [Astrin, Breed, and Mostov] that does not antedate Golden's patents.

Unless proven otherwise, the DHS & DOJ has never petitioned the PTAB for *Inter Partes Review* of patent(s) owned by a White(s) with any number of unqualified references.

The Trial Court dismissed the lead case COFC 13-307C, without adjudicating Golden's "Unconstitutional IPR-Based "Takings" claim on **11/10/2021**, which "ripen" the takings claim.

## *"Takings" III*

When the DOJ & DHS insisted on a dismissal in their favor *Golden v. US* Case No. 13-307C; dismissed 11/10/2021, without proving non-infringement or that the patents are invalided, it left the patents with the "presumption of validity". Which means the government cannot appropriate or use Golden's patents without paying "just compensation".

The Supreme Court explicitly recognized that patents are property secured by the Fifth Amendment Takings Clause. In *Horne v. Department of Agriculture* 569 U.S. 513 (2013) ("Horne I"); 576 U.S. 350, 135 S. Ct. 2419 (2015) ("Horne II"), the Court held that the Takings Clause imposes a "categorical duty" on the government to pay just compensation whether it takes personal or real property.

Chief Justice Roberts, writing for the Court, noted the long history of private property being secured against uncompensated takings by the government, beginning with the Magna Carta some 800 years ago. In further support, Roberts cited a Supreme Court opinion from the late nineteenth century:

> Nothing in this history suggests that personal property was any less protected against physical appropriation than real property. As this Court summed up in *James v. Campbell*, 104 U.S. 356, 358 (1882), a case concerning the alleged appropriation of a patent by the Government:
>
> > *"[A patent] confers upon the patentee an exclusive property in the patented invention which cannot be appropriated or used by the government itself, without just compensation, any more than it can appropriate or use without compensation land which has been patented to a private purchaser."*

James Madison, the author of the Takings Clause, once wrote: "Government is instituted to protect property of every sort." The Court's decision vindicates Madison's intent to limit the government's power to take property, both personal and real, without just compensation. And it

extends a long line of cases recognizing that "property" in the constitutional sense subsumes all things arising from labor and invention.

The DOJ & DHS never proved Golden's patents are invalid, and yet, continues to used them without paying just compensation. The only thing the DOJ & DHS proved in the *Golden v. US* Case No. 13-307C is how much of massive liars they are. Examples of their falsehoods are:

The DOJ/DHS made the *Golden v. US* Case No. 13-307C a case between private parties which placed the case outside the COFC jurisdiction.

When the DOJ/DHS stated the sensors must be "native to the manufacturing of the Apple and Samsung products, the DOJ/DHS knew they were demanding proof of direct infringement under 35 U.S.C. Sec. 271(a) as a predicate to direct infringement under 28 U.S.C. Sec. 1498(a) *Zoltek III,* that was overturned at the CAFC.

The DOJ/DHS narrowed the case to that of Apple, LG, & Samsung, thereby omitting the sensors developed by Qualcomm, Synkera, NASA, SeaCoast, and the camera sensors for detecting CBR developed by Rhevision.

The DOJ & DHS stated "Golden's patented Central Processing Units (CPUs) was an enlargement of the case. The DOJ & DHS motioned to have the case dismissed because they believe the CPU was an enlargement of the case; which means Golden violated a Court order not to amend the case. The DOJ & DHS lied to the Court.

The DOJ & DHS also stated Golden claimed his CPU is a sensor located inside the product used for detecting. As stated in the chart above, the CPU is used for carrying out the operational and functional instructions of the devices, and that the CPU is considered by many as the brains of the devices.

No where, did Golden claim the CPU is used as a sensor for CBR detection. Golden did not enlarge the case with the CPU. Rule 4 required Golden to identify where each element is found in the alleged infringing products. Golden located where the CPU was found, which is not an enlargement. Further, if the products do not have CPUs, the products cannot function correctly. The case was dismissed because the DOJ & DHS lied to the Court.

The Federal Circuit in *FastShip, LLC v. U.S.*, "[W]e interpret "manufactured" in § 1498 [] such that a product is "manufactured" when it is made to include each limitation of the thing invented and is therefore suitable for use. Without the sensors the products will never be suitable for use.

