Case No: <u>1:23-cv-00811-EGB</u>

# IN THE UNITED STATES COURT OF FEDERAL CLAIMS

Larry Golden, Pro Se Plaintiff

740 Woodruff Rd., #1102

Greenville, South Carolina 29607

(P) 864-992-7104 (E) atpg-tech@charter.net

| | |
|---|---|
| LARRY GOLDEN,<br><br>            *Plaintiff*,<br><br>        V.<br><br>THE UNITED STATES,<br><br>            *Defendant*. | **Patent Infringement**<br><br><br>July 19, 2023 |

## PLAINTIFF'S MOTION TO STRIKE

Rule 12(f) allows this Court to "strike the Government's Motion to Dismiss Plaintiff's Complaint [Dkt. 10; Filed 07/14/2023]. The Government's motion is representative of the "insufficient defense" the Government has force this Court to comply with, through intimidation and threats; as evidenced in previous litigation, and is found in the Government's current Motion to Dismiss.

This Court may strike the Government's Motion to Dismiss Plaintiff's Complaint [Dkt. 10; Filed 07/14/2023] acting on its own initiative or "on Plaintiff's motion before Plaintiff is required to respond to the Government's Motion. Motions to strike under Rule 12(f) are addressed within the sound discretion of the Court… *Ameriwood Indus. Intern. Corp. v. Arthur Andersen & Co*., 961 F. Supp. 1078, 1083 (W.D.Mich.1997) (citing *Fed. Sav. & Loan Ins. Corp. v. Burdette*, 696 F. Supp. 1183, 1186 (E.D.Tenn.1988); *FDIC v. Butcher*, 660 F. Supp. 1274, 1277 (E.D.Tenn.1987); *FDIC v. Berry*, 659 F. Supp. 1475, 1479 (E.D.Tenn.1987)).

Plaintiff's Motion to Strike should be granted because there is a clear showing that the challenged defense has no bearing on the subject matter and that permitting the matter to stand would prejudice [] Plaintiff. *Ameriwood*, 1078 F. Supp. at 1083.

## ACTING UNDER "DURESS"; FORCE AND INTIMIDATION

While the Government is making its intimidating challenges to this Court, the Government has filed a Motion to Dismiss that is confusing to say the least.

> "[I]n the event that the Court does not wish to immediately dismiss this case, the Government anticipates moving to stay the current litigation pending the Northern District of California's resolution of the earlier-filed and duplicative lawsuit filed by Mr. Golden against Google." [Case No. 23-811C Dkt. 10 Filed 07/14/23]

Plaintiff understand the above threatening statement to mean: "If the Court don't immediately dismiss this case, the Government will file a motion to stay this case until the "duplicative" case in the NDC is resolved. Does the Government mean the causes of action both cases fall under 35 U.S.C. § 271(a) or under 28 U.S.C. § 1498 (a). Because the Government is also quoted as saying:

> "Golden's complaint does not plead any plausible theory of how the Government is allegedly liable for patent infringement under 28 U.S.C. § 1498, and there is no resolution of the Northern District of California case that could cure this fundamental defect in the complaint."

## History of the Government's Intimidation and Threats

Acting under "Duress"; force and intimidation; the presiding Judge in *Golden v. USA* COFC Case No. 13-307C Dkt. 38 Filed 03/31/2014, decided to "stay" Golden's claim of a "Government Takings of Property Under the Fifth Amendment Clause of the U.S. Constitution without paying 'Just Compensation'", to allow the Department of Justice (DOJ) and the Department of Homeland Security (DHS); who are not "persons" authorized to petition the Patent Trials and Appeals Board (PTAB) to invalidate patent claims (America Invents Act 2012 and *Return Mail v. The United States Postal Service*), the time needed to petition the PTAB to institute trial with the three unqualified patents of Astrin, Breed, and Mostov that do not antedate Golden's '990 patent; submitted by the unauthorized government agencies DOJ & DHS (18 months).

"Plaintiff's November 22, 2013 More Definitive Statement also alleges that "the Government has taken the subject matter, scope, technology rationale, devices schematics, processes, methods, procedures and systems of what is now Golden's patents . . . for public use without just compensation to the Plaintiff." Stmt. 46. …

"[t]he parties will therefore proceed with Plaintiff's claims only as they relate to the alleged patent infringement by the United States."

The presiding Judge in *Golden v. USA* COFC Case No. 13-307C Dkt. 94 Filed 11/30/2016, denied the Government's Motion to Dismiss Certain Devices, pursuant to RCFC 12(b)(1) and 12(b)(6): "For the reasons discussed herein, the Government's June 24, 2016 Motion to Dismiss Certain Devices, pursuant to RCFC 12(b)(1) and 12(b)(6), is denied. Plaintiff, however, is cautioned that the court's ruling today is based on the standard of review on sufficiency of the pleading alone and is not to be construed as a ruling on the substantive merits of the patent infringement claims alleged in the February 12, 2016 Amended Complaint. The court will convene a telephone status conference in the next few days to discuss a schedule to move this case towards adjudication."

Two days later, while acting under "Duress"; force and intimidation; the presiding Judge in *Golden v. USA* COFC Case No. 13-307C, during a 12/02/2016 telephone conference, decided to allow the Department of Justice (DOJ) and the Department of Homeland Security (DHS) another chance at dismissing certain devices, pursuant to RCFC 12(b)(1) and 12(b)(6); decided to waive Golden's alleged infringement claim against the Department of Justice (DOJ) and the National Institute of Justice (NIJ); order Golden to do additional jurisdictional discovery without the resources; and, order Golden to provide the Government with *all* (est. 5000 pages) documentation Golden currently has in his possession. The Government was not ordered to provide Golden with *all* of their documents. (16 months).

THE COURT: "-- all I'm saying is under the liberal standards that the Court looks at these types of proceedings, I'm going to let you do a little jurisdictional discovery. Now, what do you have in mind and what time frame do you have in order to show me that you can satisfy the -- I'm going to let the -- the Government is going to be able to redo this again. But I'm going to give you a chance to do some jurisdictional discovery on this. So, what do you want to do?

MR. GOLDEN: "When you say redo it again -- THE COURT: "Well, the Government -- I dismissed their -- I basically did not grant their motion to dismiss now. I'm going to give you some leeway to do a little discovery. It may be that they will want to -- after the discovery takes place, they want to raise -- re-raise it again in which case I may grant it."

MR. GOLDEN: "[w]hat I found was the original solicitation and that solicitation came from the Department of Justice, the National Institute of Justice itself. THE COURT: There is no such thing as the National Institute of Justice that I know of." www.ftrinc.net

THE COURT: "No, I understand … [w]hat I'd like you to do -- I don't know how much you have by way of documentation on this -- but I would like you to find a copy store and make a copy of every document you have and send it to the Government" www.ftrinc.net

In attendance at the 12/02/2016 telephone conference, and the Government parties responsible for the intimidation and threats, were Lindsay K. Eastman, John Fargo, and Nicholas Kim from the U.S. Department of Justice (DOJ); and Joseph Hsiao, Nathan Grebasch, and Trent Roche from the Department of Homeland Security (DHS).

Acting under "Duress"; force and intimidation; the presiding Judge in *Golden v. USA* COFC Case No. 13-307C, decided *NOT* to include the third-party prime government contractor [Qualcomm] for the DHS S&T BAA07-10, *Cell-All Ubiquitous Biological and Chemical Sensing* initiative (Released 10/2007). Qualcomm was the prime contractor in the *Cell-All* initiative tasked with providing four major components for the assembly of the cell phone sensing device: 1- a new and improved upon cell phone; 2- sensors for CBRNE detection; 3- the CPU (chipset, processor, system-on-a-chip); and 4- the wireless cellular modem. The DOJ/DHS narrowed the case to that of Apple, LG, & Samsung, thereby omitting the sensors developed by Qualcomm, Synkera, NASA, SeaCoast, and the camera sensors for detecting CBR of Rhevision.

This is not the first time the DOJ has raised up in support of the illegal activities of Qualcomm. On May 21, 2019, the U.S. District Court for the NDC issued a 233-page ruling in *Federal Trade Commission v. Qualcomm*, concluding that Qualcomm's licensing business model of its 4G transmission technologies in mobile devices violates the antitrust laws.

In its officially titled Statement of Interest, the DOJ heavily criticizes the district court's decision.  Among other points, the DOJ argues that the "court's conclusion that Qualcomm acted anticompetitively is unsupported" and "ignores established antitrust principles."

The DOJ's filing is an unprecedented development in the history of the two agencies authorized to enforce the antitrust laws. The DOJ has never before filed a motion in an FTC lawsuit in support of the defendant. The DOJ expressed concerns about the impact on innovation and national security that an overbroad antitrust remedy would have if the court found Qualcomm liable.

Golden's alleged anticompetitive behavior claim that Qualcomm is collecting a 5% running royalty on the price of every alleged infringing smartphone sold, without having a patent or legal right to do so was never reached in *Golden v. USA* COFC Case No. 13-307C filed in the U.S. Court of Federal Claims and in the U.S. District Court for the Northern District of California in *Golden v. Qualcomm*. Nor, was it considered in the Ninth Circuit.

Claim 1 of Plaintiff's '189 patent is illustrated below. The chart demonstrates the number of times, and types of errors the Judge made while acting under duress; caused by the intimidation, threats, and lies told to the tribunal in *Golden v. USA* Case No. 13-307C.

| Patent #: 9,096,189; Independent Claim 1 | CMDC Devices: Specifications, Descriptions, Meanings, and Functions | Defense Presented by the DOJ & DHS in the Related Case *Golden v. US* No. 13-307C |
|---|---|---|
| A communication device of at least one of a cell phone, a smart phone, a desktop, a handheld, a PDA, a laptop, or a computer terminal for monitoring products, interconnected to a product for communication therebetween, comprising: | ***Attached as <u>Exhibit A</u> is a list of Congress members; Engineers; Scientist; Gov't Agency(s) representatives; Judges; and others skilled in the art to verify Plaintiff's intellectual property subject matter is not "Frivolous".*** <br><br> Following is an example of CMDC Devices that are not limited to any particular brand, model, or type of equipment: ***See internal chart*** <br><br> HP ZBook Fury 15.6 Inch G8 Mobile Workstation PC; Samsung Galaxy Book2 Pro 360 [PC Mode or Tablet Mode]; Asus/Qualcomm Smartphone for Snapdragon Insiders; LG V60 ThinQ 5G; Samsung Galaxy S21 Smartphone; Google Pixel 5 Smartphone; Apple iPhone 12 Smartphone | The DOJ/DHS made the *Golden v. US* Case No. 13-307C a case between private parties which places the case outside the COFC jurisdiction <br><br> When the DOJ/DHS stated the sensors must be "native to the manufacturing of the Apple and Samsung products, the DOJ/DHS knew they were demanding proof of direct infringement under 35 U.S.C. Sec. 271(a) as a predicated to direct infringement under 28 U.S.C. Sec. 1498(a) *Zoltek III,* that was overturned at the CAFC <br><br> The DOJ/DHS narrowed the case to that of Apple, LG, & Samsung, thereby omitting the sensors developed by Qualcomm, Synkera, NASA, SeaCoast, and the camera sensors for detecting CBR made by Rhevision. |

