# IN THE UNITED STATES COURT OF
# FEDERAL CLAIMS

Larry Golden, Pro Se Plaintiff

740 Woodruff Rd., #1102

Greenville, South Carolina 29607

(P) 864-992-7104

(E) atpg-tech@charter.net

|  |  |
|---|---|
| LARRY GOLDEN,<br><br>    *Plaintiff*,<br><br>V.<br><br>THE UNITED STATES,<br><br>    *Defendant*. | Case No: <u>1:23-cv-00811-EGB</u><br><br><br>**Patent Infringement**<br><br><br>April 30, 2024 |

## PLAINTIFF'S MOTION FOR RECONSIDERATION AND NOTICE OF PENDING MOTION FOR DISQUALIFICATION

Pursuant to ***28 U.S. Code § 144 - Bias or prejudice of judge:*** "Whenever a party to any proceeding in a district court makes and files a timely and sufficient affidavit that the judge before whom the matter is pending has a personal bias or prejudice either against him or in favor of any adverse party, such judge shall proceed no further therein, but another judge shall be assigned to hear such proceeding" …

On 07/19/23, Golden filed a timely "Motion for Disqualification" [Dkt. 12]. Nine months after Golden filed his "Motion for Disqualification" [Dkt. 12], and after Golden made a few phone calls inquiring why another Judge had not been assigned to the case, Senior Judge Eric G. Bruggink granted the Government's "Motion to Dismiss" on 04/24/24.

# CONTENT PAGE

*Page*

VERTICAL STARE DECISIS ............................................................................... 1

"DUE PROCESS" ............................................................................................. 1

12(b)(6) ......................................................................................................... 2

DOCTRINE OF *RES JUDICATA* ....................................................................... 2

KESSLER DOCTRINE ..................................................................................... 4

DISQUALIFICATION ...................................................................................... 4

THE SCOPE OF SOVEREIGN IMMUNITY FOR PATENT
INFRINGEMENT UNDER 28 U.S.C. § 1498(a) .................................................. 6

RELEVANT FACTS ......................................................................................... 8

    DHS S&T "CELL-ALL" ............................................................................... 8

    DoD DTRA ATAK ...................................................................................... 9

    DoD "JPEO-CBRND" .............................................................................. 16

PROCUDURAL HISTORY: SENIOR JUDGE BRUGGINK
WAS GIVENGUIDANCE ON HOW TO ADJUDICATE A
PATENT INFRINGEMENTCLAIM UNDER 28 U.S.C. § 1498(a) ......................... 19

NINE FEDERAL JUDGES WHO HAS REVIEWED GOLDEN'S
PATENTED COMBINATIONS ALL AGREE THE GOVERNMENT
IS THE "SINGLE ENTITY' FOR DIRECT INFRINGEMENT UNDER
28 U.S.C. § 1498(a) ...................................................................................... 22

The United States Court of Appeals for the Federal Circuit
Judges in Case No. 22-1267; determined Direct Infringement
by or the Government arises when there's a combined ATAK
Software; CBRN Plugins; and, a Smartphone ................................................ 23

The Northern District of California Court Judge Haywood S.
Gilliam, Jr. in Case No. 22-5246; determined Direct Infringe-
ment by or for the Government arises when there's a combined
ATAK Software; CBRN Plugins; and, a Smartphone ........................…......... 25

The Northern District of California Court Judge Rita F. Lin in
Case No. 22-5246; determined Direct Infringement by or for
the Government arises when there's a combined ATAK Software;
CBRN Plugins; and, a Smartphone ............................................................ 28

The United States Court of Appeals for the Federal Circuit
Judges in Case No. 23-2120; agreed with the Northern District
of California Court Judge in *Golden v. Samsung* that Direct
Infringement by or for the Government arises when there's a
combined ATAK Software; CBRN Plugins; and, a Smartphone ........................… 29

CONCLUSION ................................................................................... 30

## VERTICAL STARE DECISIS

Senior Judge Bruggink is in violation of the doctrine of *vertical stare decisis* for not honoring the decision of the higher Appellate Court in *Larry Golden v. Google LLC*; Case No. 22-1267.

The Court of Federal Claims, who is bound by and must follow the decisions of the U.S. Court of Appeals for the Federal Circuit [*vertical stare decisis*] fail to abide by the Circuit's decision in *Larry Golden v. Google LLC* Case No. 22-1267, that Google's "smartphone" that include the ATAK software and CBRN plugin sensors literally and/or under the doctrine of equivalents infringes Petitioner's "independent claims from U.S. Patent Nos. 10,163,287, 9,589,439, and 9,069,189 … and it does so in a relatively straightforward manner". The Claims Court was bound by the doctrine of *vertical stare decisis*, to uphold the CAFC's decision.

*Vertical stare decisis* binds Senior Judge Bruggink to follow strictly the decisions of higher courts within the same jurisdiction (e.g., the United States Court of Federal Claims must follow the decisions of the U.S. Court of Appeals for the Federal Circuit). The Supreme Court defines *vertical stare decisis* as the doctrine, "a lower court must strictly follow the decision(s) handed down by a higher court within the same jurisdiction".

Senior Judge Bruggink engages in *vertical stare decisis* when he applies precedent from a higher court. For example, if the Court of Federal Claims in *Golden v. U.S.* adhered to a previous ruling from the United States Court of Appeals for the Federal Circuit, in *Larry Golden v. Google LLC*; Case No. 22-1267, that would be *vertical stare decisis*.

## "DUE PROCESS"

The Fifth Amendment states, "No person shall…be deprived of life, liberty, or property, without due process of law;", and among other things, the government and Senior Judge Bruggink cannot deprive Golden of his property without following certain procedures. This is known as "due process," which is further broken down into two concepts: procedural due process and substantive due process.

The Supreme Court has explained that [p]rocedural due process rules are meant to protect persons [Golden] not from the deprivation, but from the mistaken [unfair] or unjustified deprivation of his property. *Carey v. Piphus*, 435 U.S. 247, 259 (1978).

1

As the Supreme Court summed up in *James v. Campbell*, 104 U.S. 356, 358 (1882), a case concerning the alleged appropriation of a patent by the Government:

> "[A patent] confers upon the patentee an exclusive property in the patented invention which cannot be appropriated or used by the government itself, without just compensation, any more than it can appropriate or use without compensation land which has been patented to a private purchaser."

Over the course of years, Senior Judge Bruggink, in multiple cases, to include this current case, has deprived Golden of his property through unfair and unjustified means that resulted in the loss of his property and the continued appropriation or use by the government without paying Golden just compensation.

## 12(b)(6)

When deciding a motion to dismiss under Rule 12(b)(6), this Judge must accept as true all factual allegations in the complaint [which means all factual evidence of literal infringement determined by the Federal Circuit in *Larry Golden v. Google LLC*; Case No. 22-1267] and must draw inferences in a light most favorable to the plaintiff. *See Scheuer v. Rhodes*, 416 U.S. 232, 236 (1974).

"The function of a motion to dismiss is 'merely to assess the legal feasibility of the complaint, not to assay [examine] the weight of the evidence which might be offered in support thereof.'" *Mytych v. May Dept. Store Co.*, 34 F. Supp. 2d 130, 131 (D. Conn. 1999) (quoting *Ryder Energy Distribution v. Merrill Lynch Commodities, Inc.*, 748 F.2d 774, 779 (2d Cir. 1984)), and certainly not to do everything, including lying, avoiding the issues, and adjudicating outside the Court's jurisdiction, to overturn the decision of the higher United States Court of Appeals for the Federal Circuit.

"The issue on a motion to dismiss is not whether the Plaintiff will prevail, but whether the plaintiff is entitled to offer evidence to support his claims." *United States v. Yale New Haven Hosp.*, 727 F. Supp 784, 786 (D. Conn. 1990) (citing *Scheuer*, 416 U.S. at 232).

## DOCTRINE OF *RES JUDICATA*

The doctrine of res judicata seeks "(1) to promote judicial economy by minimizing repetitive litigation; (2) to prevent inconsistent judgments which undermine the integrity of the

judicial system; and (3) to provide repose by preventing a person from being harassed by vexatious litigation." *See State v. Ellis*, 466, 497 A.2d at 990

Senior Judge Bruggink's theories of "issue preclusion" does not apply and is inapplicable to valid claims submitted with valid patents under § 1498(a). Golden has the right to bring an action against the United States in the United States Court of Federal Claims for the recovery of his reasonable and entire compensation *"whenever"*, or at any time the Government appropriates or uses Golden's patented invention(s).

Senior Judge Bruggink's theories of jurisdiction and the boundaries the Senior Judge applies to *"whenever"* under § 1498(a), if allowed to stand, rewrites patent infringement under 28 U.S.C. § 1498(a). Senior Judge Bruggink's theories creates a couple of "loopholes" for the Government to infringe Golden's patents without paying just compensation:

First, whenever another branch of Government [DoD DTRA] uses or manufactures the presumed valid patent(s) of Golden, according to Senior Judge Bruggink' Golden is barred from bringing an action against the United States in the United States Court of Federal Claims; because the Government is alleged to be infringing the same patents asserted in a previous case.

Second, whenever another branch of Government [DoD DTRA] uses or manufactures the presumed valid patent of Golden, and Golden brings an action of infringement without paying just compensation in the Claims Court; Senior Judge Bruggink considers it harassment because a private party [i.e., Google] manufactures or supplies only one component of the Government's requested combined components of Golden's patented combination.

Senior Judge Bruggink's theories are only applied to a certain race of people; only at certain times; only under certain conditions; and only without using the same patents that are within the patents 20-year term limit.

It's dinosaur judges like Senior Judge Bruggink that keeps systemic and structural racism alive in the Federal judicial system. It's obvious Golden's cases means more to Senior Judge Bruggink than just adjudicating the merits. It means not allowing a Black man to succeed in defending his property within his jurisdiction, and outside his jurisdiction.

Golden believes Senior Judge Bruggink's theories are racially motivated and are only used in the cases of Golden to prevent the Government from having to pay Golden just compensation for appropriating and using his patented inventions; because the Government is still appropriating and using Golden's patented inventions without paying just compensation.

## KESSLER DOCTRINE

In May 2020, the Supreme Court decided the case of *Lucky Brand Dungarees, Inc. v. Marcel Fashions Grp., Inc.*, 140 S. Ct. 1589 (2020) and expressly refused to extend preclusion doctrines beyond their traditional bounds set by the doctrines of issue and claim preclusion.