The DOJ & DHS made sure the sensors and detectors required to have a product "suitable for use" never happen. The DOJ & DHS blocked the sensors and detectors of Qualcomm, NASA, Synkera, SeaCoast, Rhevision, Apple, Samsung, and LG.

The DOJ & DHS chose not to challenge the communication methods limitation, because a challenge would verify the internet, Bluetooth, and RF connections makes the smartphones "capable of" integrating detectors and sensors remote the smartphone.

The DOJ & DHS decided to challenge the term "capable of" without a claim construction hearing because 21 of the 25 patent claims that the USPTO issued with the presumption of validity" in the related *Golden v. US* case no. 13-307C, has "capable of" in it.

Golden made multiple repeated attempts to inform the DOJ & DHS that the sensors, according to the DHS Cell-All initiative, can be located both inside and outside the phones. When Golden identified sensors both inside (camera sensor) the phone, and outside (NODE+) the phone, the DOJ & DHS did not accept the devices.

Apple and NASA are two of the third-party contractors in the related *Golden v. US* case no. 13-307C for the DHS Cell-All initiative. NASA's contribution to the development of the "cell phone sensing device" was not accepted or considered by the DOJ & DHS. The DOJ & DHS pled that "to include the NODE+ is an enlargement of the case; which is a violation of the Court's order not to amend."

The DOJ & DHS created the substantive right for Golden to receive "just Compensation for the taking of Golden's property under the Fifth Amendment Clause of the U.S. Constitution when they violated 28 U.S. Code § 1498(a): "a money-mandating constitutional provision" and the "statute or regulation" of the provision.

After the Department of Homeland Security (DHS) received information from the then President, Vice-President, three U.S. Senators from South Carolina, a DHS SBIR Program Manager, and a DHS Contracting Officer for the SafeCon initiative, the DHS in 2007 released the DHS S&T Cell-All Ubiquitous Biological and Chemical Sensing solicitation for a cell phone "capable of" detecting for CBR agents and compounds.

Using Golden's Product Grouping strategies, the DHS contracted Apple, Samsung, LG, Qualcomm, Synkera, NASA, Rhevision, and SeaCoast to assemble Golden's CMDC device in a way that will group products together by common features and design similarities.

The DOJ & DHS has continually retaliated against Golden for 10 years (2013-2023) for

18

filing a claim in the United States Court of Federal Claims for just compensation.

It is the belief of Golden that the Trial Court Judge was acting under Duress (threats, intimidation, or some other type of coercion) to comply with the lies the DOJ & DHS has put before this Court.

The reason Golden is asking the Judge to transfer the current case, is because it is a little more complicated than *Golden v. US* case no. 13-307C. **Exhibit A: Claim Chart of Current Case No. 23-811C**

Golden has two disabling locking mechanism that follows the same patterns: detection; lock; reset. The first is when a hazardous substance is detected it sends a signal to lock the device. The second is when and unauthorized attempt (fingerprint, facial, code) to unlock the device, a signal is sent to lock the device.

The first pattern was identified in claim 1 of the '497 patent and claim 10 of the '752 patent. The second pattern was identified in 11 of the remaining 23 patent claims. 12 of the patent did not call for a locking mechanism.

The DOJ & DHS repeatedly stated in signed pleadings that Golden did not identify the locking mechanism. That lie caused the case to be dismissed.

**Exhibit B: Illustration of Damages**


Sincerely,

s/ *Larry Golden*

Larry Golden, *Pro Se* Plaintiff

740 Woodruff Rd., #1102

Greenville, SC 29607

(H) 8642885605

(M) 8649927104

Email: atpg-tech@charter.net

## **CERTIFICATE OF SERVICE**

The undersigned hereby certifies that on this 19th day of July, 2023, a true and correct copy of the foregoing "Plaintiff's Motion to Disqualification", was served upon the following Defendant by priority "express" mail:

Grant D. Johnson

Trial Attorney

Commercial Litigation Branch

Civil Division

Department of Justice

Washington, DC 20530

Grant.D.Johnson@usdoj.gov

(202) 305-2513

s/ *Larry Golden*

Larry Golden, Pro Se

740 Woodruff Rd., #1102

Greenville, South Carolina 29607

atpg-tech@charter.net

864-288-5605