| | | |
|---|---|---|
| at least one of a central processing unit (CPU) for executing and carrying out the instructions of a computer program, a network processor which is specifically targeted at the networking application domain, or a front-end processor for communication between a host computer and other devices; | Your smartphone processor, also known as chipset, is a component that controls everything going on in your smartphone and ensures it functions correctly. You can compare it to the brain of the human body. Every action you perform on your smartphone goes straight to the processor.  A processor, also known as CPU, consists of multiple cores: Dual, Quad, Hexa, and Octa core. What do these cores do exactly? Processor cores distribute the work that comes in when you use your phone. One core has a maximum number of instructions it can process within a certain amount of time.<br><br>A process is an operating system concept and it is the smallest unit of isolation provided by, for example, Windows operating system (OS). Application Domain or AppDomain is one of the most powerful features of the framework. AppDomain can be considered as a light-weight process. AppDomain is of great advantage for ISP (Internet Service Provider) who hosts hundreds of applications. Because each application can be contained in an application domain and a process can contain many such AppDomains.<br><br>Sensor Front-End Processors and Sensor Devices: These are processors that are designed to handle data from sensors and convert them into usable data for further processing. They are optimized for handling low-level sensor data and can perform tasks such as signal conditioning, filtering, and data acquisition. Sensor front-end processors are commonly used in sensor devices such as smartphones, wearables, and IoT (Internet of Things) devices. | The DOJ & DHS stated "Golden's patented Central Processing Units (CPUs) was an enlargement of the case.<br><br>The DOJ & DHS motioned to have the case dismissed because they believe the CPU was an enlargement of the case; which means Golden violated a Court order not to amend the case. The DOJ & DHS lied to the Court.<br><br>The DOJ & DHS also stated Golden claimed his CPU is a sensor located inside the product used for detecting.<br><br>As stated left of this column, the CPU is used for carrying out the operational and functional instructions of the devices, and that the CPU is considered by many as the brains of the devices.<br><br>No where, did Golden claim the CPU is used as a sensor for CBR detection.<br><br>Golden did not enlarge the case with the CPU. Rule 4 required Golden to identify where each element is found in the alleged infringing products. Golden located where the CPU was found, which is not an enlargement.<br><br>Further, if the products do not have CPUs, the products cannot function correctly.<br><br>The case was dismissed because the DOJ & DHS lied to the Court. |

| | | |
|---|---|---|
| a transmitter for transmitting signals and messages to at least one of plurality product groups based on the categories of a multi-sensor detection device, a maritime cargo container, a cell phone detection device, or a locking device; | Golden's Communicating, Monitoring, Detecting, and Controlling (CMDC) devices are referred to as communication devices, monitoring devices, monitoring equipment, ***multi-sensor detection devices, cell phone detection devices***, smartphones, and new and improved upon cell phones, laptops, tablets, desktop PCs, etc. | The Federal Circuit in *FastShip, LLC v. U.S.*, "[W]e interpret "manufactured" in § 1498 [] such that a product is "manufactured" when it is made to include each limitation of the thing invented and is therefore suitable for use. Without the sensors the products will never be suitable for use. |
| a receiver for receiving signals, data or messages from at least one of plurality product groups based on the categories of a multi-sensor detection device, a maritime cargo container, a cell phone detection device, or a locking device; | Golden's Communicating, Monitoring, Detecting, and Controlling (CMDC) devices are referred to as communication devices, monitoring devices, monitoring equipment, ***multi-sensor detection devices, cell phone detection devices***, smartphones, and new and improved upon cell phones, laptops, tablets, desktop PCs, etc. | The DOJ & DHS made sure the sensors and detectors required to have product "suitable for use" never happen. The DOJ & DHS blocked the sensors and detectors of Qualcomm, NASA, Synkera, SeaCoast, Rhevision, Apple, Samsung, and LG. |
| at least one satellite connection, Bluetooth connection, WiFi connection, internet connection, radio frequency (RF) connection, cellular connection, broadband connection, long and short-range radio frequency (RF) connection, or GPS connection; | Internet of Things (IoT) and Internet of Everything (IoE) are emerging communication concepts that will interconnect a variety of devices (including smartphones, home appliances, sensors, and other network devices), people, data, and processes and allow them to communicate with each other seamlessly. These new concepts can be applied in many application domains such as healthcare, transportation, and supply chain management (SCM), to name a few, and allow users to get real-time information such as location-based services, disease management, and tracking. The smartphone-enabling technologies such as built-in sensors, Bluetooth, radio-frequency identification (RFID) tracking, and near-field communications (NFC) | The DOJ & DHS chose not to challenge this limitation, because a challenge would verify the internet, Bluetooth, and RF connections makes the smartphones "capable of" integrating detectors and sensors remote the smartphone.<br><br>The DOJ & DHS decided to challenge the term "capable of" without a claim construction hearing because 21 of the 25 patent claims that the USPTO issued with the presumption of validity in the related *Golden v. US* case no. 13-307C, has "capable of" in it. |

| | | |
|---|---|---|
| the communication device is at least a fixed, portable or mobile communication device interconnected to a fixed, portable or mobile product, capable of wired or wireless communication therebetween; and, | The DHS Cell-All initiative: "biological and chemical sensors could be [] integrated into common cell phone devices" … "miniaturized biological and chemical sensing with integration into common." "[] second-generation prototypes, chemical sensors were separated from the phones, allowing deployment of the sensors through third-party products, [] that could be added to existing phones (U.S. Department of Homeland Security, 2011a) | Golden made multiple repeated attempts to inform the DOJ & DHS that the sensors, according to the DHS Cell-All initiative, can be located both inside and outside the phones.<br><br>When Golden identified sensors both inside (camera sensor) the phone, and outside (NODE+) the phone, the DOJ & DHS did not accept the devices. |
| whereupon the communication device, is interconnected to a product equipped to receive signals from or send signals to lock or unlock doors, activate or deactivate security systems, activate or deactivate multi-sensor detection systems, or to activate or deactivate cell phone detection systems | 28 U.S. Code § 1498(a): "For the purposes of this section, the use or manufacture of an invention described in and covered by a patent of the United States by a contractor, a subcontractor, or any person, firm, or corporation for the Government and with the authorization or consent of the Government, shall be [] use or manufacture for the United States."<br><br>The NODE+ was invented and produced in 2011 by George Yu, Ph.D. Yu worked as a subcontractor to NASA on the DHS Cell-All initiative. The NODE+ sensor is an interactive scanner that uses … data from NASA to give information [] using sensors on your phone NODE+ wireless sensor platform is a handheld sensor that communicates wirelessly through Bluetooth with Apple iOS devices.<br><br>The Tucker Act, is merely a jurisdictional statute and "does not create any substantive right enforceable against the United States for money damages." *United States v. Testan*. Instead, the substantive right must appear in another source of law; a "money-mandating constitutional provision, statute or regulation that has been violated…" *Loveladies Harbor, Inc. v United States* | Apple and NASA are two of the third-party contractors in the related *Golden v. US* case no. 13-307C for the DHS Cell-All initiative.<br><br>NASA's contribution to the development of the "cell phone sensing device" was not accepted or considered by the DOJ & DHS.<br><br>The DOJ & DHS pled that "to include the NODE+ is an enlargement of the case; which is a violation of the Court's order not to amend."<br><br>The DOJ & DHS created the substantive right for Golden to receive "just Compensation for the taking of Golden's property under the Fifth Amendment Clause of the U.S. Constitution when they violated 28 U.S. Code § 1498(a): "a money-mandating constitutional provision" and the "statute or regulation" of the provision. |

| | | |
|---|---|---|
| wherein the communication device receives a signal via any of one or more products listed in any of the plurality of product grouping categories; | **Patent Specifications:**<br>It is another objective of the present invention to provide a multi sensor detection [] system for preventing terrorist activity by using products grouped together by common features in several product groupings such as design similarity, similarity in the presentation of security problems and similarity with regard to the presentation of solutions to preventing terrorist…<br><br>Still yet a further objective of the present invention is to provide a multi sensor detection [] system that can be implemented by business or government at a minimum cost by organizing the products to be protected into product grouping categories.<br><br>Product grouping 2 (sensors) include, but are not limited to, chemical, biological, radiological, explosive and nuclear detectors, motion sensors, door sensors, [] biometric sensors, [] detection of humans…<br><br>Product grouping 4 (monitoring & communication devices) include, but are not limited to, mobile communication devices, mobile communication units, portable communication devices, [] monitoring sites, monitoring terminals, web servers, desktop PCs, notebook PCs, laptops, satellite cell phones, cell phones, [] PDAs, [] and [] handhelds<br><br>Product grouping 7 (authorized person) include, but are not limited to, owner, pilot, conductor, captain, [] airport security, police, highway patrol, security guard, military personnel, HAZMAT, CIA, FBI, Secret Service, port security personnel, border security personnel, first responders, [] terminal personnel. | After the Department of Homeland Security (DHS) received information from the then President, Vice-President, three U.S. Senators from South Carolina, a DHS SBIR Program Manager, and a DHS Contracting Officer for the SafeCon initiative, the DHS in 2007 released the DHS S&T Cell-All Ubiquitous Biological and Chemical Sensing solicitation for a cell phone "capable of" detecting for CBR agents and compounds.<br><br>Using Golden's Product Grouping strategies, the DHS contracted Apple, Samsung, LG, Qualcomm, Synkera, NASA, Rhevision, and SeaCoast to assemble Golden's CMDC device in a way that will group products together by common features and design similarities.<br><br>The DOJ & DHS has continually retaliated against Golden for 10 years (2013-2023) for filing a claim in the United States Court of Federal Claims for just compensation.<br><br>It is the belief of Golden that the Trial Court Judge was acting under Duress (threats, intimidation, or some other type of coercion) to comply with the lies the DOJ & DHS has put before this Court.<br><br>The reason Golden is asking the Judge to transfer the current case, is because it is a little more complicated. |