The Supreme Court has repeatedly held that, absent guidance from Congress, courts should not create special procedural rules for patent cases or devise novel preclusion doctrines that stray beyond the traditional bounds of claim and issue preclusion. Nonetheless, over the past several years, the Federal Circuit has created and then repeatedly expanded a special, patent-specific preclusion doctrine that it attributes to the Supreme Court's 114-year-old decision in *Kessler v. Eldred*, 206 U.S. 285 (1907)—a case the Court has not cited for almost 70 years.

Senior Judge Bruggink now routinely applies his so-called "Kessler doctrine" to reject suits like this current one that would survive under ordinary preclusion principles.

Absent guidance from Congress, Senior Judge Bruggink has devised a way to stray beyond the traditional bounds of claim and issue preclusion, to create a new freestanding preclusion doctrine [the Kessler Doctrine] that may apply even when claim and issue preclusion do not.

The so-called Kessler doctrine does not supersede the Constitutional provisions of the Fifth Amendment "No person shall…be deprived of life, liberty, or property, without due process of law;" and the so-called doctrine do not supersede Congress intent in creating the statute for patent infringement under 28 U.S.C. § 1498(a).

Parallel to Section 1498 permitting the federal government to "use or manufacture", *whenever*, or at any time the Government choses, technologies protected under current U.S. patents without the permission of the patent holder; is the Patent Owner's right to bring an action against the United States in the United States Court of Federal Claims for the recovery of his reasonable and entire compensation, *whenever*, or at any time the Government appropriates or uses the patented invention.

## DISQUALIFICATION

For at least the foregoing reasons, Senior Judge Bruggink is eligible for disqualification because the Judge lacks the ability to be impartial, and his personal bias against Golden and in favor of the Government, has extremely prejudiced Golden in this case and others cases before.

4

***Rule 2.11: Disqualification:*** (A) [a] judge shall disqualify himself or herself in any proceeding in which the judge's impartiality* might reasonably be questioned, including but not limited to the following circumstances: (1) [t]he judge has a personal bias or prejudice concerning a party or a party's lawyer, or personal knowledge* of facts that are in dispute in the proceeding.

***28 U.S. Code § 455 - Disqualification of justice, judge, or magistrate judge:*** (a) [a]ny justice, judge, or magistrate judge of the United States shall disqualify himself in any proceeding in which his impartiality might reasonably be questioned. (b) [h]e shall also disqualify himself in the following circumstances: (1) [w]here he has a personal bias or prejudice concerning a party, or personal knowledge of disputed evidentiary facts concerning the proceeding;

***28 U.S. Code § 144 - Bias or prejudice of judge:*** Whenever a party to any proceeding in a district court makes and files a timely and sufficient affidavit that the judge before whom the matter is pending has a personal bias or prejudice either against him or in favor of any adverse party, such judge shall proceed no further therein, but another judge shall be assigned to hear such proceeding … The affidavit shall state the facts and the reasons for the belief that bias or prejudice exists, and shall be filed not less than ten days before the beginning of the term at which the proceeding is to be heard…

On 07/19/23, Golden filed a timely "Motion for Disqualification" [Dkt. 12]. At that point Senior Judge Bruggink, pursuant to ***28 U.S. Code § 144 - Bias or prejudice of judge***, the Judge was supposed to relinquish his current position as the presiding Judge over this current case and "proceed no further therein".

Without explanation or defending allegations that the Judge is bias or prejudice, Senior Judge Bruggink continued presiding over the case and on 07/31/23, Senior Judge Bruggink issued an "ORDER granting [11] Motion to Stay briefing on Plaintiff's motion for summary judgment; denying 13 Motion to Strike [10] MOTION to Dismiss pursuant to Rule 12(b)(6)" Signed by Senior Judge Eric G. Bruggink.

Nine months after Golden filed his "Motion for Disqualification" [Dkt. 12], and after Golden made a few phone calls inquiring why another Judge had not been assigned to the case, Senior Judge Eric G. Bruggink decided on 04/24/24, in alignment with his racist point of view, to grant the Government's Motion to Dismiss. The Judge never denied, defend, or responded to Golden's allegations that the Judge is bias, prejudice, and lack the ability to be impartial.

5

## THE SCOPE OF SOVEREIGN IMMUNITY FOR PATENT INFRINGEMENT UNDER 28 U.S.C. § 1498(a).

Golden asserts that *Zoltek V* stands for the proposition that § 1498(a) is applicable only to direct infringement, as described in certain sections of the Patent Act: when an entire patent combination is made.

Therefore, § 1498(a) is only applicable to direct infringement, described in section 1498(a) where the combined components of Golden's patented combination are caused to be combined by the Government, who authorized and consented to the third-party contractor(s) recognized as performing work for the Government to combine the combined components of Golden's patented combination; up to, and until the entire patent combination was made.

In *FastShip, LLC v. United States*, the US Court of Appeals for the Federal Circuit held that to be manufactured ["made"] under 28 U.S.C. Section 1498, an accused product must include each claim limitation [must cover the entire patent combination] so it is suitable for use.

On June 5, 2018, in *FastShip, LLC v. United States*, the US Court of Appeals for the Federal Circuit affirmed … a US Court of Federal Claims decision and interpreted the term "manufactured" as used in 28 U.S.C. Section 1498, which waives the US government's sovereign immunity and provides a remedy *whenever* a patented invention is used or manufactured by or for the government without a license from the patent owner, to require the accused product to include each asserted claim limitation so it is suitable for use ( (Fed. Cir. June 5, 2018)).

Section 1498(a) is a congressional waiver of sovereign immunity and designation of the United States Court of Federal Claims as the exclusive forum for the adjudication of patent infringement claims against the Government:

> *Whenever* an invention described in and covered by a patent of the United States is used or manufactured by or for the United States without license of the owner thereof or lawful right to use or manufacture the same, the owner's remedy shall be by action against the United States in the United States Court of Federal Claims for the recovery of his reasonable and entire compensation for such use and manufacture.

28 U.S.C. § 1498(a).

Parallel to Section 1498 permitting the federal government to "use or manufacture", *whenever*, or at any time the Government choses; technologies protected under current U.S. patents without the permission of the patent holder, is the responsibility of the Government to

6

provide the patent holder with "recovery of his reasonable and entire compensation", *whenever*, or at any time the Government appropriates or uses the patented invention.

As the Supreme Court summed up in *James v. Campbell*, 104 U.S. 356, 358 (1882), a case concerning the alleged appropriation of a patent by the Government:

> "[A patent] confers upon the patentee an exclusive property in the patented invention which cannot be appropriated or used by the government itself, without just compensation, any more than it can appropriate or use without compensation land which has been patented to a private purchaser."

Also, parallel to Section 1498 permitting the federal government to "use or manufacture", *whenever*, or at any time the Government choses, technologies protected under current U.S. patents without the permission of the patent holder; is the Patent Owner's right to bring an action against the United States in the United States Court of Federal Claims for the recovery of his reasonable and entire compensation *whenever*, or at any time the Government appropriates or uses the patented invention.

Under § 1498(a) it is, *"whenever"* an invention described in and covered by a patent of the United States is used or manufactured by or for the United States without license"; *NOT*, "*whoever* without authority makes, uses or sells any patented invention, within the United States during the term of the patent therefor" [35 U.S.C. § 271(a)]; because we already know who the "*whoever*" is under § 1498(a), it's the Government.

Therefore, Senior Judge Bruggink's theories of "issue preclusion" and the "Kessler doctrine" does not apply and is inapplicable to valid claims submitted with valid patents under § 1498(a). Golden has the right to bring an action against the United States in the United States Court of Federal Claims for the recovery of his reasonable and entire compensation *whenever*, or at any time the Government appropriates or uses Golden's patented invention(s).

Senior Judge Bruggink's theories of jurisdiction and the boundaries the Senior Judge applies to *"whenever"* under § 1498(a), if allowed to stand, rewrites patent infringement under 28 U.S.C. § 1498(a). Senior Judge Bruggink's theories creates a couple of "loopholes" for the Government to infringe Golden's patents without paying just compensation: First, whenever another branch of Government [DoD DTRA] uses or manufactures the presumed valid patent(s) of Golden, according to Senior Judge Bruggink, Golden is barred from bringing an action against the United States in the United States Court of Federal Claims because the Government is alleged to be infringing the same patents asserted in a previous case.

Second, whenever another branch of Government [DoD DTRA] uses or manufactures the presumed valid patent of Golden, and Golden brings an action of infringement without paying just compensation in the Claims Court; Senior Judge Bruggink considers it harassment because a private party [i.e., Google] manufactures or supplies only one component of the requested combined components of Golden's patented combination.

Golden believes Senior Judge Bruggink's theories are racially motivated and are only used in this isolated case to prevent the Government from having to pay Golden just compensation for appropriating and using his patented inventions; because the Government is still appropriating and using his patented inventions without paying just compensation.

Senior Judge Bruggink's theories are only applied to a certain race of people; only at certain times; only under certain conditions; and only without using the same patents that are within the patents 20-year term limit.

## RELEVANT FACTS

In addition to a detailed description of the combined efforts of all third-party contractors, the "language of intent", wherever necessary to show the Government has authorized and consented to combining components of Golden's patented combination, is included in the government solicitation(s), awards, and contracts. An example of the "language of intent", to combine the combined components of Golden's patented combination is recognized in the DHS *Cell-All* initiative:

## DHS S&T "*CELL-ALL*"

Spearheaded by the Department of Homeland Security's (DHS) Science and Technology Directorate (S&T), Cell-All aims to equip your cell phone with a sensor capable of detecting deadly chemicals … "Our goal is to create a lightweight, cost-effective, power-efficient solution," says Stephen Dennis, Cell-All's program manager:

> In 2007, S&T called upon the private sector to develop concepts of operations. To this end, three teams from Qualcomm, the National Aeronautics and Space Administration (NASA), and Rhevision Technology are perfecting their specific area of expertise. Qualcomm engineers specialize in miniaturization and know how to shepherd a product to market. Scientists from the Center for Nanotechnology at NASA's Ames Research Center have experience with chemical sensing on low-powered platforms, such as the International Space Station. And technologists from Rhevision have developed an artificial nose—a piece of porous silicon that changes colors in the presence of certain

molecules, which can be read spectrographically … Similarly, S&T is pursuing what's known as cooperative research and development agreements with four cell phone manufacturers: Qualcomm, LG, Apple, and Samsung. These written agreements, which bring together a private company and a government agency for a specific project, often accelerate the commercialization of technology developed for government purposes. *The Department of Homeland Security's (DHS) 2007.*

Qualcomm, the primary contractor for the *Cell-All* initiative, role has been to develop a smartphone app [CPU/Chipset] and the associated network software for processing data. Smartphone users can download the app from Google Play and, from Apple's iTunes store, so Cell-All will be operational on all phones using either Google's Android operating systems or Apple's iPhone operating systems.