| | | |
|---|---|---|
| wherein at least one satellite connection, Bluetooth connection, WiFi connection, internet connection, radio frequency (RF) connection, cellular connection, broadband connection… short range radio frequency (RF) connection is capable of signal communication with the transmitter and the receiver of the communication device and transceivers of the products; | Internet of Things (IoT) and Internet of Everything (IoE) are emerging communication concepts that will interconnect a variety of devices (including smartphones, home appliances, sensors, and other network devices), people, data, and processes and allow them to communicate with each other seamlessly. These new concepts can be applied in many application domains such as healthcare, transportation, and supply chain management (SCM), to name a few, and allow users to get real-time information such as location-based services, disease management, and tracking. The smartphone-enabling technologies such as built-in sensors, Bluetooth, radio-frequency identification (RFID) tracking, and near-field communications (NFC) | The DOJ & DHS chose not to challenge this limitation, because a challenge would verify the internet, Bluetooth, and RF connections makes the smartphones "capable of" integrating detectors and sensors remote the smartphone.<br><br>The DOJ & DHS decided to challenge the term "capable of" without a claim construction hearing because 21 of the 25 patent claims that the USPTO issued with the presumption of validity" Golden asserted in the case has "capable of" in it. |
| wherein the communication device is equipped with a biometric lock disabler that incorporates at least one of a fingerprint recognition, voice recognition, face recognition, hand geometry, retina scan, iris scan and signature such that the communication device that is at least one of the cell phone, the smart phone, the desktop, the handheld, the PDA, the laptop or the computer terminal is locked by the biometric lock disabler to prevent unauthorized use; | **Patent specifications**:<br>"FIG. 1 is a perspective view of the… an automatic/mechanical lock disabler and a fingerprint biometric lock with disabler… FIG. 14 is a representative schematic view of the… lock disabling system of the present invention illustrating interconnection of the… fingerprint biometric lock with disabler for engaging and disengaging the fingerprint biometric lock …<br><br>The fingerprint biometric lock with disabler 62 is interconnected to the cpu 40… Moreover, resetting of the fingerprint biometric lock with disabler 62 occurs when the fingerprint of the individual is placed on the fingerprint-matching pad 64, and if a match occurs with a known fingerprint stored by the cpu 40, then the individual can reset the fingerprint biometric lock with disabler 56… a fingerprint that matches stored and authorized fingerprints 102 would indicate an authorized individual … The fingerprint biometric lock with disabler 62 would then be reset 106 after the appropriate safety… and protection measures are completed… | Golden has two disabling locking mechanism that follows the same patterns: detection; lock; reset. The first is when a hazardous substance is detected it sends a signal to lock the device. The second is when and unauthorized attempt (fingerprint, facial, code) to unlock the device, a signal is sent to lock the device.<br><br>The first pattern was identified in claim 1 of the '497 patent and claim 10 of the '752 patent. The second pattern was identified in 11 of the remaining 23 patent claims. 12 of the patent did not call for a locking mechanism.<br><br>The DOJ & DHS repeatedly stated in signed pleadings that Golden did not identify the locking mechanism. That lie caused the case to be dismissed. |

| | | |
|---|---|---|
| wherein the only type or types of communication with the transmitter and the receiver of the communication device and transceivers of the products is a type or types selected from the group consisting of satellite, Bluetooth, WiFi, internet, radio frequency (RF), cellular, broadband, and long and short-range radio frequency (RF). | Internet of Things (IoT) and Internet of Everything (IoE) are emerging communication concepts that will interconnect a variety of devices (including smartphones, home appliances, sensors, and other network devices), people, data, and processes and allow them to communicate with each other seamlessly. These new concepts can be applied in many application domains such as healthcare, transportation, and supply chain management (SCM), to name a few, and allow users to get real-time information such as location-based services, disease management, and tracking. The smartphone-enabling technologies such as built-in sensors, Bluetooth, radio-frequency identification (RFID) tracking, and near-field communications (NFC) | The DOJ & DHS chose not to challenge this limitation, because a challenge would verify the internet, Bluetooth, and RF connections makes the smartphones "capable of" integrating detectors and sensors remote the smartphone. <br><br> The DOJ & DHS decided to challenge the term "capable of" without a claim construction hearing because 21 of the 25 patent claims that the USPTO issued with the presumption of validity" in the related *Golden v. US* case no. 13-307C, has "capable of" in it. |

The DOJ & DHS Department attorneys are subject to various legal obligations and professional standards in the performance of their duties.  For example, attorneys are required to comply with legal obligations imposed by the Constitution, statute, evidentiary or procedural rules, controlling case law, and local rules.  In addition, the DOJ & DHS attorneys must comply with standards of conduct imposed by the attorney's licensing authority, the jurisdiction in which the attorney is practicing, and Department regulations and policies.

The DOJ & DHS are guilty of intimidating the Judge(s) if the DOJ & DHS directs a threat to the Judge(s) that causes the Judge(s), while acting under duress, to rule in the Defendants favor, or if by use of threats directed to the Judge(s), the DOJ & DHS attempts to influence a ruling or decision of the Judge(s) in any official proceeding.

The Federal Judiciary Protection Act, S. 1099, increases the criminal penalties for [] threatening Federal judges, Federal law enforcement officials, and their family members.

Specifically, the bipartisan legislation would: increase the maximum prison term for forcible [] intimidation or interference with a Federal judge, Federal law enforcement officer or U.S. official from 3 years imprisonment to 8 years…

## Grant J. Johnson (DOJ Trial Attorney assigned to Represent the DOD DTRA)

The qualifications to become a Patent Examiner are: Minimum of a Bachelor's degree in engineering or science. Successful completion of a full 4-year course at an accredited college or university leading to a bachelor's degree, or higher, that included a major field of study, or specific course requirements, in a variety of engineering and science disciplines.

*Patent Examiner*: United States Patent and Trademark Office (USPTO) Jun 2007 thru May 2012 - 5 yrs.

*Associate*: Covington & Burling LLP. Sep 2013 thru Aug 2020 - 7 yrs. Washington D.C. Metro Area Grant Johnson worked as an associate in the firm's Washington, DC office and served as a member of the Patent Litigation and Patent Advisory groups. His practice focuses on patent litigation, patent prosecution, and post-issuance proceedings in the U.S. Patent & Trademark Office; ...

Therefore, let us say for the sake of argument Mr. Johnson has the 4-year college degree in engineering or science; has 5 years' experience as a USPTO patent examiner; and, at least 7 years of patent litigation experience with Covington & Burling LLP, that Mr. Johnson knows, or should have known, of the blatantly obvious, unconcealed, and deliberate lies he has made and continues to make to this Court concerning the functionality of Golden's inventions.

Mr. Johnson's violations are intentional because he engaged in conduct that was both purposeful and knowing.  Conduct is purposeful when the attorney takes or fails to take an action in order to obtain a result that is unambiguously prohibited by the applicable obligation or standard. Conduct is knowing when the attorney takes or fails to take an action with knowledge of the natural or probable consequences of the conduct, and those consequences are unambiguously prohibited by the applicable obligation or standard.

After this Court considers the nature and circumstances of the Mr. Johnson's conduct and the facts known to Mr. Johnson, the Court should find that Mr. Johnson's disregard of his obligation or standard is reckless because the conduct amounted to a gross deviation from the standard of conduct that an objectively reasonable attorney would observe in the same situation.

Mr. Johnson's excuse of "Oh, I didn't mean to do it, I just did not know" is completely unacceptable. The Government's Motion to Dismiss should be "stricken" because the motion is representative of an "insufficient defense".

# THE GOVERNMENT'S MOTION IS REPRESENTATIVE OF AN "INSUFFICIENT DEFENSE"

The Tactical Assault Kit (TAK)—a mapping system with a plugin architecture—has seen success across the Department of Defense (DoD) and Department of Homeland Security (DHS), where operators must routinely execute missions in spectrum denied environments. [nonincidental use by the Government]

The Defense Threat Reduction Agency (DTRA) leveraged TAK for enhanced CBRNE situational awareness with the goal of protecting military and civilian populations from intentional or incidental chemical or biological threats and Toxic Industrial Chemicals/Materials (TIC/TIM) hazards. [the TAK was made to include each limitation of Golden's invention]

In *FastShip, LLC v. United States*, 892 F.3d 1298 (Fed. Cir. 2018)) "[T]he Court of Federal Claims construed the relevant claim terms and granted the government partial summary judgment, finding that the LCS-3 ship was not "manufactured" by or for the government within the meaning of Section 1498" … The Federal Circuit affirmed and determined that the meaning of "manufactured" in Section 1498 was a matter of first impression. The Federal Circuit interpreted "manufactured" under its plain meaning, holding that "a product is 'manufactured' when it is made to include each limitation of the thing invented and is therefore suitable for use."

Under a Broad Agency Announcement from the Joint Science and Technology Office (JSTO) Digital Battlespace Management Division, DTRA fund the development of ATAK, WinTAK, and WebTAK compatible versions of existing decision support tools for chemical and biological warning and reporting, hazard prediction, and consequence assessment, which caused the development of iTAK. [the iTAK, ATAK, and WinTAK was developed in accordance to Golden's "product grouping" strategies to enable the integration of hardware and software]

*Golden's Patent Specifications*: "It is another objective of the present invention to provide a multi sensor detection [] system for preventing terrorist activity by using products grouped together by common features in several product groupings such as design similarity, similarity in the presentation of security problems and similarity with regard to the presentation of solutions to preventing terrorist… Still yet a further objective of the present invention is to provide a multi sensor detection [] system that can be implemented by business or government at a minimum cost by organizing the products to be protected into product grouping categories… Product grouping 2 (sensors) include, but are not limited to, chemical, biological, radiological, explosive and nuclear detectors, motion sensors, door sensors, [] biometric sensors, [] detection of humans… Product grouping 4 (monitoring & communication devices) include, but are not limited to, mobile communication devices, mobile communication units, portable communication devices, [] monitoring sites, monitoring terminals, web servers, desktop PCs, notebook PCs,

laptops, satellite cell phones, cell phones, [] PDAs, [] and [] handhelds …
Product grouping 7 (authorized person) include, but are not limited to, owner, pilot, conductor, captain, [] airport security, police, highway patrol, security guard, military personnel, HAZMAT, CIA, FBI, Secret Service, port security personnel, border security personnel, first responders, [] terminal personnel.

## iTAK

The iPhone is a line of smartphones produced by Apple Inc. that use Apple's own iOS mobile operating system. The first-generation iPhone was announced by then-Apple CEO Steve Jobs on January 9, 2007. Since then, Apple has annually released new iPhone models and iOS updates. As of November 1, 2018, more than 2.2 billion iPhones had been sold.

iOS (formerly iPhone OS) is a mobile operating system developed by Apple Inc. exclusively for its hardware. It is the operating system that powers the company's mobile devices.

**iTAK** was specifically designed for Apple smartphones. The iTAK is a software component that adds a specific feature to an existing program. When the iTAK supports CBRNE plug-ins, it enables customization. It enables third-party developers [Draper Laboratories] to extend the application with CBRNE plugins.

The "product grouping" strategy for ubiquitous iTAK CBRNE sensing is limited to the 111 Apple smartphone models that are covered under the Apple brand. (gsmarena.com)

## ATAK

Android is a mobile operating system based on a modified version of the Linux kernel and other open-source software, designed primarily for mobile devices as smartphones. Android is developed by a consortium of developers known as the Open Handset Alliance, though its most widely used version is primarily developed by Google. It was unveiled in November 2007, with the first commercial Android device, the HTC Dream, being launched in September 2008. At its core, the operating system is known as Android Open-Source Project (AOSP) and is free and open-source software (FOSS). Over 70 percent of smartphones based on Android Open-Source Project run Google's ecosystem (which is known simply as Android)

**ATAK** was specifically designed for Android smartphones. The ATAK is a software component that adds a specific feature to an existing program. When the ATAK supports CBRNE

plug-ins, it enables customization. It enables third-party developers [Draper Laboratories] to extend the application with CBRNE plugins.

The "product grouping" strategy for ubiquitous ATAK CBRNE sensing include nearly 1,300 brands that have produced over 24,000 distinct Android devices (android.com). The Samsung brand has 1,361 devices; the Google brand has 24 devices; the LG brand has 667 devices; and the Asus/Qualcomm brand has 200 devices (gsmarena.com/makers.php3)

## WinTAK

Microsoft's Windows has always dominated the desktop PC, laptop, and tablet operating system (OS) space globally, as the operating system is widely available with many PC manufacturing partners such as Dell, HP, and Samsung. Microsoft Windows was the dominant desktop operating system (OS) worldwide as of January 2023, with a share of just over 74%.