Golden raised the question of jurisdiction, "the United States Court of Appeals for the Federal Circuit has held, "any party may challenge, or the court may raise *sua sponte*, subject matter jurisdiction at any time." *Rick's Mushroom Serv., Inc. v. United States*, 521 F.3d 1338, 1346 (Fed. Cir. 2008). When Senior Judge Bruggink redirected and broadened the jurisdiction of the Claims Court by narrowing the case to a dispute between two private entities [35 U.S.C. § 271(a)] Golden and Apple, Inc. "[P]roving direct infringement under 35 U.S.C. § 271(a) is not a necessary predicate for proving direct infringement under 28 U.S.C. § 1498(a)." *Zoltek V*

When Senior Judge Bruggink redirected and broadened the jurisdiction of the Claims Court by narrowing the case to a dispute between the two private entities, Golden v. Apple, Inc., Senior Judge Bruggink personally destroyed any and all possibilities of Golden proving, under § 1498(a), that Golden's entire patented combination had been made by the combined efforts of the third-party contractors, and is "suitable for use" *FastShip, LLC v. United States.*

## DoD DTRA ATAK

Another example of the "language of intent", to combine the combined components of Golden's patented combination is recognized in the DoD DTRA initiative [the current case]. The Android Team Awareness Kit (ATAK) is an Android smartphone geospatial infrastructure and military situation awareness app for Google, Samsung, LG, Qualcomm, etc. ATAK has a plugin architecture which allows developers to add functionality. This extensible plugin architecture that allows enhanced capabilities for specific mission sets. [Draper Laboratory, Inc.]

The ATAK enables users to navigate using GPS and geospatial map data overlayed with real-time situational awareness of ongoing events. The ATAK software is representative of the

surrounding area using the military standard APP-6 symbology, and customized symbols such as icons from Google Earth and Google Maps for iconography and the Cursor on Target data format standard for communication.

As of 2020, ATAK has a growing base of 250,000 military and civilian users across numerous public safety agencies and US partner nations, and has seen the addition of 15 United States Department of Defense programs.

In September 2015, Defense Advanced Research Projects Agency (DARPA) reported that ATAK was used in a successful demonstration of the Persistent Close Air Support Program, and is in use by thousands of users. In 2018, the United States Air Force (USAF) Security Forces deployed ATAK at Eglin AFB, Florida. The Android Team Awareness Kit or TAK is currently used by thousands of Department of Homeland Security (DHS) personnel, along with other members of the Homeland Security Enterprise including state and local public safety personnel. TAK has supported the rescue of over 2,000 people during disaster response for seven major hurricanes (Harvey, Irma, Maria, Florence, Lane, Michael, and Dorian). The capability is also regularly used during public safety operations and national security special events like United Nations General Assembly meetings and the Super Bowl. ATAK has various end-user versions:

➤ ATAK - Civilian (ATAK-CIV) - A distribution controlled but fully-releasable version of the TAK Product line for First Responders, Licensed Commercial Developers. Distribution for ATAK-CIV is through Approved, Government Hosted Sites, Direct Commercial Sales (DCS).

➤ ATAK - Government (ATAK-GOV) - ITAR restricted version of the TAK Product line for USG entities and Foreign Government. Distribution for ATAK-GOV are through Approved, Government Hosted Sites; Direct Commercial Sales (DCS). This version of ATAK has no military (MIL) sensitive capabilities.

➤ ATAK - Military (ATAK-MIL) - Military Sensitive version of the TAK Product line for US and Foreign Military end-users. Similar to ATAK-GOV, distribution is through Approved, Government Hosted Sites. However, is not available through Direct Commercial Sales (DCS).

In addition to the Google Android operating system version, there is also a Microsoft Windows version operating system (WinTAK), an Apple iOS operating system version (iTAK).

Therefore, it is an extreme abuse of discretion for Senior Judge Bruggink to narrow this DoD DTRA CBRN initiative to just that of a Google smartphone that is uncombined with the Government's ATAK software and Draper's Laboratory, Inc. CBRNE plugin sensors.

| DEPARTMENT OF DEFENSE (DOD) DEFENSE THREAT REDUCTION AGENCY (DTRA) | | | | | | |
|---|---|---|---|---|---|---|
| **iTAK** | **ATAK** | | | | **WinTAK** | |
| Apple iPhone 12 Smartphone | Google Pixel 5 Smartphone | Samsung Galaxy S21 Smartphone | LG V60 ThinQ 5G | Qualcomm Smartphone for Snapdragon Insiders | Samsung Galaxy Book2 Pro 360 [PC Mode or Tablet Mode] | HP ZBook Fury 15.6 Inch G8 Mobile Workstation PC |
|  |  |  |  |  |  |  |
| **Chipset:** Apple A14 Bionic (5 nm). **CPU:** Hexa-core (2x3.1 GHz Firestorm + 4x1.8 GHz Icestorm). | **Chipset:** Qualcomm Snapdragon 765G **CPU:** Octa-core (1 × 2.4 GHz Kryo 475 Prime | **Chipset:** Qualcomm SM8350 **CPU:** Octa-core (1x2.84 GHz Cortex-X1 & 3x2.42 GHz | **Chipset:** Qualcomm SM8250 **CPU:** Octa-core (1x2.84 GHz Cortex-A77 & 3x2.42 GHz | **Chipset:** Qualcomm SM8350 **CPU:** Octa-core (1x2.84 GHz Cortex-X1 & 3x2.42 GHz | **CPU:** Intel® Core™ i5-1235U / Intel® Core™ i7-1255U. Processor Speed 1.3GHz / 1.7 GHz. | **CPU:** 11th Generation Intel® Xeon® W-11955M vPro® with Intel® UHD Graphics |
| **OS:** Apple iOS 14.1, upgradable to iOS 16.1 | **OS:** Google Android 11, upgradable to Android 13 | **OS:** Google Android 11, upgradable to Android 13 | **OS:** Google Android 10, upgradable to Android 13 | **OS:** Google Android 11 | **OS:** Preinstalled Microsoft Windows 11 | **OS:** Preinstalled Microsoft Windows 11 Pro2 |
| **CBRNE PLUGINS** Draper Laboratory, Inc | **CBRNE PLUGINS** Draper Laboratory, Inc | **CBRNE PLUGINS** Draper Laboratory, Inc | **CBRNE PLUGINS** Draper Laboratory, Inc | **CBRNE PLUGINS** Draper Laboratory, Inc | **CBRNE PLUGINS** Draper Laboratory, Inc | **CBRNE PLUGINS** Draper Laboratory, Inc |

28 U.S. Code § 1498 (a): "*Whenever* an invention described in and covered by a patent of the United States is *used* [in the above chart Golden have three inventions that are covered by his U.S. Patents—CMDC Devices; CPUs; and Multi Sensor Detection Devices—that's being "*used*"

11

by the United States] … or for the United States without license of the owner thereof or lawful right to *use* or manufacture the same, the owner's remedy shall be by action against the United States in the United States Court of Federal Claims for the recovery of his reasonable and entire compensation for such *use* and manufacture."

Senior Judge Bruggink's is so focus on protecting the Government [DoD DTRA] from infringement liability that the Judge continuously redirect Golden's pleadings; and claims Golden has filed the complaint against Google, LLC and the Google smartphone device. From the chart above Golden has illustrated the TAK can be utilized with a smartphone, PC, or laptop.

Google Pixel Smartwatch systems, methods, and apparatuses for CBRNE detection, that are interconnected to the Google Pixel smartphone devices, allegedly infringes claim 19 of Golden's '439 patent. Illustrated in the chart below is a wearable Google smartwatch that is used with the ATAK software. The Government combined the Google phone; the Google watch, and the ATAK software that is built on the Google Android operating system.

| | **Smartwatch CBR Detector for Smartphone** |
|---|---|
|  *Android Team Awareness Kit*, ATAK (built on the Google Android operating system) provides a single interface for viewing and controlling different CBRN-sensing technologies, whether that is a wearable smartwatch that measures a warfighter's vitals (e.g., heart rate) or a device mounted on a drone to detect chemical warfare agents. | **Claim 19 of the '439 Patent**: A multi-sensor detection system for detecting at least one explosive, nuclear, contraband, chemical, biological, human, radiological agent, or compound, comprising: a plurality of sensors … capable of being disposed within, on, upon or adjacent a multi-sensor detection device. |
| | The US Military's Latest Wearables [Smart Watch] Can Detect Illness Two Days Before You Get Sick https://www.defenseone.com/technology/2020/09/militarys-latest-wearables-can-detect-illness-two-days-you-get-sick/168664/ |
| | Studies reveal smartwatch biometrics can detect COVID-19: "smartwatches and other wearables measuring biometrics like heart-rate variability have the ability to detect if a person is COVID-19 positive" https://www.biometricupdate.com/202101/studies-reveal-smartwatch-biometrics-can-detect-covid-19-before-symptoms-surface |
| | Homeland Security's Smartwatch Will Detect Nuclear Bombs https://www.popular-mechanics.com/military/research/a18161/homeland-security -smartwatch-detect-nuclear-bombs/ |

The "wearable smartwatch", included in the "species" group for Golden's "communication device" or "monitoring equipment" is illustrated below in at least three of Golden's patent claims.

Golden is able to identify the Google Pixel smartwatch as the multi-sensor detection device, or cell phone detection device for at least the DoD DTRA ATAK CBRNE initiative.