**WinTAK** was specifically designed for desktop PCs, laptops, and tablets that use the Windows operating system. The WinTAK is a software component that adds a specific feature to an existing program. When the WinTAK supports CBRNE plug-ins, it enables customization. It enables third-party developers [Draper Laboratories] to extend the application with CBRNE plugins.

The "product grouping" strategy for ubiquitous WinTAK CBRNE sensing: Microsoft backed away from their goal of one billion Windows 10 devices in three years (or "by the middle of 2018") and reported on 26 September 2016 that Windows 10 was running on over 400 million devices, and in March 2019 on more than 800 million.

## DTRA's Purpose

DTRA's purpose for developing the iTAK, ATAK, and WinTAK is the same as Golden's purpose for inventing certain devices for "product grouping". That is to have a mean(s) for ubiquitous CBRNE sensing.

The following chart illustrates how the DTRA harnessed [product grouped] Golden's patented CMDC Devices, CPUs, and Multi Sensor Detection Devices to satisfy the utility requirement needed for the iTAK, ATAK, and WinTAK. Without Golden's patented CMDC Devices, CPUs, and MSD devices, the iTAK, ATAK, and WinTAK software is useless; the iTAK, ATAK, and WinTAK OSs were not designed to operate without Golden's patented inventions.

# DEPARTMENT OF DEFENSE (DOD) DEFENSE THREAT REDUCTION AGENCY (DTRA)

| iTAK | ATAK | | | | WinTAK | |
|---|---|---|---|---|---|---|
| Apple iPhone 12 Smartphone | Google Pixel 5 Smartphone | Samsung Galaxy S21 Smartphone | LG V60 ThinQ 5G | Asus / Qualcomm Smartphone for Snapdragon Insiders | Samsung Galaxy Book2 Pro 360 [PC Mode or Tablet Mode] | HP ZBook Fury 15.6 Inch G8 Mobile Workstation PC |
| Chipset: Apple A14 Bionic (5 nm). CPU: Hexacore (2x3.1 GHz Firestorm + 4x1.8 GHz Icestorm). | Chipset: Qualcomm Snapdragon 765G CPU: Octa-core (1 × 2.4 GHz Kryo 475 Prime | Chipset: Qualcomm SM8350 CPU: Octa-core (1x2.84 GHz Cortex-X1 & 3x2.42 GHz | Chipset: Qualcomm SM8250 CPU: Octa-core (1x2.84 GHz Cortex-A77 & 3x2.42 GHz | Chipset: Qualcomm SM8350 CPU: Octa-core (1x2.84 GHz Cortex-X1 & 3x2.42 GHz | CPU: Intel® Core™ i5-1235U / Intel® Core™ i71255U. Processor Speed 1.3GHz / 1.7 GHz. | CPU: 11th Generation Intel® Xeon® W-11955M vPro® with Intel® UHD Graphics |
| OS: Apple iOS 14.1, upgradable to iOS 16.1 | OS: Google Android 11, upgradable to Android 13 | OS: Google Android 11, upgradable to Android 13 | OS: Google Android 10, upgradable to Android 13 | OS: Google Android 11 | OS: Preinstalled Microsoft Windows 11 | OS: Preinstalled Microsoft Windows 11 Pro2 |
| CBRNE PLUGINS Draper Laboratory, Inc | CBRNE PLUGINS Draper Laboratory, Inc | CBRNE PLUGINS Draper Laboratory, Inc | CBRNE PLUGINS Draper Laboratory, Inc | CBRNE PLUGINS Draper Laboratory, Inc | CBRNE PLUGINS Draper Laboratory, Inc | CBRNE PLUGINS Draper Laboratory, Inc |

28 U.S. Code § 1498 (a): "Whenever an invention described in and covered by a patent of the United States is *used* [in the above chart Golden have three inventions that are covered by his U.S. Patents—CMDC Devices; CPUs; and Multi Sensor Detection Devices—that's being "*used*" by the United States] … by or for the United States without license of the owner thereof or lawful right to *use* or manufacture the same, the owner's remedy shall be by action against the

United States in the United States Court of Federal Claims for the recovery of his reasonable and entire compensation for such *use* and manufacture."

Therefore, until the Government can prove the iTAK, the ATAK, and the WinTAK; that are interconnected to Golden's patented CMDC Devices, CPUs, and Multi Sensor Detection Devices, can operate and function without the three essential patented inventions of Golden; the United States have "*used*", and continues to "*use*" Golden's patented inventions "without license of the owner thereof or lawful right…" iTAK was developed for the Apple iOS operating systems; ATAK was developed for the Google Android operating systems; and WinTAK was developed for the Microsoft Windows operating systems.

## VERTICAL STARE DECISIS

The United States Court of Appeals for the Federal Circuit is a federal court that has special importance in patent law. The Federal Circuit does not have jurisdiction over a particular region.  Instead, it has jurisdiction over all appeals in cases that "arise under" the patent laws. The Federal Circuit's jurisdiction over appeals in patent cases is exclusive.  Other circuit courts cannot review decisions in those cases.

Congress created the Federal Circuit in 1982 to be a court with specialized expertise in patent law.  In giving it exclusive jurisdiction over patent cases, Congress aimed to ensure that the interpretation of the patent laws, and applicable legal precedent, would be uniform throughout the nation, and not vary among regional circuits.

 Consistent with that, the Federal Circuit has developed a large body of precedent governing patent cases: how to interpret patent claims, how infringement must be proved, how invalidity must be established, and how damages must be calculated.  Successful patent litigation in the district courts requires diligently the following of the Federal Circuit's pronouncements on those issues.

Vertical stare decisis binds lower courts to follow strictly the decisions of higher courts within the same jurisdiction (e.g., the U.S. Court of Federal Claims must follow the decisions of the U.S. Court of Appeals for the Federal Circuit). The Supreme Court defines vertical stare decisis as the doctrine, "a lower court must strictly follow the decision(s) handed down by a higher court within the same jurisdiction".

A court engages in vertical stare decisis when it applies precedent from a higher court. For example, if the U.S. Court of Federal Claims adhered to a previous ruling from the U.S. Court of Appeals for the Federal Circuit, that would be vertical stare decisis.

The Federal Circuit on 09/08/2022, in *Larry Golden v. Google LLC*; Case No. 22-1267 — "VACATED AND REMANDED" the relevant Case No: 22-1267 Document 15; back to the District Court "to be filed and request service of process". The Federal Circuit determined the complaint, "includes a detailed claim chart mapping features of an accused product, the Google Pixel 5 Smartphone, to independent claims from U.S. Patent Nos. 10,163,287, 9,589,439, and 9,069,189" … "in a relatively straightforward manner" … and that the [Circuit] "express no opinion as to the adequacy of the complaint or claim chart except that it is not facially frivolous."

Three-Judge Panel: "DISCUSSION. 'Under the pleading standards set forth in *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007), and *Ashcroft v. Iqbal,* 556 U.S. 662 (2009), a court must dismiss a complaint if it fails to allege "enough facts to state a claim to relief that is plausible on its face." *Twombly*, 550 U.S. at 570 … [T]his standard "requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Id*. at 555 (citation omitted). A plaintiff must allege facts that give rise to "more than a sheer possibility that a defendant has acted unlawfully." *Iqbal*, 556 U.S. at 678 (citation omitted) … this court has explained that a plaintiff … must plead "'enough fact[s] to raise a reasonable expectation that discovery will reveal' that the defendant is liable for the misconduct alleged."

"Mr. Golden's complaint includes a detailed claim chart mapping features of an accused product, the Google Pixel 5 Smartphone, to independent claims from U.S. Patent Nos. 10,163,287, 9,589,439, and 9,069,189 … It [claim chart] attempts [] to map claim limitations to infringing product features, and it does so in a relatively straightforward manner …[W]e conclude that the district court's decision in the Google case is not correct with respect to at least the three claims mapped out in the claim chart. Mr. Golden has made efforts to identify exactly how the accused products meet the limitations of his claims in this chart.…"

For an infringement analysis & litigation, claim charts help confirm or dis-confirm that each and every limitation of the claim is present in a product, service, or standard. An Evidence-

of-Use (EoU) or Infringement Chart shows how a product or process accused of infringement contains each claim element to satisfy the 'all elements test' for infringement.

Below, Plaintiff displays the claim limitations of claim 5 of the '287 patent; claim 5 of the '287 patent; and claim 5 of the '287 patent; to the Google Pixel 5 smartphone elements for chemical, biological, radiological, and nuclear (CBRN) sensing. The chart below represents a scaled down version of the claim chart presented in the U.S. Court of Appeals for the Federal Circuit in *Larry Golden v. Google LLC*; Case No. 22-1267, that identifies the elements of the Smartphone and satisfies the patent claims requirement for CBRN sensing.

Vertical Stare Decisis bars the Government from challenging, and this Court from overturning, the Federal Circuit's ruling: "the complaint includes a detailed claim chart mapping features of an accused product, the Google Pixel 5 Smartphone, to independent claims from U.S. Patent Nos. 10,163,287, 9,589,439, and 9,069,189" … 'in a relatively straightforward manner'"

Which means the Federal Circuit has determined Golden has alleged "enough facts to state a claim to relief that is plausible on its face." *Twombly*, 550 U.S. at 570 … plead "'enough fact[s] to raise a reasonable expectation that discovery will reveal' that the defendant is liable for the misconduct alleged".

The Federal Circuit's language, "a detailed claim chart mapping features of an accused product, the Google Pixel 5 Smartphone, to independent claims from U.S. Patent Nos. 10,163,287, 9,589,439, and 9,069,189", indicates a determination has been made on direct infringement, either literally or under the doctrine of equivalents.

Therefore, when the Federal Circuit states, ""express no opinion as to the adequacy [the state or quality of being adequate] of the complaint or claim chart except that it is not facially frivolous", means the Circuit is not expressing an opinion on whether the direct infringement is literal direct infringement or direct infringement under the doctrine of equivalents.