**Patent No. 9,096,189 (claim 1 of the '189 patent)**

1.    *A communication device* of at least one of a cell phone, a smart phone, a desktop, a handheld, a PDA, a laptop, or a computer terminal for monitoring products, interconnected to a product for communication therebetween, comprising: [Golden has identified the Google smartphone(s) as "a communication device" and the Google Pixel smartwatch as the multi-sensor detection device or a cell phone detection device]

at least one of a central processing unit (CPU) for executing and carrying out the instructions of a computer program … or a front-end processor for communication between a host computer and other devices; [Golden has identified the Google "Tensor" as the CPU/Chipset for executing and carrying out instructions for the Google Pixel smartphone; the Qualcomm SW5100 / Cortex M33 co-processor CPU/Chipset for executing and carrying out instructions for the Google Pixel smartwatch]

a transmitter for transmitting signals and messages to at least one of plurality product groups based on the categories of a multi-sensor detection device … a cell phone detection device …; [The Google Pixel smartphone transceiver connects the Smartwatch (i.e., multi-sensor detection device, or cell phone detection device) to the Google Pixel smartphone via Bluetooth]

a receiver for receiving signals, data or messages from at least one of plurality product groups based on the categories of a multi-sensor detection device … a cell phone detection device …; [The Google Pixel smartphone transceiver connects the Smartwatch (i.e., multi-sensor detection device, or cell phone detection device) to the Google Pixel smartphone via Bluetooth]

the communication device is at least a … mobile communication device interconnected to a fixed, portable or mobile product, capable of wired or wireless communication therebetween; [Golden has identified the Google smartphone(s) as "a communication device" and the Google Pixel smartwatch as the multi-sensor detection device or a cell phone detection device for wireless communication therebetween]

at least one satellite connection, Bluetooth connection, WiFi connection, internet connection, radio frequency (RF) connection, cellular connection, broadband connection, long and short-range radio frequency (RF) connection, or GPS connection; [The Google Pixel smartphone transceiver connects the Smartwatch (i.e., multi-sensor detection device, or cell phone detection device) to the Google Pixel smartphone via Bluetooth]

wherein at least one satellite connection, Bluetooth connection, WiFi connection, internet connection, radio frequency (RF) connection, cellular connection, broadband connection, long and short-range radio frequency (RF) connection is capable of signal communication with the transmitter and the receiver of the communication device and transceivers of the products; [The Google Pixel smartphone transceiver connects the Smartwatch (i.e., multi-sensor detection device, or cell phone detection device) to the Google Pixel smartphone via Bluetooth]

wherein the communication device is equipped with a biometric lock disabler that incorporates at least one of a fingerprint recognition, voice recognition, face recognition, hand geometry, retina scan, iris scan and signature such that the communication device that is at least one of the cell phone, the smart phone, the desktop, the handheld, the PDA, the laptop or the computer terminal is locked by the biometric lock disabler to prevent unauthorized use; [Golden has identified the Google smartphone(s) fingerprint or facial recognition and the Google Pixel

smartwatch as having voice recognition. "*Google Assistant voice commands on Google Pixel Watch*" https://support.google.com/googlepixelwatch/answer/12677020?hl=en]

**Patent No. 9,589,439 (claim 23 of the '439 patent)**

23.   *A cell phone comprising*: [Golden has identified the Google smartphone(s) as "a new, improved upon, and useful cell phone" and the Google Pixel smartwatch as the multi-sensor detection device or a cell phone detection device]

a central processing unit (CPU) for executing and carrying out the instructions of a computer program; [Golden has identified the Google "Tensor" as the CPU/Chipset for executing and carrying out instructions for the Google Pixel smartphone; the Qualcomm SW5100 / Cortex M33 co-processor CPU/Chipset for executing and carrying out instructions for the Google Pixel smartwatch]

a transmitter for transmitting signals and messages to a cell phone detection device; [The Google Pixel smartphone transceiver connects the Smartwatch (i.e., multi-sensor detection device, or cell phone detection device) to the Google Pixel smartphone via Bluetooth]

a receiver for receiving signals from the cell phone detection device; [The Google Pixel smartphone transceiver connects the Smartwatch (i.e., multi-sensor detection device, or cell phone detection device) to the Google Pixel smartphone via Bluetooth]

the cell phone is at least a fixed, portable or mobile communication device interconnected to the cell phone detection device, capable of wired or wireless communication therebetween; [Golden has identified the Google smartphone(s) as "a communication device" and the Google Pixel smartwatch as the multi-sensor detection device or a cell phone detection device for wireless communication therebetween], and

whereupon the cell phone is interconnected to the cell phone detection device to receive signals or send signals to … activate or deactivate multi-sensor detection systems, or to activate or deactivate the cell phone detection device; [Golden is identifying the Google Pixel smartphone(s) as "a new, improved upon, and useful cell phone" or "communication device", interconnected to the Google Pixel smartwatch as the cell phone detection device to receive signals or send signals to activate or deactivate]

at least one of a chemical sensor, a biological sensor, an explosive sensor, a human sensor, a contraband sensor, or a radiological sensor capable of being disposed within, on, upon or adjacent the cell phone [Golden is identifying the Google Pixel smartwatch as the multi-sensor detection device or a cell phone detection device for CBRNE detection, that is adjacent the Google Pixel smartphone(s) as "a new, improved upon, and useful cell phone" or "communication device"]

at least one of a satellite connection, Bluetooth connection, WiFi connection, internet connection, radio frequency (RF) connection, cellular connection, broadband connection, long range radio frequency (RF) connection, short range radio frequency (RF) connection, or GPS connection; [The Google Pixel smartphone transceiver connects the Smartwatch (i.e., multi-sensor detection device, or cell phone detection device) to the Google Pixel smartphone via Bluetooth]

wherein at least one of the satellite connection, Bluetooth connection, WiFi connection, internet connection, radio frequency (RF) connection, cellular connection, broadband connection, long range radio frequency (RF) connection, short range radio frequency (RF) connection, or GPS connection is capable of signal communication with the transmitter or the

receiver; [The Google Pixel smartphone transceiver connects the Smartwatch (i.e., multi-sensor detection device, or cell phone detection device) to the Google Pixel smartphone via Bluetooth]

wherein the cell phone is equipped with a biometric lock disabler that incorporates at least one of a fingerprint recognition, voice recognition, face recognition, hand geometry, retina scan, iris scan, or signature such that the cell phone is locked by the biometric lock disabler to prevent unauthorized use; [Golden has identified the Google smartphone(s) fingerprint or facial recognition and the Google Pixel smartwatch as having voice recognition. "*Google Assistant voice commands on Google Pixel Watch*" https://support.google.com/googlepixelwatch/answer/12677020?hl=en]

## Patent No. 10,163,287 (claim 5 of the '287 patent)

5.    *A monitoring device, comprising*: [Golden has identified the Google smartphone(s) as "a monitoring device" and the Google Pixel smartwatch as the multi-sensor detection device or a cell phone detection device]

at least one central processing unit (CPU); [Golden has identified the Google "Tensor" as the CPU/Chipset for executing and carrying out instructions for the Google Pixel smartphone; the Qualcomm SW5100 / Cortex M33 co-processor CPU/Chipset for executing and carrying out instructions for the Google Pixel smartphone]

at least one of an internet connection or a Wi-Fi connection in communication with the at least one CPU; [Golden has identified the Wi-Fi 7 (802.11be) with 2.4GHz+5GHz+6GHz,2x2+2x2 MIMO of the Google Pixel smartphone that is in communication with the Google "Tensor" CPU/Chipset]; and the Wi-Fi 802.11 b/g/n 2.4GHz that is in communication with the Google Pixel smartphone; the Qualcomm SW5100 / Cortex M33 co-processor CPU/Chipset]

at least one of a Bluetooth connection, a cellular connection, or a satellite connection in communication with the at least one CPU; [Golden has identified the Bluetooth® v5.3 with dual antennas for enhanced quality of the Google Pixel smartphone that is in communication with the Google "Tensor" CPU/Chipset]; and the Bluetooth® 5.0 that is in communication with the Google Pixel smartphone; the Qualcomm SW5100 / Cortex M33 co-processor CPU/Chipset]

at least one radio-frequency near-field communication (NFC) connection in communication with the at least one CPU; [Golden has identified the Google Pixel smartphone as an NFC-enabled device that communicates in one or both directions uses a frequency of 13.56 MHz in the globally available unlicensed radio frequency ISM band that is in communication with the Google "Tensor" CPU/Chipset; and the NFC connectivity of the Google Pixel Smartwatch that is in communication with the Qualcomm SW5100 / Cortex M33 co-processor CPU/Chipset]

at least one sensor for chemical, biological, or human detection in communication with the at least one CPU; [The Google Pixel smartphone is equipped with the ability to check a "human" heart rate i.e. the number of beats per minute with the smartphone camera, and the working camera flash unit that is in communication with the Google "Tensor" CPU/Chipset; and check a "human" heart rate with the Multi-path optical heart rate sensor of the Google Pixel smartwatch that is in communication with the Qualcomm SW5100 / Cortex M33 co-processor CPU/Chipset]

one or more detectors in communication with the at least one CPU for detecting at least one of chemical, biological, radiological, or explosive agents; [Golden is identifying the Google Pixel smartwatch as the multi-sensor detection device or a cell phone detection device for

CBRNE detection, that is in communication with the Google Pixel smartphone "Tensor" CPU/Chipset, and in communication with the Google Pixel smartwatch Qualcomm SW5100 / Cortex M33 co-processor CPU/Chipset]

at least one of a transmitter or a transceiver in communication with the at least one CPU configured to send signals to monitor … or send signals to detect at least one of a chemical biological, radiological, or explosive agent such that the communication device is capable of communicating, monitoring, detecting, and controlling. [Golden is identifying the Google Pixel smartphone(s), that is in communication with the Google "Tensor" CPU/Chipset, as "a new, improved upon, and useful cell phone" or "communication device", interconnected to the Google Pixel smartwatch, that is in communication with the Qualcomm SW5100 / Cortex M33 co-processor CPU/Chipset, as the cell phone detection device capable of receiving signals or sending signals]

iTAK was developed for the Apple iOS operating systems; ATAK was developed for the Google Android operating systems; and WinTAK was developed for the Microsoft Windows operating systems

Therefore, until Senior Judge Bruggink can prove for the Government, the iTAK, the ATAK, and the WinTAK, that are operating systems interconnected to Golden's patented CMDC Devices, CPUs, and Multi Sensor Detection Devices, can operate and function without the three essential patented inventions of Golden; the United States have "*used*", and continues to "*use*" Golden's patented inventions "without license of the owner thereof or lawful right…"

When Senior Judge Bruggink redirected and broadened the jurisdiction of the Claims Court by narrowing the case to a dispute between the two private entities of Golden v. Google, LLC., Senior Judge Bruggink personally destroyed any and all possibilities of Golden proving, under § 1498(a), that Golden's entire patented combination had been made by the combined efforts of the third-party contractors, and is "suitable for use" *FastShip, LLC v. United States.*

## DoD "JPEO-CBRND"

Another example of the "language of intent", to combine the combined components of Golden's patented combination is recognized in the DoD JPEO-CBRND initiative [a future case for filing]. The Joint Program Executive Office for Chemical, Biological, Radiological, and Nuclear Defense (JPEO-CBRND) is a component of the U.S. Department of Defense's Chemical and Biological Defense Program, the JPEO-CBRND protects the entire Joint Force – Army, Navy, Air Force, Marines, Coast Guard, and First Responders – through the advanced development of CBRN defense capabilities.