"Literal infringement" means that each and every element recited in a claim has identical correspondence in the allegedly infringing device or process. "Under the doctrine of equivalents, 'a product or process that does not literally infringe . . . the express terms of a patent claim may nonetheless be found to infringe if there is 'equivalence' between the elements of the accused product or process and the claimed elements of the patented invention.'" *Ethicon Endo-Surgery, Inc. v. U.S. Surgical Corp.*, 149 F.3d 1309, 1315 (Fed. Cir. 1998)

| Google Pixel 5 Smartphone | Patent #: 10,163,287; Independent Claim 5 | Patent #: 9,589,439; Independent Claim 23 | Patent #: 9,096,189; Independent Claim 1 |
|---|---|---|---|
|  | A monitoring device, comprising: | A cell phone comprising: | A communication device of at least one of a cell phone, a smart phone, a desktop, a handheld, a PDA, a laptop, or a computer terminal for monitoring products, interconnected to a product for communication therebetween, comprising: |
| *Android Team Awareness Kit*, ATAK (built on the Android operating system) provides a single interface for viewing and controlling different CBRN-sensing technologies, whether that is a wearable smartwatch that measures a warfighter's vitals (e.g., heart rate) or a device mounted on a drone to detect chemical warfare agents. | at least one sensor for chemical, biological, or human detection in communication with the at least one CPU; | the cell phone is at least a fixed, portable or mobile communication device interconnected to the cell phone detection device, capable of wired or wireless communication therebetween; and | the communication device is at least a fixed, portable or mobile communication device interconnected to a fixed, portable or mobile product, capable of wired or wireless communication therebetween… |
| *Android Team Awareness Kit*, ATAK (built on the Android operating system) is a digital application available to warfighters throughout the DoD. ATAK offers warfighters geospatial mapping for situational awareness during combat — on an end-user device such as a smartphone or a tablet. With DTRA's contribution, ATAK now includes chemical, biological, radiological, and nuclear (CBRN) plug-ins. | one or more detectors in communication with the at least one CPU for detecting at least one of chemical, biological, radiological, or explosive agents; | at least one of a chemical sensor, a biological sensor, an explosive sensor, a human sensor, a contraband sensor, or a radiological sensor capable of being disposed within, on, upon or adjacent the cell phone; | wherein the communication device receives a signal via any of one or more products listed in any of the plurality of product grouping categories; |

| | | | |
|---|---|---|---|
| Google Nest × Yale Lock is connected to the Nest app; you can lock or unlock your door from your phone.<br><br>*Android Team Awareness Kit*, ATAK (built on the Android operating system) provides a single interface for viewing and controlling different CBRN-sensing technologies | at least one of a transmitter or a transceiver in communication with the at least one CPU configured to send signals to monitor at least one of a door, a vehicle, or a building, send signals to lock or unlock doors, send signals to control components of a vehicle, send signals to control components of a building, or… detect at least one of a chemical biological… agent such that the communication device is capable of communicating, monitoring, detecting, and controlling. | a transmitter for transmitting signals and messages to a cell phone detection device; a receiver for receiving signals from the cell phone detection device; | a transmitter for transmitting signals and messages to at least one of plurality product groups based on the categories of a multi-sensor detection device, a maritime cargo container, a cell phone detection device, or a locking device;<br><br>a receiver for receiving signals, data or messages from at least one of plurality product groups based on the categories of a multi-sensor detection device, a maritime cargo container, a cell phone detection device, or a locking device; |
| Google Nest × Yale Lock is connected to the Nest app; you can lock or unlock your door from your phone.<br><br>*Android Team Awareness Kit*, ATAK (built on the Android operating system) provides a single interface for viewing and controlling different CBRN-sensing technologies | X | X | whereupon the communication device, is interconnected to a product equipped to receive signals from or send signals to lock or unlock doors, activate or deactivate security systems, activate or deactivate multi-sensor detection systems, or to activate or deactivate cell phone detection systems |

| | | | |
|---|---|---|---|
| *Android Team Awareness Kit*, ATAK (built on the Android operating system) is a digital application available to warfighters throughout the DoD. ATAK offers warfighters geospatial mapping for situational awareness during combat — on an end-user device such as a smartphone or a tablet. With DTRA's contribution, ATAK now includes chemical, biological, radiological, and nuclear (CBRN) plug-ins. | X | a transmitter for transmitting signals and messages to a cell phone detection device; a receiver for receiving signals from the cell phone detection device; | wherein at least one satellite connection, Bluetooth connection, WiFi connection, internet connection, radio frequency (RF) connection, cellular connection, broadband connection… short range radio frequency (RF) connection is capable of signal communication with the transmitter and the receiver of the communication device and transceivers of the products; |
| *Android Team Awareness Kit*, ATAK (built on the Android operating system) is a digital application available to warfighters throughout the DoD. ATAK offers warfighters geospatial mapping for situational awareness during combat — on an end-user device such as a smartphone or a tablet. With DTRA's contribution, ATAK now includes chemical, biological, radiological, and nuclear (CBRN) plug-ins. | X | whereupon a signal sent to the receiver of the cell phone detection device from at least one of the chemical sensor, the biological sensor, the explosive sensor, the human sensor, the contraband sensor, or the radiological sensor, causes a signal that includes at least one of location data or sensor data to be sent to the cell phone. | X |

Plaintiff's motion to strike should be granted because "it appears to a certainty that Plaintiff will succeed despite any state of the facts which could be proved in support of the defense and are derivable from the pleadings." *Operating Engineers*, 783 F.3d at 1050 (quoting *Williams v. Jader Fuel Co.*, 944 F.2d 1388, 1400 (7th Cir. 1991)).

Further, Plaintiff's motion to strike should be granted because "it is clear that the affirmative defense [of the Government] is irrelevant and frivolous and its removal from the case would avoid wasting unnecessary time and money litigating the invalid defense." *SEC v. Gulf & Western Indust.*, 502 F. Supp. 343, 345 (D.D.C. 1980).

# INSUFFICIENT DEFENSE

Federal Rule of Civil Procedure 12(f) allows this Court to "strike from a pleading an insufficient defense or a redundant, immaterial, impertinent or scandalous matter." *Delta Consulting Grp., Inc. v. R. Randle Constr. Inc.*, 554 F.3d 1133, 1141 (7th Cir. 2009).

Striking insufficient defenses are proper, because courts "must not tolerate shotgun pleading of affirmative defenses and should strike vague and ambiguous defenses which do not respond to any particular count, allegation or legal basis of a complaint." *Tsavaris v. Pfizer, Inc.*, 310 F.R.D. 678, 682 (S.D. Fla. 2015).

Motions to dismiss are defense pleadings and, therefore, subject to all pleading requirements under the Federal Rules of Civil Procedure, including that they must set forth a short and plain statement of the defense, and they must give the opposing party "fair notice of the nature" of the defense. Fed. R. Civ. P., Rule 8(a); *Fleet Bus. Credit Corp. v. Nat'l City Leasing Corp.*, 191 F.R.D. 568, 570 (N.D. Ill. 1999).

A court may strike defenses that are "insufficient on the face of the pleadings," that fail" as a matter of law," or that are "legally insufficient." *Heller Fin., Inc. v. Midwhey Powder Co.*, 883 F.2d 1286, 1294 (7thCir 1989). Accordingly, when an affirmative defense is without merit, conclusory, improperly pled, devoid of any factual allegations, and inadequate as a matter of law, it should be stricken.

***Attached as <u>Exhibit A</u> is a list of Congress members; Engineers; Scientist; Gov't Agency(s) representatives; Judges; and others skilled in the art to verify Plaintiff's intellectual property subject matter is not "Frivolous".***

Sincerely,

s/ *Larry Golden*

Larry Golden, *Pro Se* Plaintiff

740 Woodruff Rd., #1102

Greenville, SC 29607

(H) 8642885605

Email: atpg-tech@charter.net

## **CERTIFICATE OF SERVICE**

The undersigned hereby certifies that on this 24th day of July, 2023, a true and correct copy of the foregoing "Plaintiff's Motion to Strike", was served upon the following Defendant by priority "express" mail and via email:

Grant D. Johnson

Trial Attorney

Commercial Litigation Branch

Civil Division

Department of Justice

Washington, DC 20530

Grant.D.Johnson@usdoj.gov

(202) 305-2513

s/ *Larry Golden*

Larry Golden, Pro Se

740 Woodruff Rd., #1102

Greenville, South Carolina 29607

atpg-tech@charter.net

864-288-5605

# Exhibit A

*Exhibit A consist of Congress members; Engineers; Scientist; Gov't Agency(s) representatives; Judges; and others skilled in the art to verify Plaintiff's intellectual property subject matter is not "Frivolous".*

**MOTIVE FOR THE "GOVERNMENT" THE UNITED STATES TO TAKE GOLDEN'S PROPERTY FOR USE WITH THE PUBLIC WITHOUT PAYING "JUST COMPENSATION"**

The Government the United States was very interested in implementing Golden's "targeted economic stimulus packages" (i.e., the "SafeRack" package; the "V-Tection" package; and the "ATPG" package).

The strategy for stimulating the economy under the "SafeRack" initiative, involves government spending for research and development; funding by way of awards and grants; and the development for the government certain devices and products for the detection of chemical, biological, radiological, nuclear, and explosives (CBRNE) compounds and agents.

The government was tasked with creating the demand for the CBRNE devices and systems. The demand sparks competition between the third-party contractors competing for the contracts to manufacture the devices, products, and systems "for the government". Through cooperative agreements the government can quickly get the devices, products, and systems commercialized.

The strategy for stimulating the economy under the "V-Tection" initiative, involved targeting the transportation industry. Golden's *remote* stall, stop, and vehicle slow-down system; and Golden's *pre-programmed* stall, stop, and vehicle slow-down system is targeted toward changing the course of transportation vehicles to that of driverless, self-drive, and autonomous vehicles.

The government was interested in Golden's technology for stalling, stopping, and slowing down vehicles because the driverless, self-drive, and autonomous vehicles can be equipped with the CBRNE devices, products, and systems and used by the military.

To satisfy the demand requirement and "use" of the technology developed under the "V-Tection" initiative, the government bailed out General Motors, Ford, and Chrysler. The "*bailout*" funds provided the original engineering manufacturers (OEMs) with tens of billions of dollars to make the gradual transition without going under.

The strategy for stimulating the economy under the **A**nti-**T**errorism **P**roduct **G**rouping "ATPG" initiative is to group *new, improved upon, and useful* inventions/products by common

features of design similarities (i.e., cell phones, laptops, tablets, PCs, [smartphone], etc.) that's capable of communicating, monitoring, detecting, and controlling (CMDC).

The ATPG grouping strategy included integrating the devices, products, and systems, developed and commercialized under the "SafeRack" and "V-Tection" initiatives.

The Government satisfied the demand strategy of the "SafeRack" initiative when the Department of Homeland Security (DHS) issued DHS/S&T BAA07-10 *CELL-ALL Ubiquitous Biological and Chemical Sensing* request for proposals on 10/30/2007, "[f]or example, if biological and chemical sensors could be effectively integrated into common cell phone devices and made available to the American public on a voluntary basis, the Nation could potentially benefit from a sensor network with more than 240M sensors."

> "[e]nrolling members of the public could be seen as an entrepreneurial move on the part of DHS to exploit existing public resources, in the form of people with smartphones, to meet its narrowly defined public-safety objectives; as a Qualcomm representative argued: 'Let's take advantage of the 300 million cell phones that are out there today. They're always with us.'" Hoffman, D., 2011. Qualcomm Project Presentation. Cell-All Live Demonstration for Environmental Sensing (Webcast), September 28. <http://cellall.webcaston.tv/ home/homepage.php> (accessed 17.09.12)

The Government satisfied the demand strategy of the "V-Tection" initiative when the Department of Homeland Security, under the DHS/S&T BAA07-10 *CELL-ALL Ubiquitous Biological and Chemical Sensing* initiative, "secured Cooperative Research and Development Agreements with four primary cell phone manufacturers—Qualcomm, LG, Apple, and Samsung—with the objective of accelerating the 'commercialization of technology developed for government purposes'" (U.S. Department of Homeland Security, 2008).