Four Joint Project Managers (JPM) provide oversight for the portfolios, including JPM CBRN Protection, JPM CBRN Medical, JPM CBRN Sensors and JPM CBRN Special Operations Forces. Two Joint Project Leads (JPL) focus on CBRN defense enabling biotechnologies and CBRN integration. The JPLs also provide portfolio-wide enabling support across the JPEO-CBRND.

Draper Laboratory has been awarded a $26 million (all options) contract by the U.S. Department of Defense (DOD) to further expand the capabilities of its unmanned autonomous systems (UAS) software to perform chemical, biological, radiological and nuclear (CBRN) reconnaissance missions in collaborative teams and in degraded operating environments.

Draper Laboratory ("Draper") will integrate flight software and sensor-driven algorithms that enable teams of unmanned systems to autonomously conduct CBRN missions.



Under a $26 million contract with JPEO-CBRND, Draper will advance the development of its unmanned autonomous system so that it can operate in team formations and degraded operating environments. Pictured is Draper's UAS on a CBRN reconnaissance mission as viewed on a TAK-enabled device. Credit: Draper. The TAK-enable devices include smartphones, laptops, PCs, smartwatches, etc.

17

Draper will advance its system under an effort at JPEO-CBRND called CSIRP, which stands for CBRN Sensor Integration on Robotic Platforms. Additional enhancements to the system will include advances in CBRN sensors and further customization of Draper's All Domain Execution and Planning Technology (ADEPT) autonomy framework.

Draper Laboratory delivered initial prototypes of its system for a focused assessment. Operators employed the Draper prototype in realistic mission scenarios to communicate as a team and sense and rapidly report CBRN hazards.

The autonomous software on the aerial unmanned platform will be designed to operate with the command-and-control user interface for the U.S. Army's Nuclear, Biological and Chemical Reconnaissance Vehicle (NBCRV) Stryker platform currently being developed by Teledyne FLIR.

Draper will integrate communications with the Tactical Assault Kit (TAK) platform, enabling the unmanned systems to send images to a mobile device (i.e., smartphone, laptop, tablet) and overlay the locations of detected objects of interest on an aerial map for human team members, all in real-time.

A major focus for Draper is to extend its proof-of-concept air-ground teaming architecture to link multiple systems into a mesh network. With mesh, every autonomous vehicle, including aerial (UAV), ground (UGV) and maritime (USV), becomes an access point and relays messages among themselves.

The award advances UAS software in the direction the DOD prefers; that is to be modular, reusable and open to enhancement by third-party vendors.

The UASs will use Draper's novel algorithm to synthesize the data from onboard sensors including GPS, LiDAR, accelerometer, magnetometer and onboard cameras, and be able to communicate with human operators, centralized command centers, and other teamed UASs.

Draper's UAS for CBRN is expected to perform with limited operator interaction. Assisting in the development is a team that help design the tablet interface to support teaming, and Draper's Warfighter Systems, which developed the TAK plug-in that enables Draper's UAS to provide situational awareness at every level. Draper's UAS CBRN system is currently being transitioned to a program of record for the U.S. Army.

The Dept. of Defense (DoD) and third-party contractor Draper Laboratory, Inc. has extended its reach into Golden's patented inventions without paying just compensation.

In addition to the DoD and Draper manufacturing or using Golden's patented invention combinations in the current case Golden v. Defense Threat Reduction Agency (the "Government"), that includes as one of the combined component a TAK-enabled device or mobile device (i.e., smartphone, tablet, laptop, etc.); DoD and Draper have extended their reach into Golden's patented combined combinations of at least Golden's patented TAK-enabled device or mobile device for purposes of section 1498(a).

The DoD and Draper has combined Golden's patented stall, stop, and vehicle slow-down system for controlling the operational systems of an unmanned aerial vehicle (UAV) in the DoD JPEO-CBRND initiative.

A few additional patent claims not already asserted in this current case, but are relevant to the future case, whereby DoD JPEO-CBRND is defendant. **Exhibit A**

## PROCUDURAL HISTORY: SENIOR JUDGE BRUGGINK WAS GIVEN GUIDANCE ON HOW TO ADJUDICATE A PATENT INFRINGEMENT CLAIM UNDER 28 U.S.C. § 1498(a).

**Dkt. No. 94:** Filed 11/30/2016 in *Larry Golden v. United States* Case No. 13-307C. REPORTED MEMORANDUM OPINION and ORDER denying 88 Motion to Dismiss - Rule 12(b)(1) and (6) … Signed by Judge Susan G. Braden:

> The February 12, 2016 Amended complaint identifies over thirty devices that were developed or procured, as a result of Government solicitations, Government contracts or National Science Foundation ("NSF") grants. 2/12/16 Am. compl. at ¶¶ 68-127. These devices allegedly infringe claims in Plaintiff's '497, '752, '891, '990, and '189 Patents. 2/12/16 Am. Compl. at ¶¶ 68-127.
>
> The relevant devices. are: M-Lock; High-power Electromagnetic System ("HPEMS"); Smartphone Microscope; Biophone; Smartphone Biosensor cradle; iPhone Biodetector smartphone; Pathtracker; the center of Integrated Nanomechanical Systems ("COINS") Nano-Embedded sensors; Smartphone-Based Rapid Diagnostic Tests; Lockheed Martin K-Max Unmanned Self-flying Helicopter; Boeing MH-6 Little Bird Helicopter; SIN-Vapor I Smartphone system; Samsung Galaxy s6 Microscope Smartphone; VOCket System; Nett warrior Smartphone System; Northrop Grumman x-47B UCAS | x-478 control Display unit; GammaPix; NFC Samsung Galaxy s6 smartphone Sensor; *Cell-All Synkera MikroKera ultra*: Biotouch System; iPhone Biodetector Smartphone; Navy Marine Corps Intranet; FLIR identiFINDER R300; AOptix stratus MX Peripheral; MultiRae Pro wireless portable Multi Threat Radiation and chemical Detector; PositiveID's M-BAND; PositiveID's Firefly DX; 1"x2" Detection Device Samsung Galaxy s6 smartphone; 2"x2" Detection Device Samsung Galaxy s6 smartphone; NetS2

SmartShield G300 Radiation Detector Samsung Galaxy s6 Smartphone; NetS2
SmartShield G500 Radiation Detector Samsung Galaxy s6 Smartphone; and the passport
systems Base control unit; Oshkosh Defense Autonomous Unmanned Ground vehicle
TerraMax; and the Variable NODE+Oxa. 2/72/76 Am. Compl. at, ¶¶ 68-127.

Infringing activity is "for the Government" under section 1498(a) if it is "for the benefit
of the Government.' *Advanced Software Design Corp. v. Federal Reserve Bank of St.
Louis*, 583 F.3d 1371, 1378 (Fed. Cir.2009); see also *Madey Duke University*, 413 F.
Supp. 2d, 601, 607 (M.D.N.C. 2006) ("A use is 'for the Government' if it is 'in
furtherance and fulfillment of a stated Government policy' which serves the
Government's interests and which is 'for the Government's benefit.'" (quoting *Riles v.
Amerada Hess, Corp.*, 999 F. Supp. 938,940 (S.D. Tex. 1998)). *In Hughes Aircraft Co. v.
United States*, 534 F.2d 889 (197 6), for example, the court held that a satellite program
to advance the military defense and security of the United States was "for the
Government." Id. at898.

Moreover, "authorization or consent of the Government," does not need to be expressly
stated. *See TVI Energy Corp. v. Blane*, 806 F.2d 1057, 1060 (Fed. Cir. 1986)
("[a]uthorization or consent by the Government can be express [or] [i]n proper
circumstances, Government authorization can be implied."). Indeed, "authorization or
consent . . . may be given in many ways other than by … direct form of communication
—e.g., by contracting officer instructions, [or] by specifications . . . which impliedly
sanction and necessitate infringement[.]" *Hughes Aircraft Co*, 534 F.2d at 901.

Under the Tucker Act, the United States Court of Federal Claims has jurisdiction to
adjudicate a claim if the statute, regulation, or constitutional provision that is the basis for
that claim "can fairly be interpreted as mandating compensation by the Federal
Government for the damage sustained," *United States v. Mitchell*, 463 U.S. 206,217
(1983), and the plaintiff is "within the class of plaintiffs entitled to recover under the
statute if the elements of [the] cause of action are established," *Greenlee County, Arizona
v. United States*, 487 F.3d 871,876 (Fed. Cir. 2007). "There is no further jurisdictional
requirement that plaintiff makes [] additional nonfrivolous allegation[s] that [he] is
entitled to relief under the relevant money-mandating source." *Jan's Helicopter Serv., Inc.
v. Federal Aviation Agency*. 525 F.3d 1299,1307 (Fed. Cir. 2008).

Judge Braden issued the above Opinion on 11/30/16. Two days later, on 12/02/16 Judge

Braden, Golden, three DOJ attorneys and three DHS attorneys was on a telephone conference

when Judge Braden said, without explanation, "she was going to give the DOJ and DHS another

shot" at dismissing Golden's infringement claims against the Government.

On March 29, 2018 Judge Braden dismissed all the alleged infringement claims that

included as part of the combined combination a smartphone or consumer device. A complete

reversal from the Opinion Judge Braden issued on November 30, 2016.