Smartphones are being integrated into every piece of technology and autonomous vehicles are the new big thing. Smartphones are already being connected to regular cars with Bluetooth and AUX cords. Smartphones are expected to securely connect to driverless cars, as it is the most crucial factor. Here are some features that the integration between smartphones and driverless technology can offer that are already featured with standard vehicles:

- smartphones will be able to connect to autonomous vehicles from remote locations;
- the users will be able to use various apps to control the systems inside of their cars;

- drivers will be able to remotely lock and unlock their vehicles using a smartphone app;

- drivers will be able to find their vehicles in crowded parking lots;

- autonomous vehicle owners will be able to drive their vehicles with their smartphones;

- drivers will be able to slow down much faster with technology that has a much faster reaction time, and can even brake harder.

The Department of Homeland Security (DHS) and the Department of Justice (DOJ) realized they needed to discredit Golden's "targeted economic stimulus packages" (i.e., the "SafeRack" package; the "V-Tection" package; and the "ATPG" package) and invalidate the patented inventions of Golden to avoid liability for taking Golden's property for the benefit of the public, under the Fifth Amendment Clause of the U.S. Constitution, without paying just compensation.

Therefore, the DHS and DOJ, who are not "persons" authorized to petition the Patent Trials and Appeals Board (PTAB); was motivated to petition the PTAB in 2014 with the unqualified patent references of Astrin, Breed, and Mostov, eighteen publications, and an Expert's Declaration in support of the unqualified patents and publications references.

**Members of Congress who Verified the Intellectual Property Subject Matter of Golden's Patents and Inventions are *NOT* Frivolous**

As a result of the 9/11 attacks, between the years 2003-2005, Golden submitted three (3) Economic Stimulus and Terrorism Prevention Packages, that included strategies for stimulating our economy as a whole and the African-American community, to at least that of President Bush, VP Cheney, and S.C. Senators Holland, DeMint, and Graham.

President Bush, VP Cheney, and S.C. Senators Holland, DeMint, and Graham sent the *nonfrivolous* "Economic Stimulus and Terrorism Prevention Packages", that included schematics for CBRNE detection devices (the "SafeRack" package); the schematics for a new, improved upon, and useful cell phone, PC, tablet, laptop, etc. (the "ATPG" package); and the schematics for a remote stop, stall, and vehicle slow-down system, and pre-programmed stopping, stalling, and slowing down of a vehicle (the "V-Tection" package), over to the Department of Homeland Security (DHS) for development and implementation.

Golden's evidence is the response letters Golden received from the offices of President Bush, VP Cheney, and S.C. Senators Holland, DeMint, and Graham.

The question here is, why would the leaders of our Nation send "*frivolous*" information over to the Department of Homeland Security (DHS) for implementation?

**Government Agencies who Verified the Intellectual Property Subject Matter of Golden's Patents and Inventions are *NOT* Frivolous**

The United States Patent and Trademark Office (USPTO) has verified through examination the validity of eleven (11) patents issued to Golden that covers the intellectual property subject matter of Golden's inventions. 35 U.S. Code § 282(a) states In General. "A patent shall be presumed valid. Each claim of a patent (… independent, dependent, or multiple dependent …) shall be presumed valid independently of the validity of other claims". *See*, e.g., Universal *Marion Corp. v. Warner & Swasey Co.*, 354 F.2d 541, 544 (10th Cir. 1965) ("[A] party asserting invalidity on the ground of anticipation in the prior art, or for any other reason, has the burden of establishing such invalidity by clear and convincing evidence.").

Therefore, each and every time the Courts dismiss any of Golden's cases as *"frivolous"*, without the Defendants' having first presented their patent(s) invalidity contentions on a "clear and convincing evidence" standard; without a Markman Hearing and claim construction; and without a trial by jury as guaranteed by the Seventh Amendment of the United States Constitution is a complete violation of Golden's procedural due process. Procedural due process limits the federal courts' power by requiring certain procedures to be followed in civil matters.

The question here is, why would the Courts dismiss Golden's patents as "*frivolous*", given that the Fifth Amendment of the United States Constitution says to the federal government that no one shall be "deprived of life, liberty or property without due process of law."

Golden traveled to Colorado in 2006 for the Government Agencies (DoD, DOE, DHS, etc.) SBIR Tour. Golden meet with, and left behind copies of Golden's stimulus packages with Lisa Sabolewski, DHS SBIR Program Manager, who in turn asked Golden to send the information to her via email. (E-mail correspondence available).

Golden responded to an RFI in 2007 to the DHS/S&T Safe Container (SafeCon) Initiative, and discussed the intellectual property subject matter of Golden's inventions with DHS Margo Graves; margaret.graves@hq.dhs.gov, 202-379-8727. (E-mail correspondence available).

Golden traveled to Washington, DC in 2008 with his lead engineer [Harold Kimball] to discuss a "read-ahead" of Golden's intellectual property and the possibility of Golden incubating

his company at the Department of Homeland Security (DHS). Golden and Mr. Kimball meet with Ed Turner, DHS/S&T Program Manager.

Golden submitted a proposal in 2007, in response to the DHS S&T *Cell-All Ubiquitous Biological and Chemical Sensing* request for proposals, and upon request, resubmitted Golden's intellectual property directly to the Stephen Dennis, DHS Program Manager for the *Cell-All Ubiquitous Biological and Chemical Sensing* initiative in 2008. (E-mail correspondence available).

Team Collaboration Agreement with Dr. Thomas G. Thundat who is a Corporate Fellow and the Leader of the Nanoscale Science and Devices Group at the Oak Ridge National Laboratory. He is also a Research Professor at the University of Tennessee, Knoxville, and a Visiting Professor at the University of Burgundy, France. He received his Ph.D. degree in physics from State University of New York at Albany in 1987. He is the author of over 220 publications in refereed journals, 45 book chapters, and 25 patents. Dr. Thundat's research is currently focused on novel physical, chemical, and biological detection using micro- and nano-mechanical sensors. His expertise includes physics and chemistry of interfaces, solid-liquid interface, biophysics, scanning probes, nanoscale phenomena, and quantum confined atoms. Golden was invited to spend the day with Dr. Thundat in 2006 to discuss his work.

Team Collaboration Agreement with Dr. Chris R. Taitt; Research Biochemist; Center for Bio/Molecular Science & Engineering, Naval Research Laboratory (NRL). Dr. Taitt and his team has developed an array biosensor for the rapid simultaneous analysis of multiple analytes in multiple samples. Applications include: Infectious disease diagnostics, Biological warfare defense, Food & beverage safety, Agriculture/veterinary testing, and Environmental monitoring.

Team Collaboration Agreement with Dr. Augustus Way Fountain III; U.S. Army Edgewood Chemical Biological Center is an Academy Professor in the Department of Chemistry and Life Science at the US Military Academy. He is a graduate of Stetson University and received the M.S. and Ph.D. degrees in analytical chemistry from Florida State University.

Golden was invited by DHS to Sacramento, CA in 2008 to attend a T.R.U.ST Industry Day Symposium. Golden discussed and left copies of his intellectual property subject matter with a selected panel. Golden was walked out by the Program Manager Dave Masters, where he promised Golden, he will release a Request for Proposal in the near future that aligns with Golden's intellectual property technological rational.

| DHS/S&T "TRUST" INDUSTRY DAY | DHS/S&T "TRUST" COVERED AREAS |
|---|---|
|  | |

| DHS/S&T "TRUST" (BAA) 09-17 | DHS/S&T "TRUST" PROGRAM GOALS |
|---|---|
| **U. S. Department of Homeland Security Science & Technology Directorate**  **Broad Agency Announcement (BAA) 09-17 "Time Recorded Ubiquitous Sensor Technologies" (TRUST)** | The Time Recorded Ubiquitous Sensor Technologies (TRUST) Project was initiated by DHS-S&T to solicit innovative solutions to detect and provide an alert to the presence of WMD… DHS and several other agencies have identified the need to detect and identify weapons of mass destruction (WMD) … Agency components such as Customs and Border Protection (CBP), United States Coast Guard (USCG), Transportation Security Administration (TSA), and others share a mission to secure our borders and transportation systems, from a devastating attack using WMD materials. Included with this BAA are study excerpts of environmental, threat, and signature studies performed by Massachusetts Institute of Technology (MIT)-Lincoln Laboratory (LL). The system should detect: Weapons of Mass Destruction (WMD). Chemical Agents as defined by Center for Disease Control (CDC). Biological Agents as defined by Center for Disease Control (CDC) as Category A bioterrorism agents-diseases. Radiological and Nuclear Materials. Explosives (TNT, RDX, HMX, and PETN based). Human Stowaways by chemical detection means. |

The Naval Air Systems Command (NAVAIR) provides materiel support for aircraft and airborne weapon systems for the United States Navy. It is one of the Echelon II Navy systems

commands (SYSCOM), and was established in 1966 as the successor to the Navy's Bureau of Naval Weapons.

NAVAIR issued the NAVAIR 4.5 Counter Networks & Illicit Trafficking (CNIT) Program Office (4.5CNIT) Program and Operations Support on 25 January 2011. Examples of mission requirements include, but are not limited to: Development of electronic tracking devices; Analytical software; Airborne sensors; Ground Sensors; UAV modifications; Inspection systems; Unattended ground sensors; Foliage penetrating radar; Persistent surveillance; Fast boat detection; and Communication systems

SAIC's Jim Williford, VP Business Development - Global Preparedness, Science & Recovery Science Applications International Corporation (SAIC) and Mary E. John, Sr. Subcontracts Administrator for SAIC entered into a subcontractor's agreement with Golden's Anti-Terrorism Product Grouping (ATPG) Technology, LLC to respond to the NAVAIR CNIT solicitation and provide technology for the development of a Cell phone and communications sensor detection and lock disabling system. Golden expressed an interest in entering into a licensing agreement with SAIC.

SAIC is a FORTUNE 500(R) scientific, engineering, and technology applications company that uses its deep domain knowledge to solve problems of vital importance to the nation and the world, in national security, energy and the environment, critical infrastructure, and health. The company's approximately 45,000 employees serve customers in the U.S. Department of Defense, the intelligence community, the U.S. Department of Homeland Security, other U.S. Government civil agencies and selected commercial markets. Headquartered in McLean, Va., SAIC had annual revenues of $10.8 billion for its fiscal year ended January 31, 2010. For more information, visit www.saic.com. SAIC: From Science to Solutions(R)

**Private Entities who Verified the Intellectual Property Subject Matter of Golden's Patents and Inventions are *NOT* Frivolous by Commercializing Allegedly Infringing Products**

Golden first contacted GM/OnStar during the summer months of 2007 to ask them to participate in a Department of Homeland Security solicitation: (BAA07-02A). Golden's primary contact at GM/OnStar was Mr. Jim Culbertson. Golden asked GM/OnStar if they had the capabilities of bringing a moving vehicle to a stall or stop.  Their response was, "I need time to find out if we have the capabilities and if there is interest from upper management".