**Dkt. No. 215:** Filed 02/06/2021 in *Larry Golden v. United States* Case No. 13-307C.

Order … Signed by Senior Judge Eric G. Bruggink:

Plaintiff also alleges his "communicating, monitoring, detecting, and controlling ("CMDC") device is commercialized in the form of an improved cell phone, smartphone, smartwatch, laptop, or tablet. The specifications and capabilities of the CMDC devices that were developed for, manufactured and commercialized by third-party government contractors, Apple, Samsung, and LG, are significantly the same as the Plaintiff's CMDC devices." Sixth Am. Compl. ¶¶ 6, 12. Attached to the sixth amended complaint is a claim chart that purports to identify features of devices alleged to be part of the DHS Cell-All initiative that infringe claims of the patents asserted in the current complaint. Id. Ex. 7.

Further, we read the complaint as asserting infringement from the 2011 demonstration forward. It appears that Mr. Golden asserts that the Cell-All initiative resulted in the manufacture of a variety of devices that infringe his patents. We can reasonably infer that he is pointing the finger at the federal government for the inclusion of his technology in these third-party devices. Thus, whether ultimately true or not, the complaint has put at issue events that may have happened after the patent priority dates. We therefore find no basis to dismiss on either of those grounds.

As to defendant's argument that plaintiff's current infringement allegations are too "vague as to the nature of the Cell-All project and exactly how plaintiff alleges the Cell-All Project infringed the '497 Patent," we disagree. Def. Mot. to Dismiss at 12. In alleging infringement of his patented CMDC technology, plaintiff attached a lengthy series of "claim charts" illustrating allegations of how the government, and third parties at the government's behest, are infringing certain of his patents' claims. Sixth Am. Compl. Ex. 7 at 100-108. Defendant's motion has not attempted to wrestle with that chart or otherwise explain with any detail why those claims fail as a matter of law.

In exhibit 7 to his present complaint, plaintiff's claim chart illustrates instances of alleged infringement of the '189 patent, '287 patent, '439 patent, '497 patent, and the '752 patent. E.g., id. at 100-108. He includes separate charts for a device manufactured by LG, one by Apple, and Samsung. The next chart in exhibit 7 explains why he believes that the Cell-All initiative resulted in the manufacture of these devices for DHS. More detail is appended regarding each of the accused devices in charts and diagrams that follow. In short, we cannot conclude on the face of these documents without more detailed briefing and examination that no valid patent claim has been presented. Read together with the sixth amended complaint, it is clear that Mr. Golden is alleging that the government caused the manufacture of all of these devices or caused these devices to use his technology.

The rest is history, Senior Judge Bruggink, flipped and narrowed the case to one between two private parties [Golden and Apple]. The Judge dropped the seven other third-party contractors, [Seacoast, Synkera, NASA, Rhevision, Qualcomm, Samsung, and LG]; but, most of

all, the Judge never decided whether the Government infringed the patented combination of Golden that was developed and assembled by the eight third-party contractors.

The Judge stated the sensors cannot be considered in the combination because they were not "native" to the manufacture of the Apple device. The Judge stated Golden enlarged the case when Golden identified Golden's patented CPU. The Judge himself approved claim 4, 5, & 6 of Golden's '287 patent. The three patent claims are Golden's patented CPU claims.

## NINE FEDERAL JUDGES WHO HAS REVIEWED GOLDEN'S PATENTED COMBINATIONS ALL AGREE THE GOVERNMENT IS THE "SINGLE ENTITY' FOR DIRECT INFRINGEMENT UNDER 28 U.S.C. § 1498(a).

Under 28 USC § 1498, the patentee's "exclusive remedy for an alleged infringement by or for the Government, which means the Government is the 'single entity' for the purpose of direct infringement, is a suit against the United States in the Court of Federal Claims."

The statue serves two purposes: (i) it waives sovereign immunity to permit a patent owner to recover damages for direct infringement "by or for the United States" as the single entity, and (ii) it protects contractors [such as Draper Laboratory, Inc. and Google, LLC] from liability for patent infringement committed on behalf of the United States.

The courts emphasized that the remedy provided in § 1498 is the "exclusive remedy" available when the U.S. government, as the single entity, directly infringes a patent. A recent trend of Federal Circuit decisions, including *IRIS Corp. v. Japan Airlines Corp.*, 769 F.3d 1359 (Fed. Cir. 2014) and *Zoltek Corp. v. United States*, 672 F.3d 1309 (Fed. Cir. 2012), holding that § 1498 affords government contractors a wide scope of protection against liability for infringement.

In the words of the Federal Circuit, there is "no justification" for "expos[ing] a significant range of government contractors to direct liability (and possible injunctive remedies), namely, those [that may be] accused of indirect infringement of claims [that are] directly infringed by the government."

On September 17, 2015, the Federal Circuit affirmed the dismissal under 28 U.S.C. § 1498(a) of a patentee's claims for indirect patent infringement against government contractors where the only alleged directed infringement was the Government's purported use of the patented invention. *Astornet Technologies Inc. v. BAE Systems, Inc.*, No. 14-1854 (Fed. Cir. Sept.

17, 2015). The decision is another in a line of recent Federal Circuit decisions reaffirming that government contractors enjoy broad immunity from traditional patent infringement liability under § 1498.

Therefore, nine judges, six from the Federal Circuit and three from the Northern District of California, acknowledged the "U.S. Government", the single entity under 28 USC § 1498 for direct infringement, is more likely than not, the direct infringer because the element-by-element requirement is only satisfied under 28 USC § 1498 when Golden's entire patented invention combination is made and is "suitable for use".

**The United States Court of Appeals for the Federal Circuit Judges in Case No. 22-1267; determined Direct Infringement by or the Government arises when there's a combined ATAK Software; CBRN Plugins; and, a Smartphone**

The Federal Circuit in *Larry Golden v. Google LLC*; Case No. 22-1267 examined and determined Golden has described how the Google "smartphone", that include the ATAK software and CBRN plugin sensors literally infringes at least claim 5 of Golden's '287 Patent; claim 23 of Golden's '439 Patent; and claim 1 of Golden's '189 Patent. See the chart below:

| Literal Infringement (Precedence) | Literal Infringement (Fed. Cir. *Golden v. Google*) |
|---|---|
| Literal infringement means that each and every element recited in a claim has identical correspondence in the allegedly infringing device or process. To literally infringe a patent, the accused system, method, etc. must include each limitation of a claim. E.g., *Southwall* (Fed. Cir. 05/10/95) To establish literal infringement, every limitation set forth in a claim must be found in an accused product, exactly. *Becton Dickinson* (Fed. Cir. 12/13/90). "Infringement, both literal and under the doctrine of equivalents, is an issue of fact."); *Cobalt Boats* (Fed. Cir. 05/31/19) "patent infringement is an issue of fact, tried by a jury" [U.S. CONST. amend. VII] | "Mr. Golden's complaint includes a detailed claim chart mapping features of an accused product, the [] Smartphone, to independent claims from U.S. Patent Nos. 10,163,287, 9,589,439, and 9,069,189 … It [claim chart] attempts [] to map claim limitations to infringing product features, and it does so in a relatively straightforward manner …[W]e conclude that the district court's decision in the Google case is not correct with respect to at least the three claims mapped out in the claim chart. Mr. Golden has made efforts to identify exactly how the accused products meet the limitations of his claims in this chart.…" |

The Federal Circuit in *Golden v. Google LLC* Case No. 22-1267 disclosed in "Discussion" that the Circuit reviewed the case "under the pleading standards set forth in *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007), and *Ashcroft v. Iqbal*, 556 U.S. 662 (2009), [a court must dismiss a complaint if it fails to allege "enough facts to state a claim to relief that is plausible on its face]." *Twombly*, 550 U.S. at 570; and, "plaintiff must allege facts that give rise to "more than a sheer possibility that a defendant has acted unlawfully." *Iqbal*, 556 U.S. at 678 (citation omitted)

The Federal Circuit in *Golden v. Google LLC* Case No. 22-1267 took notice that "in the patent context, th[e] court has explained that a plaintiff need not "plead facts establishing that each element of an asserted claim is met," *In re Bill of Lading Transmission and Processing Sys. Pat. Litig.*, 681 F.3d 1323, 1335 (Fed. Cir. 2012) (citing *McZeal v. Sprint Nextel Corp.*, 501 F.3d 1354, 1357 (Fed. Cir. 2007)), but must plead "'enough fact[s] to raise a reasonable expectation that discovery will reveal' that the defendant is liable for the misconduct alleged." *Id.* at 1341 (alteration in original) (quoting *Twombly*, 550 U.S. at 556)".

The Federal Circuit in *Golden v. Google LLC* Case No. 22-1267 goes on to say: "In the Google case, the district court again concluded that Mr. Golden's complaint was frivolous. Here, however, Mr. Golden's complaint includes a detailed claim chart mapping features of an accused product, the Google [Pixel 5] Smartphone, to independent claims from U.S. Patent Nos. 10,163,287, 9,589,439, and 9,069,189" ... "to the extent that the chart includes the "exact same language" as previously rejected charts, it is simply the language of the independent claims being mapped to" ... "[i]t attempts—whether successfully or not—to map claim limitations to infringing product features, and it does so in a relatively straightforward manner. We conclude that the district court's decision in the Google case is not correct with respect to at least the three claims mapped out in the claim chart. Mr. Golden has made efforts to identify exactly how the accused products meet the limitations of his claims in this chart."

Although the Federal Circuit did not specifically say "without a doubt, Google's smartphone products that include the ATAK software and CBRN plugin sensors are literally and/or under the doctrine of equivalents, infringing Golden's patents asserted in the case", the Federal Circuit imply to say under the "clear and convincing evidence" standard, Google's smartphone products that include the ATAK software and CBRN plugin sensors are more likely than not is directly infringing Golden's patents asserted in the case.

The Judge gives more influence on the decisions from previous cases that victimized Golden in a judicial system of systemic and structural racism, judicial bias in favor of white-owned corporations, and the deprivation of a Seventh Amendment right to a trial by jury, than to honor the decision handed down by a higher Federal Circuit court within the same jurisdiction.

**The Northern District of California Court Judge Haywood S. Gilliam, Jr. in Case No. 22-5246; determined Direct Infringement by or for the Government arises when there's a combined ATAK Software; CBRN Plugins; and, a Smartphone**

In *Larry Golden v. Google, LLC* NDC Case 3:22-cv-05246-RFL "Order Granting Motion to Dismiss with Leave to Amend" Document 41 Filed 08/10/23; the then presiding Judge Haywood S. Gilliam, Jr. agreed with the Defendant [Google] that the Google Pixel devices could only infringe Golden's asserted patents if a user were to add the additional ATAK application and CBRN plugins.