Golden never heard back from GM/OnStar, but noticed they made an announcement on October 9, 2007 of a new, "Stolen vehicle slow down" that is being offered by GM/OnStar beginning in the following year on their 2009 models. Golden called Mr. Jim Culbertson on March 27, 2008 at 11:20 a.m. at 313-665-2791.  Mr. Culbertson referred Golden to Angie Miller at 313-665-1485.  When Golden dialed Ms. Miller's number, the answering machine for a Michelle came on.

General Motors Corporation is the assignee of a patent (8239076) that was filed on March 31, 2008; application number 12/059893.  The patent's title is; "VEHICLE SLOWDOWN CONTROL VIA SHORT RANGE WIRELESS COMMUNICATION".

On April 14, 2008, I faxed a letter to the General Motors Corporation, to the attention of Mr. G. Richard Wagoner, Jr., Chairman & CEO and to several members of the General Motors leadership team, to include, Mr. Frederick A. Henderson, President and Chief Operating Officer, Mr. Ray G. Young, Executive Vice President and Chief Financial Officer, and Mr. Robert S. Osborn, Group Vice President and General Counsel.

In responding to the DHS solicitation BAA07-02A, I asked GM/OnStar if they were capable of developing the following technology:

- a system for slowing, stalling or stopping a moving vehicle through the use of a handheld, cell phone, smart phone, PDA, laptop, desktop, or some other fixed, mobile or portable means.
- a system for slowing, stalling or stopping any and all vehicles, truck, trains, airplanes, ships or vessels.
- a system for slowing, stalling or stopping a moving vehicle and locking the vehicle doors, thereby locking any unauthorized user inside the vehicle.
- a system for slowing, stalling or stopping a moving vehicle and locking the vehicle doors, thereby locking any unauthorized user inside the vehicle through the use of long- or short-range communication, Bluetooth, cellular and/or satellite, handheld, cell phone, smart phone, PDA, laptop, desktop or some other fixed mobile or portable device.

Golden's correspondence with Apple was sent on 11/19/2010: Golden's notice letters and licensing offer was mailed U.S. Postal Service, Certified Mail to Mr. Tim Cook, Chief Operating Officer (COO) of Apple, and Mr. Bruce Sewell, SVP & General Counsel; to 1 Infinite Loop,

Cupertino, CA 95014. Apple received and signed for the letters 11/16/2010. Tracking Nos: 7009 2250 0001 0170 9861 and 7009 2250 0001 0170 9854.

In Golden's notice letters; Golden is quoted as saying "[m]y technology covers electronic devices, mobile devices, authentication (biometrics) technology; mobile devices lock and unlock features, RFID reader technology for mobile devices, embedded sensors in electronic devices, embedded sensors in mobile and portable devices, mobile phones as readers, embedded sensors in cell phone cases; mobile, electronic and portable devices used as monitoring equipment for locating, tracking, navigating and status of sensors."

On 07/01/2019, Golden responded back to Apple's Krista Grewal, Counsel IP Transactions, on Golden's "Cease and Desist" request. Golden is quoted as saying: "Certain Apple Inc.'s smartphones, laptops, tablets, and smartwatches are infringing at least one patent claim of Golden's following patents: [7,385,497]; [7,636,033]; [8,106,752]; [8,334,761]; [8,531,280]; [RE43,891]; [RE43,990]; [9,096,189]; [9,589,439]; and, [10,163,287].

"Certainly, I appreciate the comment you made in defense of Apple's infringing activities in your last correspondence via email dated June 27, 2019: 'As an example, no Apple product includes detectors or indicator lights for detecting 'at least one of chemical, biological, radiological, or explosive' agents and compounds as required by the asserted patents."

"To address your comments above. Apple's smartphones; Apple's smartwatches; or Apple's smartphones interconnected to Apple's smartwatches; all, infringes at least one patent claim for a CMDC device(s) of the PO's patents listed above for chemical, biological, radiological, or explosive" agents and compounds."

"Apple has applied for patents for its smartphones and smartwatches that covers chemical and biological detection; biometric fingerprint and signature; motion sensors; and, the detection of humans. I expect Apple to submit to the USPTO an IDS to disclose my patents as prior art references for continued prosecution".

Golden's correspondence with Qualcomm. "On November 4, 2010, Golden emailed Kate Lane, Strategic IP, Qualcomm Incorporated (E-mail: clane@qualcomm.com); Direct: (858-658-2047)), to inform Ms. Lane of certain patented technology (i.e., CMDC—Smartphone—device; central processing unit (CPU); and, a Stall, Stop, and Vehicle Slowdown System for manned and

unmanned electric, autonomous, and driverless vehicles). Golden asked if Qualcomm would be interested in entering into a licensing agreement with the Golden. Subject: "Patented Technology for Qualcomm's Review (copy available upon request).

Golden mailed out letters dated December 7, 2010 addressed to the attention of Qualcomm's Chairman & CEO Dr. Paul E. Jacobs and Qualcomm's EVP & President Derek Aberle, (copies of the letters and return receipts are available upon request) informing the Executives of the Golden's patented technology and asked if they would be interested in entering into a licensing agreement with Golden.

After 10 months, Ms. Lane responded back via e-mail on September 29, 2011 with, "Hi Larry, I'm just checking in to see if this portfolio is still available for purchase. Please let me know. Thank you, Kate".

On October 5, 2011, Ms. Lane responded via e-mail, "Thanks Larry, [c]an you please take a few moments to fill out the attached Patent Information Request form for this? Please let me know if you have any questions. Best regards, Kate" (copy available upon request).

On October 11, 2011, the Golden returned via e-mail, the answered Patent Information Request form to Ms. Lane. Golden made several attempts to contact Ms. Lane via e-mail and by phone after that, but never heard back from Ms. Lane.

Golden's correspondence with Intel. Intel was knowledgeable of Golden's communicating, monitoring, detecting, and controlling (CMDC) devices, CPUs and detection systems dating back to 12/2010: On 12/16/2010: Golden's notice letters and licensing offer was mailed U.S. Postal Service, Certified Mail to Mr. Paul S. Otellini, President & CEO Intel, and Mr. Curt J. Nichols, VP Intel Capital Intel, at Mission College Blvd., Santa Clara, CA 95054-1549. Intel received and signed for the letters 12/20/2010. Phone: 408-765-8080. Tracking Nos: 7010 1870 0002 0193 0360 and 7010 1870 0002 0193 0377.

Golden's correspondence with L-3 Communications was sent to the attention of Curtis Brunson; EVP, Corporate Strategy and Development on November 12, 2010. "Dear Sir: Below is a copy of an e-mail I sent Patricia R. Krall, a Vice President with L-3 Communications on October 30, 2010. I talked with, and e-mailed Ms. Krall in January, 2007 a brief description of technology I had at that time patent pending that covered multiple sensing for CBRNE being transported inside maritime cargo containers. I asked Ms. Krall if L-3 would consider collaborating with me in responding to a DHS solicitation requesting the technology."

To: Patricia Krall, L-3 Communications. "Thanks for allowing me the opportunity to present technology that is beneficial for projects being researched and developed within the Divisions of L-3 Communications Security and Detection Systems, L-3 Communications Unmanned Systems, and L-3 Services, Inc. Please inform me if I need to also submit this proposal directly to L-3 Communications Legal or Patent Department. Ms. Krall, we had an opportunity to exchange e-mails in January, February of 2007 discussing cargo container security technology I had patent pending at the time.

**When compared to Google, Two Federal Circuit Judges Nominated by President Obama (Taranto and Stoll) Verified the Intellectual Property Subject Matter of Golden's Patents and Inventions are *NOT* Frivolous**

The Federal Circuit on 09/08/2022, in *Larry Golden v. Google LLC*; Case No. 22-1267 — "VACATED AND REMANDED" the relevant Case No: 22-1267 Document 15; back to the District Court "to be filed and request service of process".

The Federal Circuit determined the complaint, "includes a detailed claim chart mapping features of an accused product, the Google Pixel 5 Smartphone, to independent claims from U.S. Patent Nos. 10,163,287, 9,589,439, and 9,069,189" … "in a relatively straightforward manner" … and that the [Circuit] "express no opinion as to the adequacy of the complaint or claim chart except that it is not facially frivolous."

> "Mr. Golden's complaint includes a detailed claim chart mapping features of an accused product, the Google Pixel 5 Smartphone, to independent claims from U.S. Patent Nos. 10,163,287, 9,589,439, and 9,069,189 … It [claim chart] attempts [] to map claim limitations to infringing product features, and it does so in a relatively straightforward manner …[W]e conclude that the district court's decision in the Google case is not correct with respect to at least the three claims mapped out in the claim chart. Mr. Golden has made efforts to identify exactly how the accused products meet the limitations of his claims in this chart.…"

**Team Collaboration Agreements with "People Skilled in the Art" who Verified the Intellectual Property Subject Matter of Golden's Patents and Inventions are *NOT* Frivolous**

**Dr. Thomas J. Bonazza**, Ph.D. Candidate Mechanical Engineering, West Virginia University 1992-Present; M.S., Electrical Engineering, Johns Hopkins University, 1991; B.S.,

Electrical Engineering, West Virginia University, 1986. Currently employed with Electronic Warfare Association, (EWA).

**Dr. Lonnie Johnson**, (Inventor). Dr. Johnson holds a B.S. degree in Mechanical Engineering, an M.S. degree in Nuclear Engineering, and an honorary Ph.D. in Science from Tuskegee University. Upon graduation, he worked as a research engineer at Oak Ridge National Laboratory, and then joined the U. S. Air Force, serving as Acting Chief of the Space Nuclear Power Safety Section at the Air Force Weapons Laboratory in Albuquerque, New Mexico. Currently CEO & President of Johnson R&D.

**Dr. Santosh Pandey**, Ph.D. Electrical Engineering, Lehigh University (2006), MS, Electrical Engineering, Lehigh University (2001), BTech, Electrical Engineering, Indian Institute of Technology, Kharagpur (1999), Research Interests: Bioelectronics, sensors, bioMEMS, devices, VLSI circuits, Core Area: Advanced electronics and materials, Strategic Plan Area: Bioengineering. Assistant Professor: Department of Electrical and Computer Engineering, Iowa State University.

**Harold P. Kimball Jr.** Enabling Technologies, Inc. (ETI), President Software Functional Manager / Senior Software Developer Support Systems Associates, Inc. (SSAI), Warner Robins, Georgia. Education: Bachelor of Science in Computer Science, 1990, Mercer University, Macon, Georgia. Associate of Science in Computer Science, 1987, Macon College, Macon, Georgia. Technical Skills: Machines: PCs, SUN, VAX, Alpha. Operating Environments: UNIX, VMS, MS-DOS, Novell Netware, Windows 95 & NT Software: Sybase, ORACLE, Advantage, FoxPro, Microsoft Word, TBBS bulletin board. Languages: Delphi, SQL, Ada, C, Assembly, Pascal, FoxPro, Pro*C, PL/SQL. Experience and Accomplishments: Manager / Lead Developer for the Digital Mapping Interface System (DMIS); Manager / Lead Developer for the AC-130H Gunship Part Task Trainer (pIT); Lead Developer for re-engineered Linux based APG-150 Control Unit, AC-130H Gunship; Designed and coded software (desktop and web) for the C-141 Parts Application Program Indenture (API); Designed and coded a Delphi application to manage the AC-130H Gunship's Electrical Load Analysis (ELA) database; Designed and coded software for the Integrated Database. Designed and coded Delph applications to monitor, save and decode ML-STD-1553 messages; Designed and coded a Delphi application to track drawings and the fabrication of assemblies for the C-(4) test bench.