"Google argues that "Mr. Golden alleges that some Google Pixel devices could infringe his asserted patents if a user were to add an additional application, ATAK ... Google contends that "Mr. Golden thus alleges not that Google sells infringing Pixel devices, but that someone else could modify Google's Pixel devices, by adding non-Google software, to make them allegedly infringing." *Id.* (emphasis in original). Google argues that these allegations are not sufficient to support an infringement claim. *Id. **The Court agrees**.*"

"Even under the "less stringent standards" afforded pro se plaintiffs, *Erickson*, 551 U.S. at 94 (quotation omitted), Plaintiff's claims, as pled, only allege that Google's devices infringe the patents in issue if the end user downloads a particular application. Plaintiff includes a claim chart purporting to describe the components of the Google Pixel 5 (which Plaintiff asserts is "representative of all the alleged infringing products of Google asserted in this complaint") that allegedly map onto the elements of an independent claim for each of the asserted patents. See Compl. ¶ 53. As the below excerpt of Plaintiff's chart indicates, however, at least two elements of each independent claim included in the chart are allegedly satisfied only when the phone has the Android Team Awareness Kit (ATAK) downloaded."

Golden is the first admit, the ATAK software is not necessarily the problem. The mere existence of the ATAK software does not infringe Golden's patents. But once a third-party embodies the ATAK software with Golden's patented CPUs to carry out operational and functional instructions; embodies the ATAK software with Golden's patented smartphone to

enable the hardware and software to communicate with each other; and embodies the ATAK

software to make Golden's patented CBRNE devices detect; then we do have a serious problem.

| Google Pixel 5 Smartphone | Patent #: 10,163,287; Independent Claim 5 | Patent #: 9,589,439; Independent Claim 23 | Patent # 9,096,189; Independent Claim 1 |
|---|---|---|---|
| *Android Team Awareness Kit*, ATAK (built on the Android operating system) provides for a single interface for viewing and controlling different CBRN-sensing technologies, whether that is a wearable smartwatch that measures a warfighter's vitals (e.g., heart rate) or a device mounted on a drone to detect chemical warfare agents. | at least one sensor for chemical, biological, or human detection in communication with the at least one CPU; | the cell phone is at least a fixed, portable or mobile communication device interconnected to the cell phone detection device, capable of wired or wireless communication therebetween; and | the communication device is at least a fixed, portable or mobile communication device interconnected to a fixed, portable or mobile product, capable of wired or wireless communication therebetween . . . |
| *Android Team Awareness Kit*, ATAK (built on the Android operating system) is a digital application available to warfighters throughout the DoD. ATAK offers warfighters geospatial mapping for situational awareness during combat—on an end-user device such as a smartphone or a tablet. With DTRA's contribution, ATAK now includes chemical, biological, radiological, and nuclear (CBRN) plug-ins | one or more detectors in communication with the at least one CPU for detecting at least one of chemical, biological, radiological, or explosive agents; | at least one of a chemical sensor, a biological sensor, an explosive sensor, a human sensor, a contraband sensor, or a radiological sensor capable of being disposed within, on, upon or adjacent the cell phone; | wherein the communication device receives a signal via any of one or more products listed in any of the plurality of product grouping categories; |

See Compl. ¶ 53 at 23, 26-27.

"Even affording Plaintiff the benefit of the doubt, his own claim chart makes it clear that Defendant's products purportedly infringe because of the characteristics of the ATAK application. But Plaintiff's complaint alleges that ATAK is not made by Google, and he does not allege that ATAK comes pre-loaded on Google phones:" *Judge Haywood S. Gilliam, Jr.*

> "Through collaboration and innovation, the Defense Threat Reduction Agency has integrated its powerful, hazard-awareness-and-response tools into the Android Tactical Assault Kit (or the Android Team Awareness Kit, ATAK). ***ATAK is a digital application*** available to warfighters throughout the DoD. Built on the Android operating system, ATAK offers warfighters geospatial mapping for situational awareness during combat — ***on an end-user device such as a smartphone or a tablet***. With DTRA's contribution, ATAK now ***includes chemical, biological, radiological, and nuclear (CBRN) plug-ins***. See Compl. ¶ 18 at 13 (emphasis in original)."

In *FastShip, LLC v. United States*, the US Court of Appeals for the Federal Circuit held that to be manufactured under 28 U.S.C. Section 1498, an accused product must include each claim limitation so it is "suitable for use".

On June 5, 2018, in *FastShip, LLC v. United States*, the US Court of Appeals for the Federal Circuit affirmed ... a US Court of Federal Claims decision and interpreted the term "manufactured" as used in 28 U.S.C. Section 1498, which waives the US government's sovereign immunity and provides a remedy whenever a patented invention is used or manufactured by or for the government without a license from the patent owner, to require the accused product to include each asserted claim limitation so it is suitable for use ( (Fed. Cir. June 5, 2018)).

In a matter of first impression, the Federal Circuit interpreted the term "manufactured" in Section 1498:

- According to its ordinary, contemporary, common meaning, ruling that the plain meaning of "manufactured" encompasses products made or worked into a form that is suitable for use.
- In the context of the overall statutory scheme, concluding that interpreting "manufactured" so the product must be suitable for use aligns with the Federal Circuit's prior interpretation of "use" in Section 1498 requiring each claim limitation to be present in the thing invented.

As a result, the Federal Circuit concluded that a product is manufactured within the meaning of the statute when it is made to include each limitation of the thing invented and is therefore "suitable for use".

**The Northern District of California Court Judge Rita F. Lin in Case No. 22-5246; determined Direct Infringement by or for the Government arises when there's a combined ATAK Software; CBRN Plugins; and, a Smartphone**

In *Larry Golden v. Google, LLC* NDC Case 3:22-cv-05246-RFL "Order Granting Motion to Dismiss and Denying leave to File a Surreply" Document 68 Filed 04/03/24; the current presiding Judge Rita F. Lin agreed with the Defendant [Google] that the Google Pixel devices could only infringe Golden's asserted patents if a user were to add the additional ATAK application and CBRN plugins.

"As for the merits, the Court previously dismissed Golden's original complaint because it failed to allege either direct or indirect infringement of U.S. Patent Nos. 10,163,287 ("'287 Patent"), 9,589,439 ("'439 Patent"), and 9,096,189 ("'189 Patent") by Google. (See Dkt. No. 41.) The complaint's allegations made clear that whether Google's smartphones (Google Pixel 3, 3 XL, 3a, 3a XL, 4a, 4a (5G), and 5) allegedly infringed on the patents-in-suit depended on the end user's download of the Android Team Awareness Kit ("ATAK"), which is a third-party application not made by Google. (Id. at 5–6.) As the complaint did not allege that the Google smartphones themselves infringed on the patents, Golden failed to allege direct infringement."

"ATAK application. Golden's first claim of direct infringement (see FAC, Ex. G ("Ex. G") at 2–9) fails for the same reason as the original complaint: it requires the use of ATAK, a third-party application that the user must install on the accused product, for at least two elements of each asserted claim. (See id. at 6.) See *Nazomi Commc'ns, Inc. v. Nokia Corp.*, 739 F.3d 1339, 1346 (Fed. Cir. 2014) (finding that the defendants' products "do not infringe without modification—the modification of installing the required software")."

Both Northern District of California Court Judges Haywood S. Gilliam Jr. and Rita F. Lin determined the combined ATAK software, smartphone, and CBRN plugin sensors, describes a method, system, or apparatus that is covered in Golden's patents. The Judges also described how the DoD authorized or consented to the DTRA, Draper, and Google infringing Golden's patented combination.

28 U.S.C. § 1498(a): "*Whenever* an invention described in and covered by a patent of the United States is used or manufactured by or for the United States without license of the owner thereof or lawful right to use or manufacture the same, the owner's remedy shall be by action against the United States in the United States Court of Federal Claims for the recovery of his

reasonable and entire compensation for such use and manufacture … For the purposes of this section, the use or manufacture of an invention described in and covered by a patent of the United States by a contractor, a subcontractor, or any person, firm, or corporation for the Government and with the authorization or consent of the Government, shall be construed as use or manufacture for the United States."

Both Northern District of California Court Judges have communicated the case is outside their jurisdiction and as described, is in the jurisdiction of the United States Court of Federal Claims. "As § 1498(a) infringement actions are grounded in eminent domain and not defined by statute, the scope of what constitutes the unlawful taking of a license to use a patent is a creature of case law. As such, the basis for the USCFC's jurisdiction over infringement actions must be linked to the government's taking of a patent license through its "use or manufacture" of the patented invention "without license of the owner thereof or lawful right." *Decca Ltd. v. United States*, 640 F.2d 1156, 1166–67 (Ct. Cl. 1980)

**The United States Court of Appeals for the Federal Circuit Judges in Case No. 23-2120; agreed with the Northern District of California Court Judge in *Golden v. Samsung* that Direct Infringement by or for the Government arises when there's a combined ATAK Software; CBRN Plugins; and, a Smartphone**

In *Golden v. Samsung Electronics America, Inc.* Case: 23-2120, Document 28; *OPINION* filed for the court by Prost, Circuit Judge; Taranto, Circuit Judge and Chen, Circuit Judge. Filed: 02/12/2024.

"Mr. Golden's complaint alleged, in part, that Samsung's smartphones possess that claimed detector/sensor functionality on three alternative bases: (1) through the "Android Team Awareness Kit, ATAK," which is "[b]uilt on the Android operating system," involves "plug-ins" and "app specific software," was "[i]nitially created" by the "Air Force Research Laboratory" together with the "Defense Threat Reduction Agency," and is "available to warfighters throughout the DoD," Appx112 ¶ 55; Appx119, 127; (2) through add-on devices or modifications that utilize the smartphone's built-in camera, Appx111 ¶ 54, Appx124–25; and (3) through nine "standard sensors" which "can be used as 'biosensors,'" Appx126."

"Samsung moved to dismiss Mr. Golden's complaint, arguing that, among other things, Mr. Golden's complaint failed to plausibly state a patent-infringement claim. Appx146–48. More specifically, Samsung argued that Mr. Golden's complaint stated no alleged facts that went

beyond allegations that Samsung was making and selling smartphones that could be modified post-sale by others to perform the accused detector/sensor functionality. On that basis, Samsung said, there are no plausible allegations Samsung was engaged in directly infringing activities. Appx146–47."