**Doug Erwin Cumbie**. Enabling Technologies, Inc. (ETI); Computer & Electrical Engineer. Education: BS, Electrical Engineering, University of West Florida, 2007; BS, Computer Engineering, University of Central Florida, 2001. Job-Related Skills: C# (MS Visual Studio 200312005 - desktop and mobile devices). DOS, Windows 9812000IXP, Unix. Embedded systems. Independent Projects: <u>Handheld Wireless GPS Tracking Device</u>: Designed and developed with one team member for undergraduate electrical engineering senior design course. The device consisted of a GPS module, microcontroller, LCD display, and a long-range wireless transceiver integrated into a battery powered, portable handheld unit. <u>UAV Ground Station</u>: Developed a ground control system for communicating with a remote unmanned aerial vehicle. Project was developed for the ECAAT UAV team of the University of West Florida. The software application utilizes a wireless link to provide a real-time display of the UAV's present position and onboard system information on a laptop computer. Experience and Accomplishments: Developed version 3.0 to 5.0 of the Digital Mapping Interface System for Gunships (DMISG) moving map software for AC-130H and AC-130U model gunships; Assisted in the development of a moving map software application for a Pocket PC handheld device.

**Dr. Gilbert E. Pacey**, Ph.D. (IDCAST) CBRNE Coordinator for the University of Dayton Research Institute (UDRI) Institute for the Development and Commercialization of Advanced Sensor Technology (IDCAST). Professor, Director; Miami University Center for Nanotechnology, Department of Chemistry and Biochemistry, Miami University, Oxford, Ohio 45056. Telephone: 513-529-2875 e-mail paceyge@muohio.edu. Dr. Pacey has 30 years' experience managing research projects at MU and the last 5 directing all MU research and external funding, intellectual property, and compliance issues. He is currently the CBRNE Sensors Coordinator for the Institute for the Development of Advanced Sensor Technology, IDCAST, which is a $28 million Ohio Third Frontier Wright Center for Innovation focused on sensor development. He is currently funding in THz spectroscopy and imaging (NIH) and CBRNE sensing (million Ohio Research Scholar).  He has a career funding record (fund just for his group) exceeding ten million dollars.

**Dr. Guru Subramanyam**, Ph.D. (IDCAST) Professor, Electrical & Computer Engineering, University of Dayton Phone: 937-229-3188; Fax: 937-229-4529, E-mail: Guru.Subramanyam@ notes.udayton.edu. Education: PhD in Electrical Engineering, University of Cincinnati, 1993; MS in Electrical Engineering, University of Cincinnati, 1988; BE in

Electrical & Electronics Engineering, University of Madras, 1984, (First Class). Funding: Recent Research on voltage tunable dielectrics and biopolymers: Has been a Principal Investigator (PI) in several funded projects with AFRL, AFOSR, DARPA, NASA, NSF, and Ohio Board of Regents Research Challenge Grants. Total funding as a PI exceeds $1,500,000 to date. Thin film barium strontium titanate (BST) varactor technology developed by Professor Subramanyam has been licensed by a company (Inventis Corp) resulting in a new start-up Analog Bridge Inc.

**Dr. Wolfgang U. Spendel**, Ph.D. (IDCAST) Research Scientist IDCAST/Miami University Center for Nanotechnology, Department of Chemistry and Biochemistry, Miami University, Oxford, Ohio 45056. Telephone: 513-529-8081 e-mail spendewu@muohio.edu. Education: Ph.D. Physical Chemistry, Pennsylvania State University, State College PA, 1978; BS Chemistry, Grand Valley State College, Allendale, MI, 1974; Electronics Design Associates Degree, Cleveland Institute of Electronics, 1994. Work Experience: United States Marine Corps, 1966 – 1970.

**Dr. William H. Steinecker**, Ph.D. (IDCAST) IDCAST Research Scholar. Department of Chemistry and Biochemistry, Miami University, Oxford, Ohio 45056. Telephone: 937-285-4814, Fax: 513-529-5715, e-mail steinewh@muohio.edu. Education and Training: Miami University, BS 2001; University of Michigan, MS 2003; University of Michigan, Ph.D. 2006. Publications:

- Kaanta, B.C.; Chen, H.; Lambertus, G.R.; Steinecker, W.H.; Zhdaneev, O.; Zhang, X. "High Sensitivity Micro-Thermal Conductivity Detector for Gas Chromatography," Proceedings of IEEE MEMS '09, 2009, page numbers not yet available.

- Zhong, Q.; Steinecker, W.H.; Zellers, E.T. "Characterization of a High-Performance Portable GC with a Chemiresistor Array Detector." The Analyst, 2009, 134(2), 283-293.

- Kim, H.; Steinecker, W.H.; Lambertus, G.R.; Astle, A.A.; Najafi, K.; Zellers, E.T.; Washabaugh, P.D.; Bernal, L.P.; Wise, K.D. "Micropump-Driven High-Speed MEMS Gas Chromatography System." Proceedings of Transducers '07, 2007, 1505-1508.

- Zhong, Q.; Veeneman, R.A.; Steinecker, W.H.; Jia, C.; Batterman, S.A.; Zellers, E.T. "Rapid Determination of ETS Markers with a Prototype Field-Portable GC Employing a Microsensor Array Detector." J. Environmental Monitoring, 2007, 9(5), 440-448.

The question here is, why the Trial Court Judge(s) chose not to rely on the opinions and testimony of those who are *experts* or *skilled in the art* before dismissing a case as frivolous (i.e.,

of little importance; trivial; lacking in seriousness; clearly insufficient on its face; not deserving serious attention; wasteful; useless; totally and completely without merit; fantastical; fanciful; unbelievable; irrational; incredible; delusional; or, lacks an arguable basis either in law or fact)?

As it stands right now the Trial Court(s) have been unashamedly wrong about the features and specifications of Golden's patented inventions. The Trial Courts' biggest fear is having to litigate who actually invented the "smartphone", knowing it will change the course of history for the World to know it was a "Black Man" who invented the smartphone. It's easier to dismiss the case as "*frivolous*".

Golden, an African-American Inventor, has twenty-seven (27) independent patent claims, and twenty (20) dependent patent claims for a Communicating, Monitoring, Detecting, and Controlling (CMDC) device (i.e., a smartphone, or a new, improved upon, and useful cell phone).

But, without seeking the opinions of experts or people skilled in the art, the NDC Judge in *Golden v. Samsung* dismissed Golden's case as having been found "frivolous" before, and that Samsung own the rights to certain functionalities

"Even if preclusion did not apply – and it does – this case must be dismissed for failure to plausibly allege infringement. Golden asserts that his "Multi Sensor Detection, Stall to Stop and Lock Disabling System" patents were infringed by: (i) "CPU's Samsung uses with its Smartphones"; (ii) Samsung's use of Global Position System (GPS) and web browsers; (iii) Samsung's use of camera lenses; (iv) Samsung's use of biometric data to unlock phones; and (v) Samsung's use of remote unlocking technology. See generally Complaint ¶ 61 & pgs. 19-26; see also id. pgs. 27-31. The allegations that his patents cover the identified functionalities included in Samsung's products are wholly unsupported and implausible on their face." Case 3:23-cv-00048-WHO Document 36 Filed 06/08/23 Page 4 of 5

Every element the NDC Court described as being "the identified functionalities included in Samsung's products", are illustrated below in Golden's independent claim 23 of Golden's '439 patent. Plaintiff's new, improve upon, and/or useful cell phone has a priority disclosure date at the USPTO of November 17, 2004:

A cell phone comprising:

a ***central processing unit (CPU)*** for executing and carrying out the instructions of a computer program;

a transmitter for transmitting signals and messages to a cell phone detection device; a receiver for receiving signals from the cell phone detection device;

at least one of a satellite connection, Bluetooth connection, WiFi connection, ***internet connection***, radio frequency (RF) connection, cellular connection, broadband connection, long range radio frequency (RF) connection, short range radio frequency (RF) connection, or ***GPS connection***;

the cell phone is at least a fixed, portable or mobile communication device interconnected to the cell phone detection device, capable of wired or wireless communication therebetween; and

whereupon the cell phone is interconnected to the cell phone detection device to ***receive signals or send signals to lock or unlock doors***, to activate or deactivate security systems, to activate or deactivate multi-sensor detection systems, or to activate or deactivate the cell phone detection device;

at least one of ***a chemical sensor, a biological sensor, an explosive sensor, a human sensor, a contraband sensor, or a radiological sensor*** capable of being ***disposed within, on, upon or adjacent the cell phone***; [*camera lens used for CBRNE detection*]

wherein at least one of the satellite connection, Bluetooth connection, WiFi connection, internet connection, radio frequency (RF) connection, cellular connection, broadband connection, long range radio frequency (RF) connection, short range radio frequency (RF) connection, or GPS connection is capable of signal communication with the transmitter or the receiver;

wherein the cell phone is equipped with a ***biometric lock disabler that incorporates at least one of a fingerprint recognition***, voice recognition, face recognition, hand geometry, retina scan, iris scan, or signature such that the cell phone is locked by the biometric lock disabler to prevent unauthorized use; and

whereupon a signal sent to the receiver of the cell phone detection device from at least one of the chemical sensor, the biological sensor, the explosive sensor, the human sensor, the contraband sensor, or the radiological sensor, causes a signal that includes at

least one of location data or sensor data to be sent to the cell phone.

Samsung's i550 mobile phone was released to Reuters on October 17, 2007. Samsung Electronics Co Ltd said its Samsung's first-ever phone incorporating a Global Positioning System (GPS). In 2010 Samsung released its first phone with fingerprint biometric technology, the Galaxy Note4. First released in June 2010, the Samsung Galaxy S ran on a 5-megapixel (MP) rear camera. A year later the Galaxy S2 featured 2 megapixels in the front and 8 megapixels in the rear [megapixel cameras are used for CBRNE detection.

The NDC Court "denied" Golden's motion for reconsideration. The NDC Court knew the statements were false, and yet, spoke with a "reckless disregard for the truth". [*malicious intent*].

Sincerely,

s/ *Larry Golden*

Larry Golden, *Pro Se* Plaintiff

740 Woodruff Rd., #1102

Greenville, SC 29607

(H) 8642885605

Email: atpg-tech@charter.net

## <u>CERTIFICATE OF SERVICE</u>

The undersigned hereby certifies that on this 24th day of July, 2023, a true and correct copy of the foregoing "Plaintiff's Exhibit A", was served upon the following Defendant by priority "express" mail and via email:

Grant D. Johnson

Trial Attorney

Commercial Litigation Branch

Civil Division

Department of Justice

Washington, DC 20530

Grant.D.Johnson@usdoj.gov

(202) 305-2513


s/ *Larry Golden*

Larry Golden, Pro Se

740 Woodruff Rd., #1102

Greenville, South Carolina 29607

atpg-tech@charter.net

864-288-5605