"The district court agreed and dismissed Mr. Golden's complaint with prejudice, concluding, in part, that "[t]he allegations that his patents cover the identified functionalities included in Samsung's products are wholly unsupported and implausible on their face." Golden, 2023 WL 3919466, at *2."

"We reject Mr. Golden's appeal arguments and therefore affirm the district court's dismissal of his complaint."

## CONCLUSION

Pursuant to *28 U.S. Code § 144 - Bias or prejudice of judge*, Senior Judge Bruggink's decision to dismiss should stricken from the record; the Judge removed from this case; and the case transferred to another Judge.


Sincerely,


s/ *Larry Golden*

Larry Golden, *Pro Se* Plaintiff
740 Woodruff Rd., #1102
Greenville, SC 29607
(H) 8642885605
(M) 8649927104
Email: atpg-tech@charter.net

## **CERTIFICATE OF SERVICE**

The undersigned hereby certifies that on this 30th day of April, 2024, a true and correct copy of the foregoing "Plaintiff's Motion for Reconsideration and Notice of Pending Motion for Disqualification", was served upon the following Defendant via e-mail:

Grant D. Johnson

Trial Attorney

Commercial Litigation Branch

Civil Division

Department of Justice

Washington, DC 20530

Grant.D.Johnson@usdoj.gov

(202) 305-2513

s/ *Larry Golden*

Larry Golden, Pro Se

740 Woodruff Rd., #1102

Greenville, South Carolina 29607

atpg-tech@charter.net

864-288-5605

# EXHIBIT A

## PATENT CLAIMS

## for the

## DoD ("JPEO-CBRND") / DRAPER LABORATORY

## INITIATIVE

**Patent No. RE43,891**

44.    A vehicles' stall-to-stop system or vehicle slowdown system in signal communication with a pre-programmed automated system is adapted, modified, or designed to control the vehicles' stall-to-stop means or vehicle slowdown means, comprising:

an electrical system in electrical communication with at least one of a brake, a foot peddle, a radar, a camera, a navigational system, a light, a speed control, an ignition system, a steering wheel, a transmission, a fuel system, and a motor;

a computer system in signal transmission communication with at least one of the brake, the foot peddle, the radar, the camera, the navigational system, the light, the speed control, the ignition system, the steering wheel, the transmission, the fuel system, and the motor;

a receiver in electrical communication with the electrical system and adapted to receive at least one control signal from a pre-programmed automated system to activate a stall-to-stop means or vehicle slowdown means;

a receiver in computer communication with the computer system and adapted to receive at least one control signal in response to one of the vehicle's operating systems for monitoring the vehicle's condition upon exceeding a pre-programmed vehicle operating system parameter from the pre-programmed automated system to activate a stall-to-stop means or vehicle slowdown means such that the speed of the vehicle is initially decreased immediately after activation of the means upon initial receipt of the at least one control signal; and

wherein the at least one control signal is communicated from the receiver to the electrical system or the computer system to control at least one of the brake, the foot peddle, the radar, the navigational system, the light, the speed control, the ignition system, the steering wheel, the transmission, the fuel system, and the motor.

45.    The vehicles' stall-to-stop means or the vehicles' slowdown means of claim 44, further can be adapted, modified or designed to include a global positioning system (GPS) receiver adapted for communication with at least one satellite.

46.    The vehicles' stall-to-stop means or the vehicles' slowdown means of claim 44, further can be adapted, modified or designed to include a cellular communication device adapted for communication with at least one cell phone tower; further including, at least one satellite connection capable of communicating with the pre-programmed automated system; further including, at least one modem connection for short and long range radio frequency transmissions to and from the pre-programmed automated system.

47.    The vehicles' stall-to-stop means or the vehicles' slowdown means of claim 44, further can be adapted, modified or designed to include a vehicle system designed to perform as a brake override system for stopping or slowing a vehicle experiencing unintended acceleration.

48.    The vehicles' stall-to-stop means or the vehicles' slowdown means of claim 44, further can be adapted, modified or designed to include a vehicle system designed to perform as a pre-crash system for stopping or slowing a vehicle to prevent a crash.

49.    The vehicles' stall-to-stop means or the vehicles' slowdown means of claim 44, further can be adapted, modified or designed to include a vehicle system designed to perform as a reverse

acceleration slow-down system for stopping or slowing a vehicle traveling in reverse.

50.    The vehicles' stall-to-stop means or the vehicles' slowdown means of claim 44, further can be adapted, modified or designed to include a vehicle system designed to perform as a stabilization system for stopping or slowing a vehicle to prevent a vehicle turnover.

51.    The vehicles' stall-to-stop means or the vehicles' slowdown means of claim 44, further can be adapted, modified or designed to include a vehicle system designed to perform as a lane departure system for stopping or slowing a vehicle to prevent or minimize accidents when the vehicle begins to move out of its lane.

52.    The vehicles' stall-to-stop means or the vehicles' slowdown means of claim 44, further can be adapted, modified or designed to include a vehicle system designed to perform as a remote vehicle slowdown system for stopping or slowing a vehicle by remote means.

53.    The vehicles' stall-to-stop means or the vehicles' slowdown means of claim 44, further can be adapted, modified or designed to include a vehicle system designed to perform as an adjusted cruise control system for stopping or slowing a vehicle to prevent a crash.

54.    The vehicles' stall-to-stop means or the vehicles' slowdown means of claim 44, further can be adapted, modified or designed to include a vehicle system designed to perform as a door lock and unlocking system for stopping or slowing the vehicle and locking a terrorist, thief, or user trying to elude the law inside the vehicle.

55.    The vehicles' stall-to-stop means or the vehicles' slowdown means of claim 44, further can be adapted, modified or designed to include a vehicle designed to perform as a driverless or autonomous vehicle for stopping or slowing a vehicle that is in operation with or without a user, driver or operator inside the vehicle.

56.    The vehicles' stall-to-stop means or the vehicles' slowdown means of claim 44, further can be adapted, modified or designed to include a vehicle system designed to perform as a chemical, biological, radiological, nuclear and explosives detection system for stopping or slowing a vehicle when a harmful, hazardous, or dangerous compound or agent is detected.

## Patent No. 9,589,439

1.    A multi sensor detection system capable of identifying, monitoring, detecting, and securing those critical areas (e.g., U.S. borders), sites, locations and facilities vulnerable to terrorist activity that can be integrated with and interconnected to watchtowers to form a network, comprising:
        a communication device of at least one of a mobile communication device, a mobile communication unit, a portable communication device, portable communication equipment, a wired communication device, a wireless communication device, a monitoring site, a monitoring terminal, a web server, a desktop personal computer (PC), a notebook personal computer (PC), a laptop, a satellite phone, a smart phone, a cell phone, a Universal Mobile Telecommunications System (UMTS) phone, a personal digital assistant (PDA), a liquid crystal display (LCD)

monitor, a satellite, or a handheld, interconnected to a monitoring equipment for sending signals thereto and receiving signals therefrom;

a plurality of sensors for detecting or sensing humans that is at least one of a chemical human sensor, biological human sensor, radiological human sensor, infrared human detector, motion human detector, or image human detector, interconnected to or disposed within the multi-sensor detection system for sending signals thereto and receiving signals therefrom;

a mobile multi-sensor detection device that is at least one of a ground surveillance sensor, a surveillance radar sensor, a surveillance camera, or a stand-alone surveillance scanner, that is mounted in, on, or upon at least one of a car, a truck, a camper, a bus, a van, an unmanned aerial vehicle (UAV), an unmanned ground vehicle (UGV), or a utility vehicle, interconnected to the monitoring equipment for sending signals thereto and receiving signals therefrom;

## Patent No. 10,163,287

3.     Monitoring equipment that is at least one of products grouped together by common features of a computer terminal, personal computer (PC), laptop, desktop, notebook PC, handheld, cell phone, personal, digital assistant (PDA) or smart phone interconnected to a vehicle lock for communication therebetween; the monitoring equipment comprising:

a transmitter for transmitting signals and messages to at least one of a manned or unmanned aerial vehicle lock, a manned or unmanned ground vehicle lock, or a manned or unmanned sea vehicle lock;

a receiver for receiving signals from at least one of a manned or unmanned aerial vehicle lock, a manned or unmanned ground vehicle lock, or a manned or unmanned sea vehicle lock;

the monitoring equipment being capable of sending signals to engage (lock), disengage (unlock), or disable (make unavailable) at least one of a manned or unmanned aerial vehicle lock, a manned or unmanned ground vehicle lock, or a manned or unmanned sea vehicle lock, whereupon a signal is sent to the receiver of the monitoring equipment from at least one of the manned or unmanned aerial vehicle lock, manned or unmanned ground vehicle lock, or manned or unmanned sea vehicle lock, the signal comprising at least one of location data or lock status data to be sent to the monitoring equipment.

## Patent No. 11,645,898

1.     A pre-programmed stall, stop, vehicle slow-down system, that comprises at least one central processing unit (CPU), capable of:

processing instructions to stall, stop, or slow-down a vehicle when the vehicle receives a signal from at least one of a personal computer (PC), a cellphone, a smartphone, a laptop, a tablet, a PDA, or a handheld;

processing instructions to stall, stop, or slow-down a vehicle when at least one of a chemical hazard, a biological hazard, a radiological hazard; a nuclear hazard; or explosives have been detected;

processing instructions to stall, stop, or slow-down a vehicle when the vehicle is at least a driverless vehicle; a self-drive vehicle; an autonomous vehicle; a human controlled vehicle; a manned or unmanned convoy vehicle, or a manned or unmanned aerial, land, or sea vehicle; and,

**2.**    A vehicle, that comprises at least one onboard computer system, electronic system, fuel system, air system, braking system, ignition system, transmission system, or PowerDrive system, capable of:

stalling, stopping, or slowing down a vehicle when the vehicle receives a signal from at least one of a personal computer (PC), a cellphone, a smartphone, a laptop, a tablet, a PDA, or a handheld;

stalling, stopping, or slowing down a vehicle when at least one of a chemical hazard, a biological hazard, a radiological hazard; a nuclear hazard; or explosives have been detected;

stalling, stopping, or slowing down a vehicle when the vehicle is at least a driverless vehicle; a self-drive vehicle; an autonomous vehicle; a human controlled vehicle; a manned or unmanned convoy vehicle, or a manned or unmanned aerial, land, or sea vehicle; and,